UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMBER REINECK HOUSE,
COURTNEY ATSALAKIS, and
FAIR HOUSING CENTER OF
SOUTHEAST & MID
MICHIGAN, INC.,
     Plaintiff,
v.

CITY OF HOWELL, MAYOR
NICK PROCTOR, and TIM
SCHMITT,
     Defendants.
_____/

Case No.: 20-10203

Paul D. Borman
United States District Judge

Curtis Ivy, Jr.
United States Magistrate Judge

**REPORT AND RECOMMENDATION ON MOTIONS TO EXCLUDE
EXPERTS (ECF Nos. 42, 43, 45, 46, 47, 49)**

## I.   BACKGROUND

### A.   Procedural History

Plaintiffs Amber Reineck House, Courtney Atsalakis, and Fair Housing

Center of Southeast and Mid-Michigan, Inc., filed this civil rights case alleging

violations of the Fair Housing Act ("FHA"), the Americans with Disabilities Act

("ADA"), and Michigan's Persons with Disabilities Civil Rights Act

("PWDCRA") on January 27, 2020.  (ECF No. 1).  On June 16, 2021, Plaintiffs

and Defendants filed motions to exclude experts.  These motions were referred to

the undersigned for report and recommendation.  (ECF No. 50).  The undersigned

held a hearing on the motions on September 14, 2021. The matter is now ready for report and recommendation.

For the reasons discussed below, the undersigned **RECOMMENDS** Defendants' Motion to Exclude Jeffery Van Treese (ECF No. 42) be **GRANTED**, Plaintiffs' Motion to Exclude Patrick O'Keefe (ECF No. 43) be **GRANTED IN PART**, Plaintiffs' Motion to Exclude Richard Carlisle (ECF No. 45) be **GRANTED**, Plaintiffs' Motion to Exclude Rodney Arroyo (ECF No. 46) be **GRANTED IN PART**, Defendants' Motion to Exclude Brian Connolly (ECF No. 47) be **DENIED**, and Plaintiffs' Motion to Exclude Gerald Fisher (ECF No. 49) be **GRANTED**.

B.    <u>Factual Background</u>

Plaintiff Courtney Atsalakis founded nonprofit organization plaintiff Amber Reineck House ("ARH") in her sister, Amber Reineck's memory. Due to a controlled substance overdose, Plaintiff's sister perished on December 24, 2015. Plaintiff Atsalakis founded ARH for the purpose of acquiring residential properties located in Michigan that would subsequently provide housing and support services to women seeking recovery from substance abuse disorders. Plaintiff Fair Housing Center of Southeast and Mid-Michigan, Inc. ("FHC"), is a nonprofit organization aimed at ending discrimination in housing and public accommodations. On February 20, 2018, Atsalakis purchased a single-family residential property located

at 304 South Walnut Street in Howell, Michigan ("304 South Walnut" or "the property").  At the time of the purchase, her intent was to promptly sell the property to ARH which would later establish an affordable, eight-resident transitional living home for women in recovery from substance use disorders. (ECF No. 14, PageID.127, at ¶ 5).

To state Plaintiffs' claims generally, Plaintiffs accuse the defendants of blocking the establishment of ARH at 304 South Walnut from April 2018 to the filing of the amended complaint on March 17, 2020.

304 South Walnut is located in an area of the City of Howell zoned for single family occupancy.  Therefore, Atsalakis submitted an application for a Special Use Permit ("SUP") to Howell's Planning Commission on April 9, 2018, requesting approval to use the property as a sober living home for eight residents. (*Id.* at PageID.137, at ¶ 37-38).  Howell's Community Development Director, defendant Tim Schmitt, sent a letter to Atsalakis confirming receipt of the SUP application.  In the letter Schmitt further advised that the SUP would be considered at an upcoming meeting of the Planning Commission, but in the meantime the property could not be used as anything other than a single-family home for Atsalakis and her immediate family.  Schmitt also recognized unrest in the community regarding the proposed establishment of the sober living home, including rumors that residents had already moved in or would do so soon.  (*Id.* at

3

PageID.137-38, at ¶ 39-40).  Between April 2018 and March 2020, Plaintiffs were

informed through news articles, social media, and by Schmitt of community

members' disagreement over the proposed plan to house women recovering from

addiction at 304 South Walnut.

During May 2018, Howell's city planning consultant, Richard Carlisle,

confirmed Schmitt's decision to treat the proposed use of the property as similar to

adult foster care homes in evaluating the SUP application.  According to ARH, if it

had six or fewer residents living at 304 South Walnut, like adult foster care homes,

ARH's use of the property would be permitted as of right.  (*Id.* at PageID.142, at ¶

51).  In response to this assessment, during June 2018, Atsalakis announced her

intention to have only six residents housed at the property and withdrew the April

9, 2018, special use permit accordingly.  (*Id.* at PageID.144, at ¶ 54).  Atsalakis

was unaware of her right to submit a request for a reasonable accommodation from

existing zoning requirements for the proposed use of the property because

Howell's zoning ordinance did not contain a process for such an accommodation.

Subsequently, Schmitt emailed Atsalkis and revealed Howell required a

copy of the State license for the facility to qualify for the exception from the

single-family zoning requirement for homes with six or fewer residents, similar to

adult foster care homes.  As Michigan did not require sober homes to be licensed,

Atsalakis was unable to meet this request.  (*Id.* at PageID.144, at ¶ 57).  In

response to community opposition, on June 22, 2018, Schmitt recommended defendant Mayor Nick Proctor and the Howell City Council institute a one-year moratorium on applications for special land use permits. (*Id.* at PageID.147, at ¶¶63-64). The City later imposed a 12-month moratorium commencing July 23, 2018 and terminating July 22, 2019. (*Id.* at PageID.149, at ¶ 67). The moratorium was extended on a few occasions, ultimately to March 23, 2020. (*Id.* at PageID.159, at ¶ 98). During the moratorium, several proposed ordinance amendments were circulated. These proposed amendments, according to Plaintiffs, would have the effect of keeping sober living homes out of single-family residential neighborhoods. (*Id.* at PageID.150-51, 156-58).

On September 27, 2019, Atsalakis submitted a request to Howell for (1) the city to waive its requirements for special land uses to permit operation of the six-resident sober living home as a reasonable accommodation for disabled persons, and (2) an exception to the moratorium as a reasonable accommodation to permit ARH to begin operations as an ordinary rental property allowed as of right under the ordinance (as if it were an adult foster care facility). (*Id.* at PageID.152-53, at ¶ 78). The request was denied October 3, 2019. Atsalakis was informed she would be required to apply under the proposed ordinance following its adoption. (*Id.* at ¶ 79).

The city held a public hearing on January 15, 2020, during which the latest proposed ordinance amendment was considered.  Defendant Proctor made remarks indicating his desire to adopt the amendment and suggested any legal issues be addressed in subsequent lawsuits.  (*Id.* at PageID.158-59, at ¶¶ 95-96).  The amended zoning ordinance (the "2020 zoning ordinance") was adopted on March 9, 2020.  (*Id.* at PageID.160, at ¶ 99).  According to Plaintiffs, the 2020 zoning ordinance "imposes conditions on sober living home applicants that impose significant financial and logistical burdens on those applicants[.]"  (*Id.* at PageID.160, at ¶ 100).

Plaintiffs claim economic and non-economic damages due to Defendants' alleged stalling concerning consideration of the application for special use permit and imposing the moratorium, enactment of the allegedly discriminatory 2020 zoning ordinance, and otherwise preventing ARH from operating at 304 South Walnut.

Plaintiffs filed motions to exclude four of Defendants' designated experts; Defendants filed motions to exclude two of Plaintiffs' designated experts.  (ECF Nos. 42, 43, 45, 46, 47, 49).  Each will be addressed in turn.

## II.    LEGAL STANDARDS

Federal Rule of Evidence 702 requires the trial judge to perform a "gatekeeping role" when considering the admissibility of expert testimony.

*Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 597 (1993).  The rule provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

 Fed. R. Evid. 702.  The United States Supreme Court has established that Rule 702 requires district courts to ensure that expert testimony "rests on a reliable foundation and is relevant to the task at hand."  *Daubert*, 509 U.S. at 597; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (expanding *Daubert's* analysis of expert scientific testimony to cover expert testimony based on "technical" and "other specialized knowledge").  The Sixth Circuit has described the district court's gatekeeping function under *Daubert* as an "obligation . . . to exclude from trial expert testimony that is unreliable and irrelevant."  *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002) (internal quotation marks omitted).

The gatekeeping role progresses in three steps.  First, the witness must be qualified according to his or her "knowledge, skill, experience, training, or education." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (quoting Fed. R. Evid. 702).  Second, the expert's testimony must be relevant, in that it will help "the trier of fact to understand the evidence or to determine a fact in issue." *Id*.  "Whether an opinion 'relates to an issue in the case' or helps a jury answer a 'specific question' depends on the claims before the court." *Madej v. Maiden*, 951 F.3d 364, 370 (6th Cir. 2020).  "Thus, when analyzing the relevancy of expert testimony, a court should consider the elements that a plaintiff must prove." *Id.*

Third, the testimony must be reliable.  To determine whether expert testimony is "reliable," the court's role, and the offering party's responsibility, "is to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152.  The proponent of the testimony bears the burden to prove by a preponderance of the evidence that the testimony is reliable. *Wellman v. Norfolk & Western Railway Co.*, 98 F. Supp. 2d 919, 923 (S.D. Ohio 2000) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994)). Courts are not required to admit opinions or conclusions that are "connected to

existing data only by the *ipse dixit* of the expert."  *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

*Daubert* outlines several factors for courts to consider when evaluating the reliability of a witness's testimony.  These factors include: (1) whether a "theory or technique . . . can be (and has been) tested;" (2) whether the theory "has been subjected to peer review and publication;" (3) whether, with respect to a particular technique, there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation;" and (4) whether the theory or technique enjoys "general acceptance" within a "relevant scientific community." *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 429 (6th Cir. 2007) (citing *Daubert*, 509 U.S. at 592-94).  This inquiry is "flexible," however, and *Daubert's* factors "do not constitute a definitive checklist or test."  *Kumho Tire Co.*, 526 U.S. at 150 (emphasis in original, citation and internal quotation marks omitted).

Not all the factors apply in every case, especially where, as here, the proposed experts provided non-scientific opinions and testimony.  In *Kumho Tire*, the Supreme Court explained "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination."  526 U.S. at 141-42.  When evaluating the reliability of non-scientific expert testimony, the district court may forgo these

factors and focus on the reliability of the expert's personal knowledge or experience. *Thomas v. City of Chattanooga*, 398 F.3d 426, 431-32 (6th Cir. 2005). In this situation, the expert cannot ask a court simply to take his "word for it," but "'must explain how that experience leads to the conclusion reached . . . and how that experience is reliably applied to the facts.'" *Id.* at 432 (quoting Fed. R. Evid. 702 adv. comm. note).

"[R]ejection of expert testimony is the exception, rather than the rule, and [the court] will generally permit testimony based on allegedly erroneous facts when there is some support for those facts in the record." *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 530 (6th Cir. 2008) (internal quotations and citations omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see also Wellman v. Norfolk and Western Ry. Co.*, 98 F. Supp. 2d 919, 924 (S.D. Ohio 2000) (The Court's gatekeeper role "is not intended to supplant the adversary system or the role of the jury.") (citing *Daubert*, 509 U.S. at 596).

## III.   ANALYSIS AND RECOMMENDATIONS

### A.   Defendants' Motion to Exclude Jeffery Van Treese (ECF No. 42)

Plaintiffs' proposed expert, Jeffery Van Treese, is an attorney and Chief Executive Officer of the Michigan Association of Recovery Residences, Inc.

("MARR").  In his role as CEO, he operates and manages the certification process for all recovery residences in Michigan.  (ECF No. 42-4, PageID.507, at 28:12-18).  He has over six years of "experience working with operators of recovery residences."  (ECF No. 42-3, PageID.612).

Van Treese provided an "expert opinion regarding the number of women's recovery residences needed" in Howell.  (*Id.*).  Relying on the *SAMSHA, Center for Behavioral Health Statistics and Quality, National Survey on Drug Use and Health*, published in 2014, Van Treese estimated there are 840,000 Michigan residents suffering from substance use disorder.  His interpretation of the *Survey* did not require him to use any specialized knowledge or training, he did not conduct an independent review of the facts in the survey, nor did he attempt to locate more current statistics for the State of Michigan.  (ECF No. 42-4, PageID.556-58).  Van Treese opined 5% of the estimated 840,000 persons suffering from substance use disorder could benefit from a stay in a recovery residence.  (ECF No. 42-3, PageID.613).  The 5% figure is an estimate based on discussions Van Treese had with other professionals who work in the area of substance use recovery, including the CEO of the National Alliance of Recovery Residences, the national body of MARR.  (ECF No. 42-4, pageID.558-62).  To accommodate this number, he stated Michigan has a need for 48,000 beds in recovery residences, half of which should be allocated to women.  To opine there

11

should be an equal number of men's and women's beds available, Van Treese relied on his personal estimate that the population is split equally between the genders and his assumption that the number of citizens with substance use disorders is also equally split; he did not have any evidence to support these assumptions.  (ECF No. 42-2, PageID.566).  Finally, flowing from his earlier estimates and assumptions, Van Treese estimated the City of Howell needs approximately 20 women's recovery residence beds allocated between three recovery residences.  (ECF No. 42-3, PageID.613).

Defendants raise the following arguments: (1) Van Treese has not shown any specialized knowledge or training which would qualify him to opine on the need for sober living homes; (2) his expert report, opinion, and testimony are unreliable because they rest upon the 2014 study regarding which he did not perform an independent evaluation and he did not base his opinions on current research; (3) his expert report, opinion, and testimony are irrelevant to support Plaintiffs' claims or allegations; and (4) even if the opinion and testimony were relevant, they should be excluded because they are unfairly prejudicial.  (ECF No. 42).  Plaintiffs argue Van Treese is qualified by his knowledge and experience to opine on the need for recovery residences in Howell, his opinion is reliable, and his opinion is relevant to the claims and damages asserted in this case.  (ECF No. 57).

Even if Van Treese's years of experience working with recovery residences and as CEO of MARR qualified him to provide testimony as an expert regarding the need for sober living homes in Michigan, his opinion and testimony should be excluded as irrelevant. Evidence is relevant if it relates to a fact at issue and helps the jury determine that fact at issue or to understand the evidence. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 590-91. Testimony is not relevant if it simply presents information or conclusions that the jury can reach on its own or is not connected to the plaintiff's injuries. *United States v. Freeman*, 730 F.3d 590, 597 (6th Cir. 2013).

Van Treese offered his opinion regarding the need for sober living residences in Howell, Michigan. The number of recovery residences Howell should have for women is not an issue in this case. Plaintiffs raised claims under the Fair Housing Act and for disability discrimination under federal and state law. To establish liability, Plaintiffs must demonstrate, for example, the defendants discriminated against them or persons with substance use disorders because of a disability and defendants refused to make reasonable accommodations in the zooming ordinance or other City policies or procedures. *See* 42 U.S.C. §§ 3604, 3617, 12132, 12203. The parties are not contesting either the general need or usefulness of sober living residences, nor the number of such residences which should be located in Howell. Whether Howell should have 20 beds for women has

no tendency to make it more or less likely that Plaintiffs were discriminated against because of a disability or were illegally refused reasonable accommodations.  The report and opinions should be excluded.

Plaintiffs insist Van Treese's testimony is relevant because the defendants and their proposed expert, Richard Carlisle, made statements expressing that Howell had a sufficient number of recovery residences in the city.  The defendants and Carlisle, according to Plaintiffs, overlooked the fact that it was not until the end of 2020 that Howell had a recovery residence devoted to women only.  But whether the defendants made erroneous or misguided statements about the number of recovery residences in Howell, or how many recovery residences Howell should have, is not an issue the jury must determine in this case.  Further, they argue the testimony is relevant because Defendants raised the availability of recovery residences in Howell in their Motion for Summary Judgment.  In support of their argument that Plaintiffs lack standing to bring their claims, Defendants argued the harm alleged was purely hypothetical because Howell had at least two sober living homes at the time of the moratorium, and in 2020 approved two more sober living homes for women under the new ordinance.  (ECF No. 44, PageID.1154).  Although Defendants discussed the number of sober living homes existing at that time in Howell, Plaintiffs have not demonstrated Van Treese's opinion is relevant to rebut Defendants' standing argument.  What is more, Plaintiffs did not invoke

14

Van Treese's opinion or discuss a need for additional recovery residences in Howell in response to the standing argument.  (*See* ECF No. 58, PageID.8006-07).

Plaintiffs also assert Van Treese's opinion is relevant to the question whether Plaintiff's proposed accommodations were necessary for people with substance use disorder to have equal housing opportunity and whether the sober living homes would have resulted in a fundamental alteration of the neighborhood. (ECF No. 57, PageID.7818).  While Plaintiffs assert there is a connection between Van Treese's testimony and their claims, the connection was not made plain.  It is not clear how Van Treese's opinion that Howell should have 20 beds for women would assist the trier of fact in determining whether the lack of accommodations for the property violated the Fair Housing Act and the ADA or whether the sober living home would have fundamentally altered the neighborhood.  Further, Plaintiffs contend expert testimony confirming the unmet need for sober living homes explains the Fair Housing Center's damages related to "frustration of mission."  (*Id.* at PageID.7818-19).  However, according to the amended complaint and interrogatory responses, none of the Fair Housing Center's claimed damages relate to advocating that Howell needs more beds for women, specifically, with substance use disorders, and that Howell thwarted the advancement of additional sober living homes for women.  (*See* ECF No. 14, PageID.164-66, at ¶¶114-20; ECF No. 43-2, PageID.708-09).

In light of the finding that Van Treese's testimony should be excluded because it is not relevant, the undersigned will not address Defendants' remaining arguments.  Defendants' motion to exclude Jeffery Van Treese as an expert witness (ECF No. 42) should be **GRANTED**.

B.     Plaintiffs' Motion to Exclude Patrick O'Keefe (ECF No. 43)

Patrick O'Keefe was retained by the defendants to provide expert testimony on Plaintiffs' alleged damages.  (ECF No. 43-3, PageID.723).  O'Keefe is a Certified Public Accountant and the Founder and CEO of a strategic and financial advisory firm.  The firm, among other things, provides valuation and litigation support in quantifying economic damages in business disputes.  (ECF No. 43-4, PageID.735).  O'Keefe's qualifications to offer expert opinion on the issue of damages are not contested.  Plaintiffs ask the Court to exclude O'Keefe's opinions and testimony on three bases: (1) his opinions and testimony regarding Plaintiffs' economic damages are unreliable and unhelpful to the jury, (2) his opinions on non-economic damages improperly invade the province of the jury, and (3) he should be precluded from expressing opinions on categories of damages which were not contained in his expert reports.

1.     Economic Damages

Plaintiffs' economic damages include: (1) Atsalakis's costs related to the purchase of the property, (2) Atsalakis's lost investment income; (3) ARH's lost

grant and donation income, (4) ARH's legal fees and zoning costs, (5) ARH's diversion-of-resources and frustration-of-mission damages, and (6) the FHC's diversion-of-resources and frustration-of-mission damages.

a.    Purchase of 304 South Walnut

Atsalakis's claim for economic loss regarding the property includes $275,000 to purchase the property, fees and costs associated with the purchase (closing costs, property taxes, etc.), $6,341.44 in legal fees, and $25,135.65 in repairs and maintenance, among other costs and fees, totaling $337,788.69.  (ECF No. 43-1, PageID.687; ECF No. 43-3, PageID.724).

O'Keefe concluded there are no economic damages related to the purchase of the property.  He found the increase in the value of the property coupled with the income Atsalakis has earned from renting the property (to mitigate damages) meets or exceeds the claimed total in damages.  More specifically, O'Keefe reviewed the current estimated value of the property on publicly accessible real estate websites such as Zillow and Realtor.com.  (ECF No. 43-3, PageID.725). These websites all estimated the value to be above $320,000, which is nearly the total amount of claimed damages in this category.  As additional support for the rise in value, in the preliminary report O'Keefe also stated the "Michigan housing market continues to be robust with rising construction costs and a limited supply of existing homes."  (ECF No. 43-4, PageID.740).  In addition to the increase in

value, O'Keefe calculated Atsalakis has earned approximately $47,000 in income

from renting the property since September 1, 2018.  (ECF No. 43-3, PageID.726).

Plaintiffs do not dispute that Atsalakis has earned $47,000 in rental income.  Based

on the foregoing, O'Keefe opined the current estimated value of the home and the

rental income approximate or exceed the damage claim.  (*Id.*).  Therefore, he

opined there are no economic damages related to the property.  (*Id.*)

Plaintiffs argue O'Keefe's opinions are unreliable and unhelpful to the jury.

They contend the real estate websites O'Keefe used to estimate the value of the

property are not reliable and O'Keefe did not consult with a real estate broker, nor

did he obtain an appraisal of the property or conduct an independent review of the

value of the property.   (ECF No. 43, PageID.634-37).

Defendants maintain O'Keefe's reliance on multiple public real estate

websites was permissible—the reliability of those websites is bolstered by the fact

that all the websites estimated an increase in value.  (ECF No. 54, PageID.7319-

20).  In addition, Defendants assert O'Keefe regularly analyzes real estate and the

housing market as part of the services offered by his firm.

The defendants and O'Keefe have not established public websites such as

Zillow and Realtor.com are reliable and generally accepted sources for property

valuation.  There is no information in the record regarding how those websites

calculate property values nor information regarding the use of those websites by

real estate or property valuation professionals.  O'Keefe should not be permitted to testify to the contents of those public websites or to rely on property value estimates provided by those websites.

O'Keefe can, however, testify to the general increase in property values in Michigan.  At his deposition, O'Keefe testified he based his statement that Michigan has a robust real estate market on his experience in business valuation and the purported obviousness of the state of the real estate market.  (ECF No. 43-5, PageID.850-51).  He did not conduct a formal analysis of the Michigan housing market, but as part of his business, he and his team regularly communicate with brokers on other properties, so he was generally aware of rising home values.  (ECF No. 43-5, PageID.852, 8555-56).  O'Keefe's background provides a reliable foundation for his conclusion that the housing market in Michigan is robust and that property values generally have risen.

However, O'Keefe's opinion and testimony regarding these damages should be excluded because it would not be helpful to the jury.  As Plaintiffs explained in their brief, the jury is capable of performing simple addition and subtraction.  The jury is also capable of understanding the concept of mitigation of damages, and subtracting mitigated amounts from the claimed damages without the help of an expert.  The jury will be adequately apprised of the need to subtract from the damages any amounts mitigated through jury instructions.  Accordingly, O'Keefe

19

should be precluded from offering an opinion on the ultimate question of

Atsalakis's damages, but he may be offered for the limited purpose of explaining

the rise in Michigan's housing market as discussed above.

b.     Atsalakis's Lost Investment Income

Plaintiff Atsalakis claims lost interest and return on investment on the

money she used to purchase 304 South Walnut.  She alleges she would have

recouped this money if she was able to sell the property to ARH shortly after the

purchase, as initially planned.  Due to ARH's inability to run a sober living home

at the property, she has not yet sold the house to them.  Atsalakis claims the money

she used to purchase the property and spent on the legal issues leading up to this

lawsuit would have earned interest had it remained in her investment accounts.

(ECF No. 43-1, PageID.687).  These accounts, according to Atsalakis, appreciated

since the time of the purchase.  (ECF No. 43, PageID.638).

Plaintiffs assert O'Keefe did not opine on this category of damages, and thus

should be precluded from offering an opinion at trial.  (*Id.* at PageID.638-39).

Even if lost investment income were within the scope of O'Keefe's reports,

Plaintiffs contend this testimony is inadmissible because it is unhelpful to the

jury—lost income is an economic concept the jurors will easily grasp.  (*Id.* at

PageID.639-40).  In response, Defendants assert O'Keefe addressed the claim of

lost investment income in paragraph nine of his supplemental report.  Defendants

appear to argue O'Keefe's lack of robust discussion of the lost investment stems from Plaintiffs' failure to fulfill their duty pursuant to Fed. R. Civ. P. 26(a) to disclose all economic damages and provide evidence and supporting calculations. Atsalakis did not provide documentation related to this category until after O'Keefe provided his supplemental report, and that documentation did not include analysis. Finally, Defendants assert lost investment income is not a simple concept for jurors to understand without expert assistance. The jury would need expert testimony to understand returns on investment and appreciation over time. (ECF No. 54, PageID.7322-24).

Defendants' arguments in favor of O'Keefe's expert report are red herrings and unconvincing. O'Keefe's "discussion" of Atsalakis's lost investment income in paragraph nine of his report is merely a recitation of her deposition testimony. Atsalakis stated that even if she recouped the purchase money, she has lost the income and return on investment on those sums, which have appreciated. (ECF No. 43-3, PageID.725). O'Keefe did not offer an opinion related to this category of damages. Pursuant to Fed. R. Civ. P. 26(a)(2)(B), an expert report must contain a statement of all the opinions the expert will express and the basis and reasons for them. The report must provide sufficient detail to ensure "opposing counsel is not forced to depose an expert in order to avoid an ambush at trial." *R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010). An opinion not

stated in the report cannot be offered later.  Admittedly, it appears not all the

documentation was available to O'Keefe prior to his supplemental report.  To

remedy this, Defendants could have moved to allow O'Keefe to file a second

supplemental report to discuss and opine on Atsalakis's lost investment, but they

failed to do so.  As a result, O'Keefe should not be allowed to later opine on this

category of damages.

Further, though the concept of lost interest and return on investment may be

a more difficult concept for the average juror, O'Keefe cannot be used to explain

the concepts and methodologies because he did not do so in either of his reports.

Thus, any discussion of the computation of these damages, and opinions therefrom,

would be beyond the scope of O'Keefe's report and should be excluded.

c.     ARH's Lost Grant and Donation Income

Plaintiff ARH claims economic losses from the "deprivation of grant

funding and donations, as Defendants' discriminatory conduct has limited their

ability to fundraise and apply for grants."  (ECF No. 43-1, PageID.688).

Incorporated into the interrogatory response by reference was ARH's monthly

treasurer's reports (not provided to the Court).  The reports purportedly show the

donations received by ARH each month.  (ECF No. 43, PageID.640).  ARH's

corporate designee, Rebecca Mayo (ARH's Treasurer), testified at her deposition

that Howell's conduct negatively impacted donations.  Donations did not increase

until after ARH opened its first sober living home in 2020.  (ECF No. 43-6, PageID.1015).  She also stated she had not performed any financial analytics to quantify the direct impact on donations.  However, there had been no decrease in gala revenue since 2018 (except 2020 because of the pandemic).  The gala is ARH's largest source of donations.  (*Id.* at PageID.966, 984, 1020).  As for grants, Ms. Mayo testified ARH does not have records of all grants applied for.  Ms. Mayo stated when ARH was started they applied for a $25,000 grant, but were not selected.  She further testified that ARH focused on obtaining a house as opposed to grants because it was difficult to receive approval for them.  (*Id.* at PageID.968-69).

On the issue of donations, O'Keefe reviewed Ms. Mayo's testimony and the fact that she had not performed financial analytics to quantify the direct impact of Defendants' alleged conduct on donations.  He stated, "Plaintiffs have not provided any evidence that there has been a loss in revenue.  Alleging damages in this area is speculative and without sufficient evidence."  (ECF No. 43-4, PageID.728-29).  On the issue of grants, O'Keefe summarized Ms. Mayo's testimony and concluded "[t]he issue of damages for grants is speculative at best."  (ECF No. 43-3, PageID.728).  At the end of his supplemental report, O'Keefe concluded "Plaintiffs have failed to quantify and prove their damages related to the Defendants' alleged

discriminatory conduct that limited their ability to fundraise and apply for grants."
(ECF No. 43-3, PageID.730).

Plaintiffs first argue O'Keefe's opinions or statements are little more than a
"cursory" mention of an opinion, and thus do not satisfy the requirement that a
report contain a complete statement of all the opinions and the bases and reasons
for the opinions pursuant to Fed. R. Civ. P. 26(a)(2)(B)(i).  They point out the
monthly financial reports were available to Defendants prior to O'Keefe's report,
yet O'Keefe did not review those reports.  At the hearing, counsel for Plaintiffs
argued further that statements such as "Plaintiffs have not provided sufficient
evidence" of lost revenue or "Plaintiffs failed to quantify and prove their damages"
improperly encroach on the role of the Court to explain burdens and standards to
the jury through jury instructions.  Defendants respond that it is Plaintiffs' duty to
provide documentation and supporting calculations of economic damages, and they
failed to do so.  (ECF No. 54, PageID.7326).  At the hearing, Defendants' counsel
asserted some financial documentation was provided after O'Keefe submitted his
supplemental report.

In the view of the undersigned, O'Keefe should be precluded from testifying
and opining on ARH's lost grant and donation income as his testimony will be
unhelpful to the jury.  First, O'Keefe did not review any financial documentation
related to this category of damages.  His expertise, and thus his usefulness to the

jury, is in evaluating financial documents and quantifying damages.  He did not do that in this instance.[1]  Accordingly, there is no utility in his testimony on ARH's lost grant and donation claim.  Second, whether Plaintiffs have adequately supported and proved their damages is a determination for the jury, not an expert witness.

### d.    ARH's Legal Fees and Costs

There are two sets of legal fees and costs ARH seeks to recover as damages. The first were incurred during the special use application process and interactions with Defendants prior to the filing of the lawsuit.  These fees and costs were included in Atsalakis's calculations for damages related to the purchase of the property, discussed above.  The second set of costs and fees were allegedly incurred by ARH seeking to open another house in Howell pursuant to the 2020 amended zoning ordinance.[2]  (ECF No. 43-1, PageID.686-88).  ARH asserts it would not have incurred these fees and costs if not for Defendants' discriminatory acts.  (ECF No. 43, PageID.643).

Plaintiffs seek an order prohibiting O'Keefe from opining on this category of damages.  They argue O'Keefe did not discuss or opine on legal fees and costs in

---

[1] Again, Defendants blame Plaintiffs for not providing adequate documentation, at least not until after O'Keefe issued his reports.  Defendants did not attempt to provide a supplemental report.

[2] It is not clear that Plaintiffs would be entitled to recoup legal fees and costs related to the Michigan Avenue house as issues related to that house are not part of this lawsuit.

either of his reports, and thus he should be prohibited from doing so now. Especially troubling to Plaintiffs is O'Keefe's deposition testimony.  He stated he believed legal fees and costs associated with obtaining a zoning variance were not the result of discrimination, but rather are part of the process.  (ECF No. 43, PageID.643-44; ECF No. 43-5, PageID.897).  According to Plaintiffs, his testimony amounts to the improper legal conclusion that costs and fees were not incurred as a result of discrimination.

Defendants argue O'Keefe is qualified to testify regarding fees and costs. Defendants, however, do not contest the fact that O'Keefe did not discuss or opine on legal fees or costs, specifically, in either of his reports.  Any opinions regarding legal fees and costs should be excluded pursuant to Fed. R. Civ. P. 26(a)(2)(B)(i), which requires expert reports to contain all the opinions about which the expert will testify.  Violation of Rule 26(a) can be excused upon a showing that failure to comply was "substantially justified or harmless."  *Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776, 782 (6th Cir. 2003).  Defendants made no effort to show the failure was substantially justified or harmless.

e.    ARH's Diversion of Resources and Frustration of Mission

ARH claims damages for diversion of resources and frustration of mission as a result of being prevented from opening a sober living home.  Because Plaintiffs could not open the home, they were "unable to provide the core services [ARH]

was formed to provide." (ECF No. 43-1, PageID.688). ARH was "forced to divert resources" from the mission to address Defendants' conduct.

O'Keefe mentioned frustration of mission twice in his supplemental report. First, he stated that Ms. Mayo testified the failure to fulfill ARH's mission of getting a house in a timely manner caused damage to Plaintiffs' reputation, resulting in a decrease of donations. (ECF No. 43-3, PageID.728). Following this statement is the discussion of Ms. Mayo's testimony regarding donations, discussed above. Because the discussion that follows is about donation-related damages, contrary to Defendants' assertion, O'Keefe did not opine on frustration of mission damages. The second mention is in the conclusion. O'Keefe stated, "Plaintiffs have failed to quantify and prove their damages related to the Defendants' alleged discriminatory conduct that . . . [caused] frustration of mission. . . . Any such damages should be considered speculative." (*Id.* at PageID.730). There is no developed discussion of frustration of mission in the report. At his deposition, O'Keefe testified he could quantify frustration of mission damages only "[i]f presented with the economic factors where the mission has not achieved what it required."[3] (ECF No. 43-5, PageID.866).

---

[3] In discussing O'Keefe's deposition testimony, Plaintiffs stated O'Keefe does not have experience quantifying frustration of mission as a litigation expert. (ECF No. 43, PageID.645). He went further, however, to state he has experience quantifying frustration of mission as a "turnaround expert in having to deal with not-for-profits that have had issues in serving the community." (ECF No. 43-5, PageID.866). Plaintiffs do not vigorously contest O'Keefe's qualification to opine on this category of damages.

Plaintiffs argue O'Keefe's statement that Plaintiffs failed to quantify and prove their damages is cursory and insufficient pursuant to Fed. R. Civ. P. 26(a)(2)(B)(i). They further argue O'Keefe's testimony will be unhelpful to the jury, as the concepts of diversion of resources and frustration of mission are within the grasp of the average juror. Finally, Plaintiffs contend his testimony will be prejudicial because it improperly tells the jury what result to reach by implying these damages must be quantified to be proven. (ECF No. 43, PageID.645-46).

In response, Defendants imply the lack of robust discussion of these damages in O'Keefe's report falls on the Plaintiffs—Plaintiffs carry the burden to substantiate their alleged damages with data, yet they failed to do so. They contend O'Keefe's testimony will help the jury because to recover damages for frustration of mission, there must be evidence tying the damages to Defendants' alleged wrongdoing. (ECF No. 54, PageID.7327-28) (citing *Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 2015 WL 853193, at *4 (S.D. Ohio Feb. 26, 2015)).

Defendants' arguments are unavailing. O'Keefe's opinions or statements regarding this category of damages are unhelpful to the jury and invade the province of the jury. The testimony would be unhelpful because O'Keefe is not imparting specialized knowledge to aid the jury in quantifying damages. Furthermore, an expert is not required to the explain to the jury there must be

evidence tying damages to the defendants' wrongdoing.  That is the judge's role, and it is for the jurors to determine whether Plaintiffs' have established their damages.

       f.     FHC's Economic Damages

O'Keefe did not offer an opinion on FHC's claimed damages in his reports, and confirmed this at his deposition.  (ECF No. 43-5, PageID.910).  Accordingly, he may not offer such an opinion in this case.  Fed. R. Civ. P. 26(a)(2)(B)(i). Defendants did not address O'Keefe's failure to opine on FHC's damages.  Rather, they argued Plaintiffs did not prove the damages, which is irrelevant for present purposes since O'Keefe did not opine on damages.  (ECF No. 54, PageID.7328-29).

       2.     Non-economic Damages

Plaintiffs' non-economic damages include Atsalakis's claim for emotional distress damages, Astalakis and ARH's reputational harm, and punitive damages. Like the economic damages, O'Keefe concluded there was insufficient financial documentation to establish these damages, and that "Plaintiffs have failed to quantify and prove" their economic damages.  (ECF No. 43-3, PageID.730-31).

Plaintiffs argue O'Keefe should be prohibited from testifying on non-economic damages because his reports on the same are cursory in violation of Fed. R. Civ. P. 26(a)(2)(B)(i).  Plaintiff's assert O'Keefe's conclusion that Plaintiffs

failed to quantify and prove their non-economic damages is prejudicial and improperly tells the jury what result to reach.  Finally, specifically regarding punitive damages, Plaintiffs contend punitive damages are entirely within the purview of the jury; expert testimony on the subject is inappropriate.  (ECF No. 43, PageID.648-52).

In response to these arguments, Defendants contend (1) Plaintiffs did not provide evidence related to non-economic damages, (2) what is prejudicial is Plaintiffs' assertion that damages exist merely because an act is committed, and (3) O'Keefe adequately addressed non-economic damages in his report.  Confusingly, Defendants also stated, "Mr. O'Keefe is not offering an opinion on Plaintiffs' alleged non-economic damages," yet their argument is in support of O'Keefe's statements regarding the same.  (ECF No. 54, PageID.7329-30).

The undersigned suggests O'Keefe be prohibited from offering opinions and testimony on punitive damages.  Not only did O'Keefe testify that juries typically decide punitive damages without expert witness opinion, courts generally agree. *See In re Welding Fume Prods. Liability Litig.*, 2010 WL 7699456, at *49, n. 190 (N.D. Ohio June 4, 2010) (citing *Voilas v. General Motors Corp.,* 73 F. Supp. 2d 452, 464 (D.N.J. 1999) ("the assessment of possible ranges of punitive damages is not a proper subject for an expert's report or testimony")).  Further, O'Keefe made no attempt to discuss the possible considerations involved in calculating punitive

damages.  Because punitive damages are specially within the province of the jury, O'Keefe's opinions and testimony on the subject should be prohibited.

As for emotional distress and reputational harm damages, again, O'Keefe's opinion is unhelpful because he did not offer specialized knowledge or expertise to assist the jury in evaluating or quantifying these damages and his opinion invades the province of the judge and jury.  He should be precluded from offering such testimony.

In sum, O'Keefe's opinions and testimony should be excluded except that he may offer testimony regarding the housing market in Michigan.

C.    Plaintiffs' Motion to Exclude Richard Carlisle (ECF No. 45)

Defendants' proposed expert, Richard Carlisle, worked as a community planning consultant for Howell.  In that role, relevant to this case, Carlisle advised defendant Schmitt during the review of Atsalakis's 2018 application for special use permit and advised the city during the consideration and adoption of the new ordinances.  Plaintiffs do not contest Carlisle's qualification to testify as an expert witness on city planning and zoning.  Carlisle is a certified planner with 40 years of experience as a community planner drafting planning, zoning, and enabling legislation; establishing state-wide community planning policy; and "guiding development of diverse communities throughout southeast Michigan."  (ECF No. 45-1, PageID.3319).  Carlisle is a member of the American Institute of Certified

Planners since 2000 and has served on the Board of Michigan Association of

Planners.  He has worked as a planning consultant for Howell for 37 years.  (*Id.* at

PageID.3309).  He has been qualified as an expert witness in the Eastern District of

Michigan.  (ECF No. 53-2, PageID.7301).

Plaintiffs brought forth multiple arguments for the exclusion of Carlisle's

expert testimony.  They first challenge Carlisle's report, opinions, and testimony as

unreliable *ipse dixit* testimony.  They assert Carlisle did not explain how or why he

reached his conclusions.  (ECF No. 45, PageID.3286-90).  Defendants, in turn,

argue the foundation of Carlisle's opinions is based on his knowledge, skill,

training, and education.  Although Defendants addressed some of the case law on

which Plaintiffs relied, they did not directly address the specific examples of

opinions Plaintiffs contend demonstrate unreliability.  (ECF No. 53, PageID.7280-

81).

In assessing the reliability of Carlisle's opinion, the undersigned does not

look to the *Daubert* factors as they do not readily apply to this non-scientific expert

report and testimony.  *See Thomas v. City of Chattanooga*, 398 F.3d 426, 431-32

(6th Cir. 2005); *see also Tennessee Bank Nat. Ass'n v. Baretto*, 268 F.3d 319, 334-

35 (6th Cir. 2001).  As stated above, an expert may rely on his experience in

making conclusions, but if the expert is relying solely or primarily on experience,

as Carlisle did in his report, then the witness "must explain how that experience

leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note (citing *Daubert,* 43 F.3d at 1319). The court may not take the expert's word for it. *Thomas*, 398 F.3d at 432. In determining the admissibility of experience-based testimony, a court must analyze whether the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho,* 526 U.S. at 152.

Plaintiffs challenge Carlisle's four opinions (stated in the conclusion to Carlisle's report): (1) Howell advanced a legitimate governmental interest in protecting public health, safety, and welfare while allowing for a reasonable accommodation for persons with disabilities in its handling of Plaintiffs' special use application and the adoption of new zoning ordinances, (2) Howell has never questioned the need for sober living homes, (3) Howell Zoning Administrator defendant Schmitt made a reasonable interpretation of the former zoning ordinance to allow the 2018 application to be submitted for a use that was not listed in the ordinance (i.e. treating the proposed sober living home as an adult foster care facility), and (4) Howell has historically recognized its responsibility to protect the health, safety, and welfare of its residents, including those with disabilities. (ECF No. 45-1, PageID.3316-17).

The undersigned agrees with Plaintiffs that Carlisle never expressly connected his opinions to his knowledge and experience; he never stated a rationale for his conclusions.  At the hearing on the motion, Defendants' counsel insisted Carlisle's rationale is clear from the report—Carlisle outlined his analysis and used his knowledge to make his assessments.  As explained below, however, even accepting Carlisle's specialized knowledge and experience working with Howell for 37 years, Carlisle left analytical gaps in his report.

The first challenged opinion presumably is about the zoning ordinance amendments that were enacted in early 2020.  Carlisle devoted a section of his report to the "Consideration and Adoption of the new Zoning Ordinance Sections." Therein, he recalled his personal involvement in the process and facts about sober living homes.  Carlisle recalled that the city asked him to conduct a review of sober living homes and the like.  He found, among other things, that sober living homes are not required to have a license from the State of Michigan.  Carlisle then cited an article written by an intern for the Home of New Vision.  The intern addressed issues associated with the lack of governmental oversight of sober living homes, including the fact that it can be difficult to choose a "good" home from a "bad" home.  Then, Carlisle stated the lack of regulation could result in serious consequences for the residents of the home and the neighborhood.  (ECF No. 45-1, PageID.3313-16).  Finally, he stated, "The City advanced a legitimate

governmental interest to protect public health, safety, and welfare by regulation of all transitional homes, including sober living homes," (*id.* at PageID.3314), and allowed for a reasonable accommodation for persons with disabilities (*id.* at PageID.3316).  Carlisle later testified he relied on the Michigan Zoning Enabling Act (which "speaks to public health, safety, and welfare"), and his "general experience as a planner" and his experiences testifying as an expert zoning witness to come to this conclusion.  (ECF No. 45-2, PageID.3505).

Missing from Carlisle's report is an explanation of how his knowledge and experience as a planner and expert zoning witness lead to the conclusions.  Carlisle did not provide a specific explanation for how his opinions were formed.  At his deposition he stated he relied in part on his experiences testifying in other cases, but offered no discussion of those cases and how (or if) they are similar to this case.  An expert relying solely or primarily on experience to support his opinions cannot simply relate his conclusion but must "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Thomas*, 398 F.3d at 432 (citing Fed. R. Evid. 702 advisory committee's note (2000)).  Opinions leaving such analytical gaps are unreliable and should be excluded.  *See, e.g.*, *Adams v. City of Clarksville, Tennessee*, 2010 WL 11693099, at *5 (M.D. Tenn. Feb. 25, 2010) ("Here, [the expert] makes no attempt whatsoever to connect the dots

between his experience and his opinions—he simply offers opinions with no rationale to support his conclusions, and states that his opinions are based upon his training and experience.").

Carlisle's opinion that Schmitt made a reasonable interpretation of the former zoning ordinance to allow the application for a sober living home in 2018 (by treating the home similar to an adult foster care facility) has the same problem. A section of the report is devoted to a discussion of a 2016 application to Howell for a sober living home submitted by persons unconnected to this case. Carlisle recalled the facts. At that time, the zoning ordinance did not have a provision for the regulation of sober living homes. Defendant Schmitt made the determination that the proposed sober living home was similar to an adult foster care home. Carlisle then stated, "It is appropriate for the Zoning Administrator to make reasonable interpretation of the Zoning Ordinance. By providing such an interpretation, Mr. Schmitt was making a reasonable accommodation to allow the application for sober living, a use that was not otherwise mentioned in the zoning ordinance." (ECF No. 45-11, PageID.3309-10). In the conclusion section of the report, Carlisle opined Howell, through Schmitt, "made a reasonable interpretation to allow two (2) applications for sober living to be submitted for a use that was not specifically listed in the Ordinance prior to the enactment of Sections 6.27 and 6.29." (*Id.* at PageID.3317).

Again, Carlisle did not explain how or why his background lead to the conclusion that the city's action amounted to a reasonable interpretation of the zoning ordinance.  This opinion should likewise be stricken.

The second and fourth opinions (that Howell has never questioned the need for sober living homes and Howell has recognized its responsibility to protect the health and safety of residents) should also be excluded.  On their face, these "opinions" appear to be statements of fact and should not be considered expert opinions.  At his deposition, Carlisle testified these statements were fact and opinion inextricably intertwined.  (*See* ECF No. 45-2, PageID.3505-06).  The undersigned is not convinced.  Moreover, what Howell did or did not do in the past does not require expert opinion—that is a subject for a fact witness, for which Carlisle is planned.  The undersigned recommends these statements be excluded as expert opinion.

Plaintiffs contend what remains of Carlisle's report should be stricken as impermissible factual narrative, and that the report and opinions are unduly prejudicial and contain legal conclusions.

The undersigned has recommended excluding all of Carlisle's opinions. What remains in the first few sections of Carlisle's report are factual narrative consisting of facts about Howell (e.g., demographics), the unrelated application for a sober living home, and Plaintiffs' 2018 application for special land use approval.

(ECF No. 45-1, PageID.3305-13).  Plaintiffs characterize these factual statements as Carlisle's (perhaps more properly Defendants') attempt to cloak his fact witness testimony with the authority of expert witness testimony.  Defendants insist that is not the case; rather, the facts are merely background for his opinions and to rebut Plaintiffs' proposed expert Brian Connolly's report by pointing out factual inaccuracies in Connolly's report.  Defendants do indeed plan to use Carlisle as a fact witness for his involvement with the 2018 application and zoning ordinance amendments, and as an expert witness as discussed above.

The factual background is unnecessary for the purpose of rebutting Connolly's report because that rebuttal is no longer relevant.  As will be discussed below, Connolly provided a preliminary report prior to Carlisle's report.  Carlisle rebuts what he believes are misinterpretations of Howell's amended zoning ordinance and other factual inaccuracies.  (ECF No. 45-1, PageID.3306-08).  After Carlisle provided his report, Connolly provided a supplemental report addressing Carlisle's points of rebuttal.  In the supplemental report, Connolly adopted the Defendants' interpretation of the amended zoning ordinances, but came to the same conclusions he made in his preliminary report—that the zoning ordinance places greater burdens on disabled persons.  (ECF No. 47-3).  Because of the nature of Connolly's supplemental report, Plaintiffs' assert Carlisle's report is no longer relevant.  The undersigned agrees.  Defendants have not pointed to any

portions of Connolly's supplemental report for which Carlisle's points of rebuttal are relevant.  In light of the forgoing, the undersigned suggests the rebuttal and factual narrative portions of Carlisle's report be stricken.

Plaintiffs' remaining arguments need not be addressed as the entirety of Carlisle's report and expert testimony are recommended to be stricken.  One final exclusion is worth short discussion, however.  During his deposition (but not his report), Carlisle testified Howell "didn't violate any laws," (ECF No. 45-2, PageID.3524), and Howell did not exhibit a pattern of discrimination (*id.* at PageID.3529).  Carlisle should be precluded from offering such opinions.  "The principle that an expert may not make legal conclusions is indeed well established."  *Jones v. Pramstaller*, 874 F. Supp. 2d 713, 720 (W.D. Mich. 2012) (citing *Berry v. City of Detroit,* 25 F.3d 1342, 1353 (6th Cir. 1994)).  An expert's opinion "must stop short of embracing the 'legal terminology' which frames the ultimate legal conclusion which the jury must reach in the case."  *Alvarado v. Oakland Cty.*, 809 F. Supp. 2d 680, 688 (E.D. Mich. 2011) (citing *Torres v. County of Oakland, et al.*, 758 F.2d 147, 151 (6th Cir. 1985)).

C.    Plaintiffs' Motion to Exclude Rodney Arroyo (ECF No. 46)

Rodney Arroyo is Defendants' prospective expert on planning and zoning engaged to opine on the Michigan Zoning Enabling Act, generally acceptable land use and planning principles, and as a rebuttal witness to Plaintiffs' prospective

experts Jeffery Van Treese and Brian Connolly.  Plaintiffs challenge Arroyo's

qualification to testify as an expert in this manner.  They also assert his opinions

and testimony should be excluded for the additional reasons that his opinions are

conclusions of law, he improperly opines on Defendants' states of mind, and his

opinions are unreliable because of his business relationship with Defendants'

Counsel and Richard Carlisle.

>1.    Qualification

Arroyo obtained a Master of City Planning degree from the Georgia Institute

of Technology.  He has been a certified planner with the American Institute of

Certified Planners for approximately 30 years.  He has worked in the field since

1982.  Arroyo is an adjunct faculty member for Wayne State University's Urban

Planning Program.  (ECF No. 46-2, PageID.4055).  He is currently Partner and

Director of Community Planning at Giffels Webster located in Detroit, Michigan, a

community planning firm.  Arroyo has served as a planning and zoning expert in

litigation for the past 15-20 years, primarily as an expert for clients of counsel

representing Defendants.  (ECF No. 46-1, PageID.3754-56).  When questioned

about the expert witness services provided in the past, Arroyo recalled cases in

which he was a traffic expert, a zoning expert, and a planning expert.  (*Id.* at

PageID.3765).  Arroyo testified some of his work as an expert dealt with

billboards, signs, and religious land use.  (*Id.* at PageID.3762, 3775).

Plaintiffs focus on Arroyo's experiences as an expert on zoning as it relates to billboards and signs to argue this is his area of expertise, not sober living homes or congregate living.  They assert Arroyo's background and expertise do not qualify him to testify in his matter.  Indeed, Arroyo confirmed at his deposition he has no experience in and does not hold himself out as an expert in substance use addiction or recovery, sober living homes, the Fair Housing Act, the Americans with Disabilities Act, or requests for zoning variances as accommodations under federal and state law.  (ECF No. 46, PageID.3719-20; ECF No. 46-1, PageID.3760-64, 3775-76).

In the view of the undersigned, Arroyo's education and decades-long experience in municipal planning and zoning qualifies him to testify in this matter, even though he does not have experience related to sober living homes and disability discrimination cases specifically.  An expert witness must be qualified by "knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  "[T]he issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question."  *Madej v. Maiden*, 951 F.3d 364, 370 (6th Cir. 2020) (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)).  "[T]he only thing a court should be concerned with in determining the qualifications of an expert is whether the expert's knowledge of the subject matter is such that his

41

opinion will likely assist the trier of fact in arriving at the truth. The weight of the expert's testimony must be for the trier of fact." *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 851 (6th Cir. 1981). A party's expert need not be a "blue ribbon practitioner" or even have direct experience with the precise subject matter at issue. *Jackson v. E-Z-Go Division of Textron, Inc.*, 326 F. Supp. 3d 375, 387-88 (W.D. Ky. 2018) (citations omitted). However, his expertise in the general field must be applicable to the specific issues in the case. *Id.*; *see also Bradley v. Ameristep, Inc.*, 800 F.3d 205, 209 (6th Cir. 2015) ("[W]e take a liberal view of what 'knowledge, skill, experience, training, or education' is sufficient to satisfy the requirement.").

Arroyo is qualified to testify in this matter because his expertise in zoning and planning generally can be transferred to the specific area of zoning for sober living homes. Arroyo need not be an expert in substance abuse or sober living homes, nor need he have been involved in a request for accommodation by a sober living home. His experience drafting planning and zoning ordinances for cities across Michigan and extensive experience serving as a planning and zoning expert are sufficient for the issues in this case. Arroyo's lack of experience in the specific issues in this case goes to the weight of his opinions, not his qualification. *See also Dilts v. United Grp. Servs., LLC*, 500 F. App'x 440, 446 (6th Cir. 2012) ("An expert's lack of experience in a particular subject matter does not render him

42

unqualified so long as his general knowledge in the field can assist the trier of fact.").

However, the undersigned agrees with Plaintiffs that two of Arroyo's opinions be stricken because of his lack of expertise. Arroyo stated the purpose of sober living homes (e.g., "The concept is to provide a safe environment for personal, emotional and spiritual growth." (ECF No. 46-2, PageID.4042) and "Poorly-run Sober Living Homes can be a threat to stable single family neighborhoods, . . ." (*id.*)). Arroyo is not an expert on sober living homes. He should not be permitted to testify to their purpose or the effects of a poorly run home.

### 2. Impermissible Legal Opinions

Beginning with a section titled, "New Ordinances Adopted Following Moratoria," Arroyo quotes or paraphrases the 2020 amended ordinance sections related to transitional housing. After each subsection, Arroyo explains the meaning of the subsection; sometimes he opines that the subsection is "reasonable." For example, Arroyo quoted Section 6.29(c)(2), which states,

> Taking into consideration the needs, facts, and circumstances which exist throughout the City and the population to be served by the use, the proposed reasonable accommodation shall be necessary to afford such person equal opportunity to the proposed use and enjoyment within the City

(ECF No. 46-2, PageID.4023). Arroyo then stated,

> This is also a reasonable condition, as it reminds the
> approving body that the needs, facts, and circumstances
> that exist throughout the City and the population to be
> served should be considered as each application is
> reviewed. In granting a reasonable accommodation via a
> special use accommodation, it shall have the effect of
> affording a qualified person such equal opportunity after
> consideration of the individual case, the site, surrounding
> land uses, and the overall needs, facts, and circumstances
> in the City.

(*Id.*).  The report continues in much the same way through this section and some of

his rebuttal of Connolly's report.  (*See id.* at PageID.4023-42).  During this

discussion, Arroyo also comments on the consistency of an ordinance subsection

with the Michigan Zoning Enabling Act ("MZEA").  (*See, e.g.*, *id.*at PageID.4025)

(Arroyo stated, "From a planning perspective, there is a clear nexus between the

statutory authority in the MZEA and the standards noted [in the ordinance].").

Near the end of his report, Arroyo concluded, "I find that the City of Howell's

actions regarding the two requests made by the Plaintiff were reasonable and

appropriate, and that the special accommodation use process provides for a

reasonable accommodation for qualified persons, and it is consistent with sound

planning practice."  (ECF No. 46-2, PageID.4041).

Plaintiffs argue Arroyo's discussion of the zoning ordinances and the MZEA

and use of the terms "reasonable" and "reasonable accommodation" amounts to

impermissible legal interpretation and conclusion from an expert witness.

Defendants assert Arroyo's statements regarding the MZEA are admissible

because he is not offering his interpretation of the MZEA, but only offering what it states. (ECF No. 52, PageID.7254).

"Although an expert's opinion may 'embrace[ ] an ultimate issue to be decided by the trier of fact[,]' Fed. R. Evid. 704(a), the issue embraced must be a factual one." *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994). "[A] witness may not testify to a legal conclusion." *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 322 (6th Cir. 2014) (citing *id.*). The Sixth Circuit in *Berry*, through an example, explained the fine line between permissible and impermissible expert testimony as it relates to legal conclusions.

> The expert can testify, if a proper foundation is laid, that the discipline in the Detroit Police Department was lax. He also could testify regarding what he believed to be the consequences of lax discipline. He may not testify, however, that the lax discipline policies of the Detroit Police Department indicated that the City was *deliberately indifferent* to the welfare of its citizens.

*Berry*, 25 F.3d at 1353 (emphasis in original). In addition, especially where a trial is planned before a jury, expert testimony which provides legal analysis or interpretation is inadmissible. *See Eiserman v. Kentucky Fuel Corp.*, 2016 WL 1732728, at *3 (E.D. Ky. Apr. 29, 2016) (collecting cases); *Bammerlin v. Navistar Int'l Transp. Corp.*, 30 F.3d 898, 900 (7th Cir. 1994) ("The meaning of federal regulations is not a question of fact, to be resolved by the jury after a battle of experts. It is question of law, to be resolved by the court."); *Culpepper v.*

*Rothrock*, 2007 WL 580577, at *1 (W.D. Mich. Feb. 15, 2007) ("Although Mr.

Cosgrove's legal interpretations may well prove correct, those interpretations are

not helpful to the jury and are not within the ken of proper expert testimony.").

The undersigned suggests the discussion of the amended zoning ordinances

in the report crosses the line into impermissible legal interpretation and opinion.

The nature of the issues in this case—planning and zoning—provide a subtle

difference between what is legal interpretation or opinion and what is planning

interpretation or opinion.  A city planner's daily work must follow the dictates of

the MZEA; such a person will be familiar with and well-versed in the MZEA and

zoning ordinances.  However, the MZEA is a legal statute.  Interpretation of the

MZEA is necessarily interpretation of law, whether interpreted by an attorney or

lay person.  Conversely, for example, assessing an ordinance's (or city's)

accordance with the AICP Code of Ethics and Professional Conduct, which is not a

legal document, is not legal interpretation and is permissible from an expert

witness.  *See, e.g.*, *Alvarado v. Oakland County*, 809 F. Supp. 2d 680, 690 (E.D.

Mich. 2011) ("expert testimony regarding recognized police policies and

procedures, and specifically continuum of force policies, are appropriate subjects

of expert testimony, provided that the experts do not express legal conclusions

based on their interpretation of the application of those policies in a particular

case.").

Further, "reasonable accommodation" is a legal term.  "It is the responsibility of the court, not testifying witnesses, to define legal terms." *Berry*, 25 F.3d at 1353.  Such testimony, implicitly or explicitly, impermissibly communicates a legal standard to the jury.  Arroyo's conclusion that the special use accommodation process in the amended ordinances provides a "reasonable accommodation" for qualified persons runs the risk of defining "reasonable accommodation" for the jury.  Similarly, Arroyo's testimony and opinions that Defendants' actions were reasonable runs the risk of communicating a legal standard or conclusion to the jury.  These opinions or statements should be excluded.[4]  Arroyo can otherwise discuss the amended zoning ordinances.

An additional opinion which should be excluded is that Schmitt's September 2019 letter to Atsalakis in response to her second request for accommodation was not a denial of the request.  The undersigned is not persuaded that this opinion goes directly to an ultimate issue—whether Defendants denied reasonable accommodation.  However, the opinion is excludable for the separate reason that it is not helpful to the jury.  Arroyo did not appear to use any special expertise to interpret Schmitt's letter.  He read the letter and drew a conclusion based on the contents of the letter.  The jury is equally capable of performing this task.

---

[4] Striking Arroyo's discussion and interpretation of the MZEA obviates the need to specifically address Plaintiffs' argument that Arroyo's interpretations run contrary to federal law. (ECF No. 46, PageID.3725-27).

Plaintiffs did not specifically contest Arroyo's rebuttal of Connolly's report except to the extent Arroyo's conclusions addressed "reasonableness."  With the limitations discussed above, Arroyo may be offered to rebut Connolly's testimony as stated in Arroyo's report.  The undersigned notes, however, that Connolly provided a supplemental report addressing Arroyo's rebuttal and adopting Defendants' interpretation of the amended zoning ordinances.  (*See* ECF No. 47-3).  Thus, it would appear Arroyo's rebuttal is no longer relevant.  If it is not relevant, it should not be allowed at trial.

### 3.    Opining on Defendants' States of Mind

Plaintiffs seek to exclude Arroyo's statements that touch on the defendants' states of mind.  For example, Arroyo stated "the City felt that a factual communication was necessary," (ECF No. 46-2, PageID.4030), and Schmitt was attempting to assist and be helpful to Atsalakis (*id.* at PageID.4038).  Although it may not have been Arroyo's intent to opine on or convey a state of mind for the defendants, these and similar statements should be precluded from reaching the jury.  The defendants may testify for themselves about their intent.  *Visteon Global Tech., Inc. v. Garmin Int'l, Inc.*, 2016 WL 4396085, at *4 (E.D. Mich. Aug. 18, 2016) ("Experts may testify to the facts underlying the issues of intent or motive but may not go the next step to infer for the jury or the Court that those facts demonstrate a certain intent, motive or state of mind.").

48

4.       Reliability

Plaintiffs accuse Arroyo of being an expert for hire, arguing his opinions were conceived and invented solely in the context of this litigation.  (ECF No. 46, PageID.3721-22).  Relatedly, they argue Arroyo's relationship with defense counsel makes Arroyo's opinions and testimony unreliable.  (*Id.* at PageID.3733-35).  If a proposed expert is found to be an expert for hire, courts then generally apply the *Daubert* factors with "greater rigor."  *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 435 (6th Cir. 2007).  But here, Arroyo is a certified planner whose work experience is in crafting and evaluating city plans and zoning ordinances.  Arroyo's work for Defendants' counsels' law firm does not appear to predominate his work—he is a partner in a planning firm and still provides planning and zoning services to cities in Michigan in addition to his expert services.  The fact that he has testified in prior matters as an expert for counsel, without more indicia of unreliability, is not enough to strike the opinions and testimony.  Plaintiffs will be free to cross-examine Arroyo at trial to raise these issues and attack the weight of Arroyo's testimony.

In sum, Arroyo's interpretations and opinions regarding the zoning ordinances and the MZEA should be stricken; opinions addressing ultimate issues (i.e. "reasonable accommodation") should be stricken; Arroyo's interpretation of Schmitt's September 2019 letter should be stricken; Arroyo's conclusions

regarding sober living homes should be stricken; and Arroyo's statements touching on Defendants' states of mind should be stricken.

D.  <u>Defendants' Motion to Exclude Brian Connolly (ECF No. 47)</u>

Plaintiffs' prospective expert, Brian Connolly, provided opinions regarding sound planning practices for group homes and whether Howell's special use accommodation processes and new zoning provisions place burdens on the disabled that are not placed on non-disabled individuals.  Defendants move to exclude on the grounds that (1) Connolly is not qualified to opine on zoning and planning practices, (2) Connolly's opinion and testimony are unreliable, and (3) factual inaccuracies in his report and testimony would mislead the jury and thus they should be excluded as unfairly prejudicial.  (ECF No. 47).

1.  Qualification

Defendants argue Connolly is not qualified as an expert in this case because he only has two years of experience as an urban planner; most of his experience (eight years) is working as an attorney in Colorado specializing in land use law. Connolly is not a certified planner.  They argue "[s]imply possessing a law degree does not make one an expert in all areas of law, even if one's criticisms are insightful."  (ECF No. 47, PageID.4104 (quoting *Cicero v. Borg-Warner Automotive, Inc*., 163 F. Supp. 2d 743, 747 (2001)).  Defendants assert Connolly's membership in various bar associations does not connote expertise, as any attorney

can select himself to be a member.  They further assert that, except for a book

Connolly co-authored, all his other publications were not peer reviewed.  Without

peer review, they contend his writings are no more than a lawyer's opinion.  (*Id.* at

PageID.4105-06).

The record on Connolly's background provides the following.  He earned his

baccalaureate degree in Urban and Regional Studies in 2007 and his Master of

Regional Planning in 2008, both from Cornell University.  (ECF No. 47-4,

PageID.4378).  From July 2008 to May 2010, he worked as a planner in the

Westchester County Department of Planning in White Plains, New York.  (*Id.* at

PageID.4382).  He then graduated from the University of Michigan School of Law

in 2012.  In addition to various bar associations, Connolly is also a member of the

American Planning Association, for which he is currently the Chair of the Planning

and Law Division.  (*Id.* at PageID.4383).  Connolly co-authored a book published

in 2014 titled *Group Homes: Strategies for Effective and Defensible Planning and

Regulation*, published by the American Bar Association.  This book was peer-

reviewed.  He has also written a large number of articles on the topic of zoning and

planning, none of which were peer reviewed.  (*Id.* at PageID.4383-84).

Connolly has given many presentations on planning and the law.  One such

relevant presentation, given at the Rocky Mountain Land Use Institute Annual

Conference in March 2020, was titled *Group Homes for those in Recovery: Recent*

*Developments and Understanding what Stakeholders Want.*  (*Id.* at PageID.4385).

In April 2018, he gave a presentation to the National Conference of the American

Planning Association titled *Opioid/Heroin Crisis and Land Use.*  (*Id.*).  Not

included in his *curriculum vitae* is his recent appointment by the Governor of

Colorado to a task force charged with finding ways for the State to become

involved in repurposing older, under-utilized commercial spaces for housing

development.  (ECF No. 47-2, PageID.4168-69).  In other words, the task force is

involved in planning and zoning matters.

  Connolly has testified as an expert on community planning in four cases.  In

*Yellowstone Women's First Step House, Inc. v. City of Costa Mesa*, 2018 WL

6167930 (C.D. Calif. Nov. 5, 2018), the defendant sought to exclude Connolly as

an expert.  Without elaboration on the point, the court concluded Connolly could

testify concerning whether the defendant city's housing ordinances complied with

sound planning and zoning practice, the same type of opinion he offers in this

matter.  The court further noted the attack on Connolly's credentials went to the

weight of the opinion.  *Id.* at *5.  Because there was no explanation for the ruling,

this case does not hold much persuasive value on its own.

  The undersigned concludes Connolly's knowledge of urban and regional

planning and land use and his experience as a planner and land use attorney qualify

him to offer opinions regarding Howell's zoning ordinances and the special

accommodation use applications. As stated above, "the only thing a court should be concerned with in determining the qualifications of an expert is whether the expert's knowledge of the subject matter is such that his opinion will likely assist the trier of fact in arriving at the truth. The weight of the expert's testimony must be for the trier of fact." *Mannino Co.*, 650 F.2d at 851.

Considering Connolly's education, work experience, publications, and research concerning planning and group homes, he is qualified to testify as an expert in this matter. Although Connolly is not a certified planner and has not spent his entire career specifically as an urban and regional planner, his background and experience make him well-positioned to assist the jury to make sense of Howell's relevant ordinances and accommodations application process. Connolly's lack of robust work experience as a planner and lack of certification is an issue of weight better suited for cross-examination.

Defendants' arguments otherwise are unavailing. Defendants assert that Connolly's time practicing law in the area of land use is insufficient alone to qualify him pursuant to *Cicero v. Borg-Warner Automotive, Inc.*, 163 F. Supp. 3d 743 (E.D. Mich. 2001) (stating that "something more than time in practice would be required to qualify an attorney as an expert in a given specialty."). But Connolly has more than time in practice—he has degrees, experience, lectures, and publications on the specialty that qualify him as an expert. Defendants assert he

"is not qualified to give an expert opinion on the topic because is not certified" as a planner.  (ECF No. 47, PageID.4106).  However, Defendants did not cite any authority for the proposition that only a person certified as a planner by the American Institute of Professional Planners can be qualified as an expert on urban and regional planning.  *See, e.g.*, *United States v. Winkle*, 477 F.3d 407, 415-16 (6th Cir. 2007) (holding District Court did not abuse its discretion allowing accounting firm employee to testify as expert on auditing financial transaction even though expert was not a certified public accountant).

      2.     Reliability

Defendants argue Connolly's opinion and testimony are unreliable because (1) the sources he relied upon were cited in his 2014 publication, yet he did not do updated research and (2) he did not apply principles and methods reliably to the facts since his opinions are based on an erroneous interpretation of the zoning ordinance.  (ECF No. 47, PageID.4107-08).

As for the first argument, Defendants have not argued (let alone demonstrated) the sources used in the 2014 book are outdated or that no experts in the field would rely on these sources.  Connolly's opinions and testimony should not be excluded on this basis.

The second argument concerns Defendants' experts' contention that Connolly misinterpreted the amended zoning ordinance, and thus Connolly's

conclusions based on the misinterpretation are incorrect.  Defendants' experts
Carlisle, Arroyo, and Fisher (discussed below) all remark on the alleged factual
inaccuracies in Connolly's report.  However, Connolly issued a supplemental
report after Defendants' experts issued their reports.  In the supplemental report,
Connolly responded to the rebuttal experts.  Notably, he used Howell's
interpretation of the zoning ordinance, reviewed the ordinance under that
interpretation, and issued an opinion which did not change from the initial report.
(ECF No. 56, PageID.7280-81).  Defendants did not address Connolly's
supplemental report.  In fact, they did not cite to the supplemental report at all in
their analysis.  In light of the fact Connolly issued a supplemental report adopting
Defendants' interpretation of the zoning ordinance, it would seem Defendants'
rebuttal to Connolly's reports is moot.  Thus, exclusion of Connolly's initial report
on the basis of alleged factual inaccuracies is not warranted.

In addition to the foregoing, both arguments go to the weight of the opinion,
not the reliability.  Connolly listed the materials he reviewed for his opinion,
applied that information to the facts in this case, and rendered an opinion.
"[R]ejection of expert testimony is the exception, rather than the rule, and [the
court] will generally permit testimony based on allegedly erroneous facts when
there is some support for those facts in the record." *In re Scrap Metal Antitrust
Litigation*, 527 F.3d 517, 530 (6th Cir. 2008) (internal quotations and citations

omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

      3.    Prejudice

Finally, Defendants argue Connolly's opinion and testimony should be stricken as unfairly prejudicial because his opinion is based on a misinterpretation of the facts and ordinances (essentially, this is the same argument raised against the reliability of Connolly's reports). His testimony, they contend, will confuse the jury because of the factual inaccuracies. As discussed above, Defendants did not specifically address whether the supplemental report contains all the same alleged errors as the initial report. It appears the supplemental report cures the alleged deficiencies. In any event, even "shaky" but admissible evidence is allowed to go to the jury. Defendants may cross-examine Connolly to attack what they believe to be misinterpretations and errors. The danger of prejudice Connolly's testimony may pose is minimal.

      F.    <u>Plaintiffs' Motion to Exclude Gerald Fisher (ECF No. 49)</u>

Defendants engaged attorney Gerald Fisher to offer expert testimony in response to Plaintiffs' proposed experts Jeffery Van Treese and Brian Connolly. In light of the conclusion, above, that Van Treese's report and testimony be stricken

in their entirety, the undersigned will not address Plaintiffs' arguments against Fisher's rebuttal of Van Treese's report.

With regard to Fisher's rebuttal of Connolly's preliminary report, Plaintiffs argue (1) the report and testimony are nearly exclusively legal analysis and opinion (that they assert is wrong) which should be stricken as such, (2) Fisher is not qualified to testify as an expert in planning and zoning, and (3) Fisher may not opine on Defendants' motivations.

### 1.  Qualification

Once again, an expert witness must be qualified by "knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  "[T]he only thing a court should be concerned with in determining the qualifications of an expert is whether the expert's knowledge of the subject matter is such that his opinion will likely assist the trier of fact in arriving at the truth.  The weight of the expert's testimony must be for the trier of fact."  *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 851 (6th Cir. 1981).  A party's expert need not be a "blue ribbon practitioner" or even have direct experience with the precise subject matter at issue.  *Jackson v. E-Z-Go Division of Textron, Inc.*, 326 F. Supp. 3d 375, 387-88 (W.D. Ky. 2018) (citations omitted).  However, his expertise in the general field must be applicable to the specific issues in the case.  *Id.*; *see also Bradley v. Ameristep, Inc.*, 800 F.3d 205,

209 (6th Cir. 2015) ("[W]e take a liberal view of what 'knowledge, skill, experience, training, or education' is sufficient to satisfy the requirement.").

Plaintiffs' argument that Fisher is not qualified to opine in this case is well-taken.  Fisher, like Plaintiffs' expert Connolly, is an attorney.  But unlike Connolly, Fisher does not have education or experience in municipal planning. Fisher earned his law degree in 1972.  Between 1985 and 2005, he worked and was a partner at the law firm Secrest Wardle.  There, he was the manager of the Municipal Practice Group.  (ECF No. 49-2, PageID.6833).  He represented parties in the area of land use law, land use regulations, and with zoning ordinances.  (*Id.* at PageID.6834-36).  He taught at Western Michigan University Cooley Law School from 2004 through 2019.  He is now an emeritus professor there.  He taught property law, constitutional law, zoning and land use law, and state and local government law.  (ECF No. 49-2, PageID.6826).  In his property law class, he taught the Fair Housing Act in approximately three hours of class time.  (ECF No. 49-2, PageID.6827-28).  He recently wrote a book in which he devoted a chapter to discriminatory housing and zoning, specifically related to World War II and minorities in older urban cities.  (*Id.* at PageID.6831).  Fisher has been qualified as an expert in five cases.  The purpose of his testimony in one of the cases is tangentially related to the issues in this case—he testified to the zoning authority of

a city.  (ECF No. 49-1, PageID.6801).  He apparently has not been qualified to testify regarding a city's zoning ordinances or variance applications.

Fisher is not qualified to provide expert testimony in this matter.  In *Cicero v. Borg-Warner Automotive, Inc.*, 163 F. Supp. 2d 743 (E.D. Mich. 2001), the Court found two attorneys proffered to opine on attorney professional responsibility were unqualified for the task.  One of the attorneys was also a professor at a local law school who taught on the subject at issue (as well as other subjects).  Among the problems arising from attorneys (and professors)-as-experts, the Court noted holding a law professorship does not make one an expert on a subject, especially where there is no information as to whether the witness maintained up-to-date expertise in the subjects.  *Id.* at 748.  Further, the Court found years of law practice do not necessarily lead to expertise.  *Id.* at 749.  In a footnote, the Court observed, "One would hope that attorneys who practice in a particular area of law for many years would develop an expertise in that area, however, courts do sometimes encounter attorneys who have been practicing law not very well but for a great length of time."  *Id.* at n. 7.  This reality limits the extent to which a Court may rely on an attorney's time in practice as an indicator of expertise.

Here, Fisher's time in practice and years as a law professor are insufficient to qualify him as an expert to opine on the legal issues in this case and to rebut

Connolly's preliminary report.  Like in *Cicero*, there is no indication Fisher

maintained up-to-date expertise in the areas of law he taught in school and relevant

to this case.  Further, his years in practice in municipal law, without more, do not

necessarily evince expertise on a subject matter.  Most telling of his lack of

pertinent expertise is Fisher's description of himself as "[n]ot being a 'community

planning expert.'"  (ECF No. 49-5, PageID.7158).

While a witness need not be a "blue ribbon practitioner" in a particular area,

the witness should have more than time in practice (occasionally handling matters

similar to those in this case) and as a law professor (touching on relevant issues for

only a small portion of one class taught).

### 2.    Legal Analysis and Opinions

Even if Fisher were qualified as an expert in this matter, the undersigned

finds Plaintiffs' first argument regarding Fisher's legal analysis and opinions

dispositive.  Plaintiffs thoroughly described Fisher's preliminary report, (ECF No.

49, PageID.6727-30); a short description follows.  Fisher's preliminary report

begins with the factual background of case.  Then, Fisher uses the first three

sections of the report to explain and analyze statutory and case law relevant to the

claims in this case, including the MZEA.  These sections read like a law review

article in that Fisher is instructing the reader (potentially the jury) on the law.

(ECF No. 49-1, PageID.6755-65).  Fisher himself refers to these three sections as

"legal analysis" that informed his opinions.  (ECF No. 49-1, PageID.6765).  He

also included some of his conclusions in these sections.  For example, at the end of

Section II, he wrote,

> The conclusion that arises from this analysis is that the
> administrative "burden" that a party must endure in order
> to pursue a reasonable accommodation is imposed as a
> matter law by state statute and the constitutional
> requirement of due process.  The local government is
> required by powers greater than itself to impose this
> burden in order to avoid making arbitrary decisions.  The
> fact that some amount of burden is imposed on an
> applicant can therefore not serve as a basis for
> concluding that the local government has engaged in
> discriminatory behavior.

(*Id.* at PageID.6760).

In the fourth and final section of the preliminary report, Fisher repeatedly

offers conclusions of law.  For example, he stated Howell's new ordinances

provide "an efficient, streamlined and nondiscriminatory procedure."  (ECF No.

49-1, PageID.6766).  Fisher repeats his conclusion that the ordinances are

nondiscriminatory later in his analysis.  (*See, e.g.*, ECF No. 49-1, PageID.6769).

Fisher made similar statements in his supplemental report, for example,

opining Plaintiffs' expert Connolly created "non-existent" "cloaks of

discrimination" in his report and that the actions taken by the defendants were "an

attempt to achieve the legitimate interests of the City in the manner required under

state law in order to satisfy the policy and requirements of federal law."  (ECF No. 49-3, pageID.7076).

"Instructing the jury on the law is role of the judge, not the expert." *Alvarado v. Oakland Cnty.*, 809 F. Supp. 2d 680, 691 (E.D. Mich. 2011).  "The problem with testimony containing a legal conclusion is in conveying the witness' unexpressed, and perhaps erroneous, legal standards to the jury." *Torres v. Cty. of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985).  Testimony that expresses legal conclusions or interpretations of law should be excluded.  *See id.* at 151 (Discussing that the term "discrimination" has a specialized meaning in the law and in lay use the term has a distinctly less precise meaning; an expert's use of the term should be prohibited); *see also McMillen v. Windham*, 2019 WL 4017240, at *21 (W.D. Ky. Aug. 26, 2019) ("expert witnesses may not testify to legal conclusions or to the applicability or interpretation of a particular statute or regulation."); *Eiserman v. Kentucky Fuel Corp.*, 2016 WL 1732728, at *3 (E.D. Ky. Apr. 29, 2016) (collecting cases).

The undersigned recommends Fisher's preliminary report (ECF No. 49-1) and the supplemental report (ECF No. 49-3) be entirely excluded as containing impermissible legal analysis and legal conclusions.

Section IV(B) of the preliminary report "discuss[es] the shortcomings in the underlying assumptions and interpretations made in the Plaintiffs' expert report,"

i.e. Connolly's report.  (ECF No. 49-1, PageID.6765).  However, it begins with more discussion of case law and the MZEA, which is impermissible interpretation of law.  (ECF No. 49-1, PageID.6770-71).  Moreover, similar to Carlisle's and Arroyo's rebuttal, it is not altogether clear that Fisher's rebuttal of Connolly's *preliminary* report will be relevant in light of Connolly's supplemental report. Moreover, this portion of Fisher's report delves into interpretations of the ordinance and the MZEA.

### 3.    Opining on Defendants' Motivations

Occasionally in his reports Fisher referred to Howell's motivations, as in "[t]he City viewed it important to establish new procedures and standards," or "[t]he City and its officials recognized the need to comply with state law."  (ECF No. 49-1, PageID.6754, 6765).  As stated above, "[e]xperts may testify to the facts underlying the issues of intent or motive but may not go the next step to infer for the jury or the Court that those facts demonstrate a certain intent, motive or state of mind."  *Visteon Global Techs., Inc. v. Garmin Int'l, Inc.*, 2016 WL 4396085, at *4 (E.D. Mich. Aug. 18, 2016).  If Fisher is found to be qualified and allowed to offer expert testimony, he should be precluded from offering statements or opinions evincing the defendants' motives or intent.

### G.    Conclusion

The undersigned makes the following recommendations:

- Defendants' motion to exclude Jeffery Van Treese (ECF No. 42) be **GRANTED**, and Van Treese be stricken as an expert witness;

- Plaintiffs' motion to exclude Patrick O'Keefe (ECF No. 43) be **GRANTED IN PART AND DENIED IN PART**, except that O'Keefe should be allowed to testify regarding the housing market in Michigan;

- Plaintiffs' motion to exclude Richard Carlisle (ECF No. 45) be **GRANTED**, and Carlisle be stricken as an expert witness;

- Plaintiffs' Motion to Exclude Rodney Arroyo (ECF No. 46) be **GRANTED IN PART AND DENIED IN PART**, and that Arroyo be prohibited from offering opinions on sober living homes and from using the term "reasonable accommodation," that he be prohibited from engaging in or offering legal analysis of the MZEA and zoning ordinances, but that he otherwise be permitted to testify as an expert witness;

- Defendants' Motion to Exclude Brian Connolly (ECF No. 48) be **DENIED**; and

- Plaintiffs' Motion to Exclude Gerald Fisher (ECF No. 49) be **GRANTED**, and Fisher be excluded as an expert witness.

## IV.   PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some

issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2), Local Rule 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  September 29, 2021                    s/Curtis Ivy, Jr.
                                             Curtis Ivy, Jr.
                                             United States Magistrate Judge