UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMBER REINECK HOUSE,
COURTNEY ATSALAKIS, and
FAIR HOUSING CENTER OF
SOUTHEAST & MID MICHIGAN,
INC.,

Plaintiffs,

v.

CITY OF HOWELL, MICHIGAN,
NICKOLAS PROCTOR, and TIM
SCHMITT,

Defendants.

Case No. 20-cv-10203

Paul D. Borman
United States District Judge

Curtis Ivy, Jr.
United States Magistrate Judge

## OPINION AND ORDER
## GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL[1] SUMMARY JUDGMENT (ECF No. 44) AND DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF No. 48)

### TABLE OF CONTENTS

Introduction ........................................................................................................... 4

I. Statement of Facts and Procedural History ...................................................... 5

   A. Statement of Facts ........................................................................................ 5

      1. Atsalakis Founds ARH ............................................................................. 5

      2. Atsalakis Buys The Walnut House ........................................................... 5

      3. The City Of Howell's Zoning Code Restricts Uses In R-1 Districts ................. 7

      4. Atsalakis Submits A SLU Application ..................................................... 10

      5. Opposition To Atsalakis' Application Arises ............................................ 11

---

[1] Although Defendants' label their motion as for "Summary Judgment," the Motion is actually, as Plaintiffs point out (ECF No. 58, Response to Defendants' MSJ, PageID 7998), for only *Partial* Summary Judgment."

6. The City Responds To Atsalakis' Application .................................................. 14

7. Opposition To Atsalakis' Application Continues ............................................ 17

8. Schmitt Requests More Information from Atsalakis ....................................... 23

9. Schmitt Asks Carlisle Wortman To Review Atsalakis' Application ............................... 24

10. The Initial Inspection Concludes ................................................................ 24

11. Carlisle Sends Initial Questions About Atsalakis' Application ..................................... 25

12. Carlisle Issues His Final Report On Atsalakis' Application ......................................... 28

13. Atsalakis Holds An Open House ................................................................. 29

14. Atsalakis Withdraws Her Application ......................................................... 30

15. Schmitt Proposes And The City Council Enacts A Moratorium ..................................... 32

16. Atsalakis Begins Renting Out The Walnut House .............................................. 40

17. The City Repeatedly Extends The Moratorium ................................................ 40

18. Atsalakis Requests Accommodations ......................................................... 43

19. Schmitt And Atsalakis Meet For Coffee ....................................................... 46

20. The City Drafts The New Ordinance ........................................................... 46

21. Ordinance 929 Significantly Modifies The Zoning Code's Treatment Of THFs And Housing For Those Entitled To Reasonable Accommodations Under Law ......................... 56

22. The City of Howell Grants Special Accommodation Uses To Two Sober Living Homes ................................................................................................................... 69

23. Atsalakis Is Unsure About Whether ARH Will Open A Sober Living Home At The Walnut House ......................................................................................................... 71

  B. Procedural History ......................................................................................... 72

II. Standard of Review ............................................................................................ 77

III. Analysis .......................................................................................................... 79

  A. Preliminary Matters ...................................................................................... 79

    1. Federal anti-discrimination laws preempt conflicting state and local zoning laws. .......... 79

    2. Proctor is **DISMISSED** in his individual capacity. ............................................ 80

    3. Plaintiffs' claims under Mich. Comp. Laws §§ 37.1501–07 are **DISMISSED**. .............. 80

    4. This Opinion will proceed as follows. ............................................................ 82

  B. Plaintiffs have established standing to bring many of their claims. But Plaintiffs have not established that their intentional discrimination, interference, and reasonable accommodation claims are fairly traceable to Schmitt, nor that they were or will be injured by Ordinance 929. ................................................................................................................. 84

    1. Plaintiffs' intentional discrimination, interference, and reasonable accommodation claims are not fairly traceable to Schmitt in his individual capacity. ......................................... 86

2

2. Plaintiffs have standing for their claims to damages from the City of Howell enacting the Moratorium with discriminatory intent. .............................................................................. 87

3. None of the Plaintiffs have standing for their claims for damages, injunctive relief, and declaratory relief from the City of Howell enacting Ordinance 929 with discriminatory intent. ............................................................................................................................. 89

4. Plaintiffs have standing for their claims to damages from the City of Howell interfering with their attempts to exercise their Fair Housing rights by enacting the Moratorium. ....... 97

5. Plaintiffs have standing for their claims to damages from the City of Howell refusing to grant them a reasonable accommodation. ............................................................................ 97

C. Plaintiffs' claims are not moot. ........................................................................................... 98

D. Both sides' Motions for Summary Judgment on Plaintiffs' claims that Defendants intentionally discriminated against people with disabilities by enacting the Moratorium are **DENIED**. Defendants' Motion for Summary Judgment on Plaintiffs' claims that Defendants intentionally discriminated against people with disabilities by enacting Ordinance 929 is **GRANTED** ..................................................................................................................... 99

1. Neither the Moratorium nor Ordinance 929 is facially discriminatory. ....................... 101

2. Whether the Moratorium was enacted with discriminatory intent is a question for the jury to decide. But no reasonable jury could conclude that Ordinance 929 was enacted with discriminatory intent. ..................................................................................................... 118

E. Plaintiffs' Motion for Summary Judgment on their claim of unlawful interference is **DENIED**. ............................................................................................................................. 151

F. Both sides' Motions for Summary Judgment on Plaintiffs' claim that Defendants unlawfully denied their first request for a reasonable accommodation are **DENIED**. Defendants' Motion for Summary Judgment on Plaintiffs' claim that Defendants unlawfully denied their second request for a reasonable accommodation is **GRANTED**. ..................................................... 160

1–2. Defendants knew or should have known that Atsalakis' associates had disabilities. . 163

3. The first accommodation was necessary but the second was not. ................................. 163

4. Whether the first accommodation was reasonable is a question for the jury ................. 175

5. Schmitt refused Atsalakis' request for the first accommodation. .................................. 179

G. If Plaintiffs had standing to assert discriminatory treatment and interference claims against Schmitt, then Schmitt would be entitled to legislative immunity from such claims. ............. 186

H. Schmitt is entitled to qualified immunity from the remaining claims against him. ............ 192

I. Proctor and Schmitt are **DISMISSED** from the case in their official capacities. ............... 199

Conclusion ............................................................................................................................. 201

## INTRODUCTION

This case arises out of Plaintiffs Courtney Atsalakis and Amber Reineck House's attempt to open a sober living home in the City of Howell. These Plaintiffs, joined by co-Plaintiff the Fair Housing Center of Southeastern and Mid-Michigan, allege that Defendants the City of Howell, Mayor Nickolas Proctor, and Community Development Director and Zoning Administrator Timothy Schmitt violated the Fair Housing Act, Americans with Disabilities Act, and Michigan Persons with Disabilities Civil Rights Act by impeding their efforts in a variety of ways. Now before the Court are the parties' cross-Motions for partial Summary Judgment. For the reasons that follow, the Court will **DENY** Plaintiffs' Motion and **GRANT IN PART** and **DENY IN PART** Defendants' Motion.

# I. STATEMENT OF FACTS AND PROCEDURAL HISTORY

## A. Statement of Facts

### 1. Atsalakis Founds ARH

Courtney Atsalakis is the President of the non-profit Amber Reineck House ("ARH"). (ECF No. 14, Amended Complaint, PageID 125.) She founded ARH in December 2017, in honor of her sister, who died from an opioid overdose. (ECF No. 14, PageID 125.) ARH's "mission is to provide affordable transitional housing for women with substance use disorders." (ECF No. 14, PageID 126.) Specifically, the organization seeks to "acquir[e] properties for this housing and partner[] with established non-profits," including Home of New Vision ("HNV"),[2] "designated as 'recovery partners' to manage the homes and offer support services to their residents." (ECF No. 14, PageID 126.)

### 2. Atsalakis Buys The Walnut House

Around the end of 2017, Atsalakis spoke with Timothy Schmitt about ARH. (ECF No. 44-15, Dep. of T. Schmitt, PageID 1996.) Schmitt has been the City of Howell's Community Development Director since January of 2015. (ECF No. 44-15, PageID 1885.) In this role, he "handle[s] anything that has to do with the built environment," including "code enforcement, long-range planning, short-range

---

[2] Atsalakis joined the board of HNV around the fall of 2016, and she became its Vice President around the summer or fall of 2017. (ECF No. 44-3, Dep. of C. Atsalakis, PageID 1190.)

planning, [and] new construction." (ECF No. 44-15, PageID 1886.) He also serves as the City's Zoning Administrator, in which capacity he "implements the zoning ordinance and makes determinations and interpretations on how applications meet or don't meet that ordinance." (ECF No. 44-15, PageID 1889.)

Schmitt advised Atsalakis "on what type of home to buy" and "said to pick up one and apply for a special land use permit." (ECF No. 44-3, Dep. of C. Atsalakis, PageID 1215.) At that point, the City was "anticipating the request to be [for a house] on Grand River." (ECF No. 44-15, Dep. of T. Schmitt, PageID 1992.) Schmitt told Atsalakis that the City would "probably" process it "similar to like a foster care, because that's really all [they] ha[d] in the ordinance" and "it worked on [another] house." (ECF No. 44-15, PageID 1997.) According to Schmitt, he "gave her the best advice [he] could at the time to keep her moving in the right direction." (ECF No. 44-15, PageID 1996.)

On March 9, 2018, Atsalakis bought a house at 304 South Walnut for $275,000. (ECF No. 44-2, Warranty Deed, PageID 1173.) The house, which had previously been used as an adult foster care home, (ECF No. 44-3, Dep. of C. Atsalakis, PageID 1183), was in an R-1, "One-Family Residential District."[3] (ECF No. 44-5, § 4.06

---

[3] The Court has removed italics from, and fixed spacing issues within, all zoning code titles and text.

Purposes and Uses within Zoning Districts, PageID 1368; ECF No. 44-8, May 3, 2018 Carlisle Report, PageID 1398.)

Atsalakis planned to sell the house to ARH and for ARH to then enable HNV to operate a sober living home for women within it. (ECF No. 48-43, Dep. of R. Mayo, PageID 5815–16.) But ARH would only buy the house after it was approved for that use. (ECF No. 48-43, PageID 5815.)

### 3. The City Of Howell's Zoning Code Restricts Uses In R-1 Districts

At that time, the Zoning Code permitted only a limited number of land uses in R-1 districts. Uses permitted as of right included "one-family[4] detached dwellings" and, pursuant to state law, *see* M.C.L. 125.3206(1)(ii), "[s]tate licensed adult foster care small group home[s] serving six [] persons or less and adult foster care family home[s]." (ECF No. 44-5, § 4.06 Purposes and Uses within Zoning Districts, PageID 1368; ECF No. 44-29, § 6.04 Child and Adult Foster Care Facilities, PageID 2290.)

Some other "special land uses" ("SLUs") could be permitted upon application. (ECF No. 44-5, § 4.06 Purposes and Uses within Zoning Districts, PageID 1368; ECF No. 44-13, § 3.03 Special Land Uses, PageID 1591.) These uses included

---

[4] The Zoning Code defines a "family" as: "One or two individuals related by blood, marriage or adoption, with their direct lineal descendants or adopted children (and including the domestic employees thereof), occupying a dwelling unit in accordance with the standards of section 5.14." (ECF No. 44-7, § 2.02 Definitions, PageID 1385.) The Code adds that: "Anyone seeking the rights and privileges afforded a member of a family by this Code shall have the burden of proof by clear and convincing evidence of their family relationship." (ECF No. 44-7, PageID 1385.)

"[d]omestic units"—defined as groups of "individuals . . . whose relationship is of a regular and permanent nature and having a distinct domestic character or a demonstrable and recognizable bond where each party is responsible for the basic material needs of the other and all are living and cooking as a single housekeeping unit," (ECF No. 44-7, § 2.02 Definitions, PageID 1385)—with three[5] or more residents, *"adult foster care small group homes serving more than six (6) persons,"* and "adult foster care large group homes." (ECF No. 44-5, PageID 1368; ECF No. 44-29, § 6.04 Child and Adult Foster Care Facilities, PageID 2290.)

The Zoning Code provided that "[a] public hearing [would] be held by the [seven-member] Planning Commission for all [SLU] requests," and that the Zoning Administrator would provide notice of the SLU request at least fifteen days before the hearing "in a newspaper of general circulation within the City" and "to all persons [with] property . . . within three hundred [] feet of . . . the [subject] property." (ECF No. 44-13, § 3.03 Special Land Uses, PageID 1591.) The Code instructed the Planning Commission to "review the proposed [SLU] in terms of the standards stated within this subsection and [] establish that such use and the proposed location comply with the following criteria:"

(1) Will be harmonious and in accordance with the general objectives or any specific objectives of the Master Plan;

_____

[5] The code does not refer to domestic units of two people. Presumably, these units are allowed to move into R-1 Districts as of right, without a permit.

8

(2) Will be designed, constructed, operated and maintained so as to be harmonious and appropriate in appearance with the existing or intended character of the general vicinity and will not change the essential character of the area;

(3) Will not be hazardous or disturbing to existing or future nearby uses;

(4) Will be an improvement in relation to property in the immediate vicinity and to the community as a whole;

(5) Will be served adequately by essential public services and facilities or that the persons responsible for the establishment of the proposed use will provide adequately any such service or facility;

(6) Will not create excessive additional public costs and will not be detrimental to the economic welfare of the community; and

(7) Will be consistent with the intent and purposes of this Zoning Ordinance.

(ECF No. 44-13, PageID 1591.)

The Code gave the Planning Commission discretion to approve or deny SLU requests, or to approve them with "additional conditions and safeguards deemed necessary for the general welfare, for the protection of individual property rights and for ensuring that the purposes of this Zoning Ordinance and the general spirit and purpose of the district in which the [SLU] is proposed will be observed." (ECF No. 44-13, § 3.03 Special Land Uses, PageID 1591.) It also directed the Planning Commission to "incorporate[]" its decision in a "statement" specifying its finding, conclusions, and reasoning. (ECF No. 44-13, PageID 1591.)

The Code did not allow "[t]ransitional housing facilit[ies]" ("THFs")—which it defined as "facilit[ies] that provide[] housing accommodations and support services for persons or families but restrict[] occupancy to no more than twenty-four (24) months," not including "state-licensed residential facilities, spouse abuse/domestic violence shelters, or housing otherwise exempted from local regulation by the State of Michigan," (ECF No. 44-7, Definitions, PageID 1396)—in R-1 districts. (ECF No. 44-5, § 4.06 Purposes and Uses within Zoning Districts, PageID 1368.) But it did allow THFs in R-M, "Multiple Family Residential District[s]," as SLUs and "subject to the [additional] requirements of Section 6.27." (ECF No. 44-5, PageID 1369.)

The Code did not specifically refer to sober living homes at all. (ECF No. 44-15, Dep. of T. Schmitt, PageID 2070–71.)

### 4. Atsalakis Submits A SLU Application

On April 9, 2018, Atsalakis submitted to the City a Request for a SLU to allow for "rezoning of . . . 304 South Walnut." (ECF No. 44-3, Dep. of C. Atsalakis, PageID 1214; ECF No. 44-4, Request for Review, PageID 1353–66.) The Request explained:

> The proposed use of this property, is to house and to provide recovery supportive services, for up to 8 women in recovery from substance use disorders. Prior to being approved to enter the recovery housing program at the Amber Reineck House, the women will receive a professional assessment, detoxification, crisis treatment and participate in developing a plan for their continued recovery. Recovery supportive

services for residents of the Amber Reineck House will be provided
offsite through local outpatient treatment providers and the Home of
New Vision.

Currently, Livingston County offers residential services for men, but
not for women. The space and layout of this house is an excellent fit for
this much needed community service. The house is in close proximity
to Community Mental Health Services, the Livingston County Judicial
Center, Saint Joseph Livingston Hospital, Stepping Stones Engagement
Center, Howell Carnegie Library, 12 Step Recovery meetings, support
groups and employment opportunities; all which will play a vital role
in the recovery of the women residing in the home.

(ECF No. 44-4, PageID 1357.) The Request also stated that Atsalakis had "been very

encouraged by the community support for [her] initiative" and that she was "open to

discussing [her] plans for th[e] residence, providing a tour of the property and

answering questions if those of the board so desire[d]." (ECF No. 44-4, PageID

1357.)

Attached to the Request were floor plans of the Walnut House, other information

about the house, photos of the house, a Fact Sheet about HNV, and a Livingston

Daily article about opioid addiction that featured Atsalakis and ARH. (ECF No. 44-

4, Request for Review, PageID 1358–65.)

### 5. Opposition To Atsalakis' Application Arises

Shortly after Atsalakis submitted this Request, the City began to receive emails

and phone calls from people opposing the opening of an ARH at the Walnut House.

One opponent explained that he had learned of Atsalakis' plan to open an ARH there

through her "public" Facebook page. (ECF No. 48-9, Myers ETO Charles, PageID

5390.) Additionally, "unknown individuals" "distributed to the neighborhood" a flier that announced, "**<u>WARNING</u>!!!!!!!!!!!! HEROIN RECOVERY HOUSE PROPOSED TO MOVE INTO <u>YOUR</u> NEIGHBORHOOD AT 304 SOUTH WALNUT** . . . <u>CONTACT CITY OF HOWELL ASAP TO VOICE OPPOSITION.</u>" (ECF No. 48-12, Apr. 10, 2018 Charles ETO Schmitt, PageID 5396–97) (emphasis original). The flier listed phone numbers and emails for Schmitt, then-City Manager Shea Charles[6] (Schmitt's boss), Mayor Nickolas Proctor, and then-Mayor Pro Tem, Allen Schittler. (ECF No. 48-12, PageID 5397).

Most of the opponents "expressed concerns regarding property values, safety, and addiction or relapse of the residents of the proposed sober living home." (ECF No. 44-15, Dep. of T. Schmitt, PageID 2069.)

For example, on the day that Atsalakis submitted her Request, Jennifer LaBrecque emailed Charles:

> It has come to my attention that there are plans to operate a heroin recovery home in the city of Howell just two doors down from my families home . . . . You should all know that I intend to notify all vested parties, and fight this home to the fullest extent I am capable. . . . [T]his will destroy property values . . . . The city should support its residents and their efforts to better the city, not special interest recovery homes.

---

[6] Charles held that position for fifteen years, until June 2019. (ECF No. 44-10, Dep. of S. Charles, PageID 1417–18.)

(ECF No. 48-12, Apr. 9, 2018 LaBrecque ETO Charles, PageID 5396.) The next

day, Charles forwarded this email to Schmitt and other city officials. (ECF No. 48-

12, Apr. 10, 2018 Charles ETO Schmitt, PageID 5396.)

    For another example, on April 11, 2018, Jon Kabel emailed Charles:

> I was been robbed by heroin addicts in 2013. . . . They do whatever is
> necessary to feed their habit. / If one of them falls off their treatment,
> the neighborhood will be at risk. / . . . [T]hey should NOT be downtown
> . . . If this is a business trying to push this through, for the sake of us
> living downtown and being gone all day at work, you need to push back
> / I am watching this situation closely.

(ECF No. 48-8, Apr. 11, 2018 Kabel ETO Charles, PageID 5388.) Carbon-copying

Proctor, Charles responded:

> Thank you for your e-mail . . . . I have shared your e-mail with the
> Mayor & City Council and Tim Schmitt . . . will forward it to the
> Planning Commission. The City received a Special Land Use
> Application at 3:00 this past Monday and we have not yet begun the
> review process. Please let me stress that there have been **no** approvals
> issued by the City for this use. All special land use requests are
> considered by the Planning Commission and subject to a public hearing
> . . . . / The City will also be sending out a letter to the neighborhood
> either today or tomorrow with further information and discussing the
> upcoming process.

(ECF No. 48-8, PageID 5388) (emphasis original); *see also* (ECF No. 48-13, Apr.

12, 2018 Charles ETO Kautzman, PageID 5400) (reflecting that Charles sent the

same response to a different resident expressing similar concerns).

    And for a third example, also on April 11, Jonathan Myers emailed Schmitt and

the City Manager, in part:

. . . The City of Howell, and a single family neighborhood, should not be used as an experiment for Ms. Atsalakis' first foray into operating a drug treatment facility in a **single family neighborhood**. . . . The property values in the area are stable and rising and the price she paid, should have made her question whether she should knock on neighbor's doors and ask for thoughts and feedback on whether we would be interested in a heroin treatment facility steps away from our children. . . .

I've attached two screenshots. One from the Home of New Vision website and another regarding drug relapse rates. . . . The drain on city services in having police, fire and ambulance there and the disruption to the neighborhood would be terrible. It's a serious and terrifying concern for the neighborhood.

(ECF No. 48-9, Apr. 11, 2018 Myers ETO Charles, PageID 5390) (emphasis original).

### 6. The City Responds To Atsalakis' Application

Still on April 11, Schmitt emailed Atsalakis an update on her application. He told her that the City was "gearing up to . . . review [her] proposal and [he] need[ed] to schedule a time for [the City's] Building Official to do an onsite inspection, since the property w[ould] technically be a rental under [the] Code." (ECF No. 48-16, Apr. 11, 2018 Schmitt ETO Atsalakis, PageID 5407.) Although Schmitt did not usually attend inspections, (ECF No. 44-15, Dep. of T. Schmitt, PageID 2002), he also said that, in this case, he would "probably tag along . . . so [he] could get a feel for the property." (ECF No. 48-16, PageID 5407.) (He did not end up attending, however, because of scheduling conflicts. (ECF No. 44-15, PageID 2002.)) He continued: "Additionally, as you're probably aware, the neighborhood is already up in arms

14

over your request. We received emails/calls/flyers within hours of your submittal[.] I'm going through everything we've gotten, but we'll definitely have some questions we need answered shortly here." (ECF No. 48-16, Apr. 11, 2018 Schmitt ETO Atsalakis, PageID 5407.)

After Atsalakis said that she would be available in a week, Schmitt responded, "I would strongly advise against posting further regarding the project on social media, as I believe that it is leading to some misinformation within the neighborhood. . . . [I]t seems like people are misinterpreting what is out there and we are trying to work with people to get solid information out." (ECF No. 48-16, Apr. 11, 2018 Schmitt ETO Atsalakis, PageID 5407.) Atsalakis wondered if the opposition "[was] because of [a recent] news article," and noted that she had "not disclosed the address on any social media." ECF No. 48-16, PageID 5408.) But she also said that she "did remove the posts as [she] d[id] not want any negative publicity." (ECF No. 48-16, PageID 5408.) Schmitt replied, "I just know we've got a surprising number of calls and email already, so folks are getting information/disinformation somewhere, so I'm just trying to stay on top of things. Thanks [for taking the posts down.]" (ECF No. 48-16, PageID 5408.)

At his deposition, Schmitt testified that this email exchange had two purposes: first, "to schedule an inspection," and second, to give Atsalakis "a heads-up . . . and let her have a chance to clarify things and get ahead of the conversation." (ECF No.

44-15, Dep. of T. Schmitt, PageID 2001.) In Schmitt's view, the City was "essentially trying to run PR for [Atsalakis]," and "trying to push back" against community opposition that "d[id]n't make sense." (ECF No. 44-15, PageID 2001–03.) He said that the City "knew [it] w[as] going to need some additional information from [Atsalakis] to try and help make that case." (ECF No. 44-15, PageID 2003.)

Schmitt also sent Atsalakis a letter on April 11. After noting that Atsalakis' SLU request would likely be heard at the May or June Planning Commission meeting, that "Staff w[ould] need a survey of the property to move forward," and that he had emailed Atsalakis about the need for an inspection, he continued:

> There has been a great deal of information and misinformation in the community surrounding your application. Some members of the public have taken your social media postings to mean that you will be moving residents into the house this week or already have moved them in. Other information leads the public to believe that the City has already approved the use.

> As you are aware, the property is zoned R-1, Single Family Residential. **At this time, we want to be clear that no approvals have been granted for the use of the house as anything other than a single-family home for you and your immediate family's occupancy.** There is no active rental registration on the property, so occupancy of the house by anyone who isn't on the deed or directly related to someone on the deed is prohibited. If it is found that any person is residing in the house other than the owners of record, then tickets will need to be issued and the house vacated.

> Staff looks forward to continue working with you on your request, but we need to make sure that proper information is relayed to the neighborhood and correct procedure is followed.

(ECF No. 48-5, Apr. 11, 2018 Schmitt LTO Atsalakis, PageID 5001) (emphasis original).

At her deposition, Atsalakis testified that this letter signaled to her that "things were turning." (ECF No. 44-3, Dep. of C. Atsalakis, PageID 1234.) She stated that she did not agree with what she perceived as a suggestion that she had posted misleading information on social media. (ECF No. 44-3, PageID 1234–38.) In fact, Schmitt's letter did not accuse her of posting misleading information. Atsalakis also considered the threat of tickets and vacation to be "very stern and aggressive." (ECF No. 44-3, PageID 1234–38.)

At his deposition, Schmitt noted that sending this letter was "outside the normal process" in this first-time request. (ECF No. 44-15, Dep. of T. Schmitt, PageID 2038.)

*7. Opposition To Atsalakis' Application Continues*

The next day, April 12, Charles sent a letter to City "Resident[s]," which read, in relevant part:

> Over the last few days, you may have received a flyer about a recovery house permitted by the City of Howell at 304 South Walnut Street. At this time, the City has issued **<u>no approval</u>** for that address. On Monday, . . . the City received a Special Land Use Application for 304 South Walnut Street to establish a "house to provide recovery supportive services" for up to eight women recovering from substance abuse disorders. The City was not aware of the proposed use at this location prior to the submittal received on Monday afternoon. The applicants had only inquired about the application process for some other

17

properties in the City, but had not disclosed they were considering this location until their Monday submittal.

Now that a Special Land Use application has been submitted City staff will begin the review process. The City's Planning Commission is the body responsible for considering any Special Land Use applications. Pursuant to City ordinance, the Planning Commission requires a public hearing prior to taking action on a Special Land Use request. A notice of the hearing will be sent to all property owners within 300 feet of the proposed use 15 days prior to the hearing.

. . . The earliest the public hearing can be scheduled is May 16, 2018, a regular monthly Planning Commission meeting.

It is our understanding there are a number of social media posts giving the impression the City has approved the use and people are moving in next week. Again, this is not true. We have advised the applicant that they are not permitted to move individuals into the house. Only the owner and their family are authorized to occupy the residence.

(ECF No. 44-11, Apr. 12, 2018 Charles LTO Residents, PageID 1583) (emphasis original).

At his deposition, Schmitt characterized this letter as an attempt "to calm the neighborhood down and just tell them, Look, it's under review, we just got this, we're still trying to analyze it." (ECF No. 44-15, Dep. of T. Schmitt, PageID 2004.) And Proctor, at his deposition, explained that sending this sort of letter was atypical, but necessary to "put right" "misinformation" by "inform[ing] people of the process . . . and when the next regular Planning Commission would be so they could come and express personally their concerns or support." (ECF No. 44-36, Dep. of N.

Proctor, PageID 2700.) "As [Proctor] recall[ed], [the City] probably did [also] have

a few say they supported [Atsalakis'] effort." (ECF No. 44-36, PageID 2700.)

That same day, after they received this letter, Donn and Linda Deniston emailed

Charles the following about their past and present zoning grievances:

> A few years ago we attended a meeting regarding a house being used
> for sex offenders located just down the block on Washington Street.
> The impression we and others at that meeting got was that the city was
> somewhat naïve in thinking that residents in the area, many of them
> with children, would turn a blind eye to the obvious potential dangers
> and we all sensed a fair amount of indignation and arrogance from the
> spokespeople at that meeting when we raised our objections.
>
> Now we find out that there is a *possibility* of another halfway house for
> recovering substance abusers. . . . We hope the city understands the
> impact that allowing this use would have on . . . the city as a whole. The
> impact on property values is certainly a serious concern but so is the
> impact this would have on families in the area . . . .

(ECF No. 48-11, Apr. 12, 2018 Deniston ETO Charles, PageID 5394) (emphasis

original). Charles responded, in relevant part:

> In regards to your experience from 2013, the feedback we received
> during that time period help[ed] the City identify an area of our
> ordinance that needed strengthening. Under the current ordinance the
> City has clearly defined that uses of this type require specific approval
> before moving forward. As this is a special land use the Planning
> Commission has a higher level of discretion than if it was a "use by
> right", so public feedback does impact their final decisions.

(ECF No. 48-11, PageID 5394.)

Some would continue to oppose the ARH going forward. *See, e.g.*, (ECF No. 48-

17, Apr. 20, 2018 Rubin ETO Schmitt, PageID 5411–12) (expressing "grave

19

concern" "on behalf of the neighborhood situated directly between Southeast and Southwest Elementary schools" "over the safety and well-being of the neighborhood with the proposed usage of the Amber Reineck home"); (ECF No. 48-22, June 11, 2018 S. Rubin ETO Schmitt, PageID 5428) (using the exact same words); (ECF No. 48-20, Apr. 25, 2018, LeBrecque ETO Schmitt, PageID 5243) ("I hope you agree as, we in the neighborhood do, that this use does not correspond to or enhance our family centered neighborhood."); (ECF No. 48-40, June 2018, 2018 Bourne ETO Schmitt, PageID 5780) (stating that he found a "used needle and syringe in [his] front yard," which he believed to be a threat from someone in favor of the ARH or a planted example of "how bad the heroin epidemic is" from an opponent of it).

While Atsalakis' application was outstanding, Schmitt, Charles, or whoever received a comment from the public, would generally forward the comment to the Planning Commission, their usual procedure. *See* (ECF No. 48-17, Schmitt ETO Rubin, PageID 5411) ("Absolutely will make sure Planning Commission gets it Arnie."); (ECF No. 44-36, Dep. of N. Proctor, PageID 2670) (stating that comments from the public "could be" included in the packet that Schmitt would present to the Planning Commission and that "the packet usually includes all information, pro and con, for the Planning Commission to make an informed decision"); (ECF No. 48-24, May 16, 2018 Planning Commission Minutes, PageID 5433) (noting that at Planning Commission meetings, "attendees are given opportunities to speak, and

anything submitted in writing [about the issue being considered] will be included in the packet" of materials for review); (ECF No. 44-15, Dep. of T. Schmitt, PageID 1974) ("Generally, the public comment is to the planning commission.").

At his deposition, Proctor explained that he tried to give these opponents "a neutral response" and not "argue how they feel" or "discount anyone's feelings." (ECF No. 44-36, Dep. of N. Proctor, PageID 2706, 2716.) Schmitt testified that at that time "there was no broad effort for us to educate the public," and he added that the City "view[s] that as partially in any case the applicant's job." (ECF No. 44-15, Dep. of T. Schmitt, PageID 2006.)

At each of their depositions, Schmitt, Proctor, and Charles expressed disagreement with some of the community opposition to ARH. *See, e.g.*, (ECF No. 44-15, Dep. of T. Schmitt, PageID 2043) ("[W]e're used to getting e-mails from people that have gross inaccuracies and broad statements of their own interpretation of facts."); (ECF No. 44-36, Dep. of N. Proctor, PageID 2693) ("Personally, I am very supportive of recovery homes. . . . So my initial reaction [to the flier opposing ARH] personally, would [have] been, geez, kind of misguided, perhaps."); (ECF No. 44-10, Dep. of S. Charles, PageID 1467) ("I think my initial reaction [to one community member's complaint] was it is not the first time I have had a resident express a little hyperbole."). Further, Proctor thought that the Planning Commission would have "pushed back," "with facts," on any unfair opposition that might come

up at a public hearing. (ECF No. 44-36, PageID 2697.) And Schmitt was "fairly certain that [he] corrected a few people from saying this drug house to, No, these are actually recovering people that are trying to integrate themselves back into society." (ECF No. 44-15, PageID 2006.) Schmitt also stated that, in response to a similar prior controversy with "not-in-my-back-yard [('NIMBY')] crowd, people" opposing a house on Chestnut Street, the City had "made it clear that's sort of not how we function," and the house had been approved, because "it met [City] standards at the time." (ECF No. 44-15, PageID 1999–2000.)

Still, Schmitt testified that the Planning Commission considers public comments within a SLU analysis when "there's a concern that is raised and they think it's valid that [they] need to look into it further." (ECF No. 44-15, Dep. of T. Schmitt, PageID 1974.) Similarly, Proctor testified that the Planning Commission "would listen to residential input, residents input, constituents." (ECF No. 44-36, Dep. of N. Proctor, PageID 2677.) He added that public input "certainly would not be the sole factor" but "would be a contributing factor." (ECF No. 44-36, PageID 2704.) And he said that, in this case, "because of the apparent pushback from the residents, [the Planning Commission] wanted to make sure that [it] moved with certain due diligence in the process." (ECF No. 44-36, PageID 2720.)

Atsalakis testified that she felt bullied by the community members opposing her plan to open an ARH. (ECF No. 44-3, Dep. of C. Atsalakis, PageID 1309–11.) She

attributed this bullying, at least to some degree, to the City "broadcast[ing]" information about the proposed ARH at meetings and through mailings. (ECF No. 44-3, PageID 1311–12.) Although this is how all zoning requests are dealt with by cities—they must deal with them at noticed open meetings.

### 8. Schmitt Requests More Information from Atsalakis

On April 17, 2018, Schmitt sent another email to Atsalakis. He wrote, in relevant part:

> We've received a great deal of feedback over the course of the last week. I believe we need some clarification/additional information on the following items:
> - Explanation on intake procedures/how tenants are selected. Are they immediately out of hospital treatment? Are they actively in treatment? Just some explanation here seems to be the biggest question that has come up.
> - Is there a operator living in the house? Or is the house remotely managed?
> - Generally, how does the house operate? Curfew? One strike and you're out? Stuff like that. the only other time I can recall having a sober living house under review, these questions came up.
> - I would definitely include some discussion about House of New Vision's history/operations, as I expect that to come up.
> - Parking. Do the tenants have their own vehicles? Minor issue, but one that was brought up.

(ECF No. 48-27, Apr. 17, 2018 Schmitt ETO Atsalakis, PageID 5717.) These questions gave Atsalakis an "opportunity to beef up [her] narrative and explain what [ARH] does" in support of her request. (ECF No. 44-15, Dep. of T. Schmitt, PageID 2014.)

### 9. Schmitt Asks Carlisle Wortman To Review Atsalakis' Application

That same day, April 17, Schmitt emailed Atsalakis' application to Richard Carlisle, of Carlisle Wortman, "the city's planning consultant since [around] 1994." (ECF No. 44-15, Dep. of T. Schmitt, PageID 1964.) Schmitt asked Carlisle to "review the application . . . by Friday, May 3rd so [the City] c[ould] give [Atsalakis] a chance to review and provide additional information before any potential Planning Commission meeting." (ECF No. 48-26, Apr. 17, 2018 Schmitt ETO Carlisle, PageID 5715.) He also told Carlisle that the City had "received a great deal of comment from the neighborhood, which [it was] consolidating and forwarding to [Atsalakis] to request additional information." (ECF No. 48-26, PageID 5715.)

### 10. The Initial Inspection Concludes

On April 18, 2018, the City's Inspector concluded that the Walnut House was not approved for SLU review because it was missing smoke and carbon monoxide detectors, in violation of R.315.2 and R.314.3, and the basement lacked an egress window, in violation of R.310.1. (ECF No. 44-40, Apr. 18, 2018 Inspector Report, PageID 3205.) He also noted that a "floor joist [was] cut for [the] upstairs shower downspout away from house," there was "loose outside water," and an "outside outlet [was] not waterproofed." (ECF No. 44-40, PageID 3205.)

24

*11. Carlisle Sends Initial Questions About Atsalakis' Application*

On May 3, 2018, Carlisle submitted his review of Atsalakis' application to Schmitt. In this review, Carlisle noted that the Walnut House was "zoned R-1," and that Atsalakis had "applied for a special land use under a similar premise as the application for the sober living home at 313 Chestnut St." (ECF No. 44-8, R. Carlisle MTO T. Schmitt, PageID 1398.) He continued:

> In the case of 313 Chestnut St, the site was also zoned R-1 . . . and was an existing duplex. Because the Zoning Ordinance does not specifically mention sober living homes as either a permitted or special land use in any district, the Zoning Administrator made a determination that the proposed use is similar in nature to an adult foster care home. An adult foster care small group home serving between 7 and 12 residents would require special land use approval.

(ECF No. 44-8, May 3, 2018 Carlisle Report, PageID 1398.) And then Carlisle stated that, "[i]n order to provide an opinion on the acceptability of the proposed special land use at 304 South Walnut, [he] w[ould] need additional information relative to the following:"

> 1) An important distinction regarding 313 Chestnut was the fact that it was an existing duplex. The Building Official determined that the maximum total occupancy for both duplexes was eleven (11). That included ten (10) residents and one (1) manager, five (5) residents in each unit and a resident manager in one of the two units.
>
> Therefore, 313 Chestnut had a history as a rental unit accommodating group living. What characteristics of 304 South Walnut would make it either similar to or different than 313 Chestnut?

2) The sober living home at 313 Chestnut has on-site management. We have not been able to discover in the information submitted whether 24/7 on-site management will be provided?

3) The narrative attached to the application indicates that residents will receive treatment off-site. What, if any, specific treatment will be provided in the proposed home?

4) The home at 313 Chestnut was able to accommodate most of its parking on-site. Both units have two car garages and space in the driveway for two more cars. It appears that 304 S. Walnut has a single garage and single driveway. How will parking be handled for eight (8) occupants?

5) Information provided by the applicant indicates that Home of New Vision is licensed by the Michigan Department of Community Health. What is the specific license? Also, what State licenses and/or permits are required, if any, at 304 S. Walnut?

6) Will family members be living with individuals who are receiving housing at 304 S. Walnut?

7) What is the expected average length of stay?

(ECF No. 44-8, PageID 1398–99.)

Two weeks later, Schmitt forwarded Carlisle's review to Atsalakis and asked her if she could "look it over and get a response together to the questions [that it] raised?" (ECF No. 48-28, May 17, 2018 Schmitt ETO Atsalakis, PageID 5719.) He added that he would "be able to finalize a report then and hopefully present it to the Planning Commission at their next meeting." (ECF No. 48-28, PageID 5719.)

On May 24, after one reminder email from Schmitt, (ECF No. 44-9, May 21, 2018 Schmitt ETO Atsalakis, PageID 1402), Atsalakis sent Schmitt answers to Carlisle's questions. (ECF No. 44-9, May 24, 2018 Atsalakis ETO Schmitt, PageID

1401.) These answers, which Atsalakis procured from Glynis Anderson, the Founder

and CEO of HNV, read as follows:

> [(1)] The home would have only 6 residents and 1 House Leader . . . .
> Home of New Vision has provided the same services in Washtenaw
> County for 21 years and have never had even a single visit from the
> local police Departments to any of our 7 Recovery Residences. . . .

> [(2)] Each of our Recovery Homes have a house leader/manager that
> lives on site. This will also be provided at 304 Walnut Street. . . .

> [(3)] There will be no treatment provided on site at 304 South Walnut
> St. / . . . There are no required licensing or accreditation for Recovery
> Housing, however, Home of New Vision keeps all records in Recovery
> Residents as though it was licensed and accredited program. / Each
> woman, prior to entering our Recovery Housing program, will be
> clinically assessed and/or screened for appropriateness for Recovery
> Housing at our home office . . . . Commonly our residence have already
> received treatment and are prepared to and have already lived a life in
> productive recovery. There are many services available in the
> Livingston County area that our recovery housing will utilize. . . .

> [(4)] One of the reason we picked this location is the access to the
> necessary and desired locations surrounding the home which can be
> reached without transportation. Employment is an immediate
> requirement for the residence and with many not having transportation
> this particular location ensures all of our residence will be employed.
> Many women do not have a vehicle when they enter Recovery Housing
> (average of three) this will make the parking manageable. There is room
> for 3 cars in the drive and garage and two in front of the house if
> necessary. . . .

> [(5)] Home of New Vision has been licensed by the State of Michigan
> since 1992. Our State licensing is with the Licensing and Regulatory
> Affairs (LARA) for Residential Treatment, Case Management, Peer
> Recovery Supports, Outpatient Services, Detoxification and Early
> Intervention for our services in Ann arbor Michigan. In Jackson County
> we are licensed for Outpatient Treatment and Case Management. We

also hold a National Accreditation with CARF International for all of our treatment services, in both Jackson and Ann Arbor Michigan. . . .

[(6)] NO . . .

[(7)] Residence can stay up to 2 years. With our 21 year history of providing recovery housing our average length of stay has been pretty steady at 1 year.

(ECF No. 48-29, May 24, 2018 Responses to Carlisle Report, PageID 5724–26.)

Schmitt responded that they were "still on track for the June 20th [Planning Commission] meeting, but [he] d[id]n't have official approval of the agenda yet." (ECF No. 44-9. May 25, 2018 Schmitt ETO Atsalakis, PageID 1401.)

### 12. Carlisle Issues His Final Report On Atsalakis' Application

On June 7, 2018, Carlisle issued his final Report. (ECF No. 48-34, June 7, 2018 Carlisle Report, PageID 5747–50.) In it, he noted again that "[t]he Zoning Administrator [had] previously made a determination that the proposed use is similar in nature to an adult foster care home" and thus the Walnut "home would be similar in nature to an adult foster care small group home serving between 7 and 12 residents which would require special land use approval." (ECF No. 48-34, PageID 5748.)

From there, he considered the Walnut House's compliance with the criteria set out in § 3.03(c). He found, among other things, that "[t]he total number of residents and need for parking" could cause "disruption" and was "a concern"; "the negative impact to the economic welfare of the community . . . [was also] a legitimate concern"; and "while there may [have] be[en] a need for a use of this nature, it [was]

28

not apparent that the need overr[ode] the potential detriment to the surrounding residents." (ECF No. 48-34, June 7, 2018 Carlisle Report, PageID 5748–49.)

Carlisle went on to opine that the ARH would not qualify as a domestic unit. (ECF No. 48-34, June 7, 2018 Carlisle Report, PageID 5749.) And then he concluded that "the use as proposed [was] not a compatible use for a single family neighborhood." (ECF No. 48-34, PageID 5750.) Schmitt could not remember another time that Carlisle had recommended denial of an application. (ECF No. 44-15, Dep. of T. Schmitt, PageID 1964.) Nevertheless, Schmitt testified that, after receiving the Report, he began to draft a cover memorandum recommending that the Planning Commission *approve* Atsalakis' application. (ECF No. 44-15, Dep. of T. Schmitt, PageID 1993–94.) Schmitt thought that Carlisle's contrary assessment might have led the Planning Commission "to ask more questions" about the application but that the Planning Commission would not have "hid[] behind that [assessment] in making a determination." (ECF No. 44-15, PageID 2031.)

*13. Atsalakis Holds An Open House*

On June 10, Atsalakis held an open house at 304 South Walnut, "to let the community know . . . how the house would be ran," give "them a chance to meet" Anderson, from HNV, and "educate" them about substance abuse recovery. (ECF No. 44-3, Dep. of C. Atsalakis, PageID 1257–58.) This did not go well. The "mood was tense and the neighborhood was not supportive." (ECF No. 44-3, PageID 1257–

58; ECF No. 48-32, June 13, 2018 Schmitt MTO Planning Commission, PageID 5741.)

*14. Atsalakis Withdraws Her Application*

The next day, David Plunkett, an attorney representing Atsalakis, sent a letter informing Schmitt and Charles that Atsalakis was withdrawing her application (ECF No. 44-16, June 11, 2018 WWR&P LTO Schmitt, PageID 2196–98):

> Since submitting the Special Land Use Request, Ms. Atsalakis has received a great deal of input from the community regarding her planned use of the Property, including at an open house held at the Property on June 10. Some of the input has been supportive and encouraging, some has taken the form of suggestions regarding possible changes to our client's plans and, unfortunately, some has been social media comments and posts attacking Ms. Atsalakis personally, denigrating the potential residents of the Amber Reineck House and making false statements. That said, Ms. Atsalakis is sensitive to concerns expressed by the residents of Howell and wants to make all efforts to be a good neighbor and member of the Howell community.

(ECF No. 44-16, PageID 2196–97.) "As a result," the letter continued,

> Atsalakis is reducing the number of women who will reside at the Property from "up to 8," as stated in the Special Land Use Request to six (6). As stated in a May 3, 2018 memorandum from the City's planning consultant, Carlisle Wortman, to Mr. Schmitt: "[] the Zoning Administrator made a determination that the proposed use is similar to an adult foster care home. An adult foster care small group home serving between 7 and 12 residents would require special land use approval." The statement is consistent with Section 6.04(c)(1)B. of the City of Howell's Zoning Ordinance.
>
> Because the Amber Reineck House will now only serve six residents, such use of the Property is a permitted use in the R-1 zoning district and there is no need for Ms. Atsalakis to seek or obtain a special land use permit. . . . If the City of Howell takes the position that a special

30

> land use permit is necessary for the Amber Reineck House to operate
> at the Property as a sober living home limited to six women residents,
> please let us know.

(ECF No. 44-16, PageID 2197.)

The day after that, June 12, Schmitt sent a letter to City residents, telling them that Atsalakis had "formally withdraw[n]" her application and "[t]herefore, the Planning Commission ha[d] officially . . . removed" the application from its agenda. (ECF No. 48-36, June 12, 2018 Schmitt LTO Community, PageID 5754.) At the same time, he noted that Atsalakis had "expressed [her] intention to continue moving forward with a recovery supportive services house at this location, . . . under other provisions in the Zoning Ordinance," and he "expect[ed] this request to reappear in the future in some form or another," concluding, "*[a]t this time, no approval has been granted and they do not have approval to occupy the house for anything other than a single family*." (ECF No. 48-36, PageID 5754) (emphasis original).

On June 15, Schmitt sent a letter to Atsalakis acknowledging that he had received the withdrawal letter from her attorney. (ECF No. 44-16, June 15, 2018 Schmitt LTO Atsalakis, PageID 2199.) He continued:

> At this time, there is <u>no approval for any sort of occupancy</u> for the
> structure at 304 South Walnut. There were two major health/safety
> violations discovered during the review the Special Land Use request,
> the need for a basement egress window and the beam
> repair/replacement on the upper floor. These items need to be addressed
> prior to any occupancy of the house, single-family or otherwise.

> Your attorney pointed out a specific clause in the Zoning Ordinance
> that would allow you to operate the Amber Reineck House in a slightly
> changed matter from the Special Land Use request. At this time, Staff
> has not received the State license that is required to operate under that
> clause. Until such time as said license is granted and provided to the
> City, <u>no occupancy is permitted under Section 6.04(c)(1)A of the
> Zoning Ordinance.</u>

(ECF No. 44-16, PageID 2199) (emphasis original).

ARH could not obtain the State License required by Section 6.04(c)(1)A because
that is a license for adult foster care homes and there is no such license for sober
living homes.

### 15. Schmitt Proposes And The City Council Enacts A Moratorium

On June 22, 2018, Schmitt submitted to the seven-person City Council[7]—which
included Mayor Proctor throughout the duration of the events giving rise to this case,
and which has the power to pass new zoning laws—a memorandum "re[garding]
group homes and sober living houses" that proposed a "moratorium for all uses in
the R-1 or R-2 zoning district that would require approval of a special land use to
allow unrelated persons to live together in a single-family home." (ECF No. 48-42,
June 22, 2018 Schmitt MTO Proctor, PageID 5790.) The memo read, in full:

> The Community Development Department received an application in
> April for a recovery supportive services home at 304 South Walnut.
> This is a group home setup for people recovering from addiction, in this
> case from heroin. Staff received a tremendous amount of public input

---

[7] In the summer of 2018, City Council members were Robert Ellis, Jan Lobur, Steven
Manor, Michael Mulvahill, Andrew Yost, Scott Niblock, and Proctor. (ECF No. 48-
45, July 23, 2018 City Council Minutes, PageID 5899.)

on the application, largely negative from Howell residents and positive from those outside of the City. After an informational open house on June 10th, the applicant formally withdrew their original application and is attempting to pursue other paths to open a facility at the site.

This was the second formal application that the City has received in the past three years for a facility of this nature. We have had conversations with two other groups interested in moving or opening a similar facility in the City. There are a number of existing homes in the City that are similar in character that pre-date the City's ordinances and have not gone through the formal approval process, as they are an existing non-conforming use. Staff is also aware of a recent home based facility that was licensed by the State for six adults as a foster care facility, thereby superseding local requirements.

These group living situations, either related to addiction recovery or some other situation, appear to be consolidating in the City of Howell. As we have spoken to existing and potential operators, the City's concentrations of jobs, the services we provide (specifically local Police), and Livingston County's presence in Howell, serving high needs populations (Community Mental Health and Justice Center) appear to be encouraging the growth of this housing sector. Additionally, previous actions by the State related to adult foster care facilities have limited the City's abilities to regulate certain types of group homes. At this time, Staff is not 100% certain we know where every one of these houses are in the City.

With the feedback from 304 South Walnut, Staff determined that additional study is necessary on this topic, not just locally, but regionally. These facilities are beginning to create a negative perception among some populations as opioids have become more of a focus of the homes. There is a strong sense by some that the City of Howell is taking on more than our fair share of this housing type in the County or that specific neighborhoods are taking on more than their fair share within the Community.

Staff believes that we need to look at this topic at a Countywide level, looking at the location of as many group homes as Staff can identify in each municipality in Livingston County. This will allow us to determine if Howell is taking on more than our fair share of this land

use type. This topic will take time and outside resources to fully analyze. Staff anticipates Carlisle Wortman Associates and outside legal counsel both being required to expend substantial hours on the topic, along with Staff work. We anticipate needing between six and nine months to do a full analysis of the County, our legal options within our current ordinances, and our legal options going forward under the existing State framework. As such, Staff would recommend the City Council implement a moratorium for all uses in the R-1 or R-2 zoning district that would require approval of a special land use to allow unrelated persons to live together in a single-family home. This will allow Staff and consultants time to fully analyze the situation, without having to work around new applications for this type of use.

(ECF No. 48-42, PageID 5789–90.)

When asked to describe this memorandum at his deposition, Schmitt offered:

This is our initial memo to city council about we really should get regulations in place so we don't have the sort of ad hoc approach of calling it related to an adult foster care. *Let's put an ordinance in place to give guidelines for people so they can more easily get through this process.*

. . .

Let's take a step back. Let's get the facts out there. What's in the community. *What kind of guidelines can we put in place to make this easier for people if they want to do this in the future*, because, you know, there was some obvious flaws in the approach because we were trying to . . . fit a land use in that's not directly listed in the code. . . . *So we wanted to give these people their own process as they want to open a sober living home or sort of group housing facility more broadly.*

(ECF No. 44-15, Dep. of T. Schmitt, PageID 2070–71) (emphasis added). He also clarified that he had discussed the issue with Charles and "probably talked to the city attorney at this point too." (ECF No. 44-15, PageID 2078.)

34

When asked to explain why the memorandum mentions "public input" and the

public's "negative perception," Schmitt responded:

> I think we're just trying to set the stage for this is why we're
> recommending that you do a moratorium and give us an opportunity to
> establish an ordinance.[8]

> If we just came forward and said we had an application, they withdrew,
> council is unlikely to give us the space we needed to try and draft this.
> So by explaining that there was a great deal of public input, we were
> given the latitude to move forward with this ordinance change.

> . . .

> [P]eople were forming their own opinions and trying to create their own
> facts about things. So my point was, again, let's take a step back, get
> some facts, get some reality here so we can show people, Look, whether
> or not you think they are bad, there's not a lot of them. They aren't bad.
> They haven't had a negative impact in other places. Here's how we can
> address them so everyone is happy going forward.

(ECF No. 44-15, PageID 2071–74.)

On July 19, 2018, Schmitt submitted a proposed Moratorium Resolution to

Proctor and the rest of the City Council. (ECF No. 44-18, Moratorium and

Introduction, PageID 2204–05.) In his memorandum introducing the Moratorium,

Schmitt again noted that "[t]here were a number of questions raised during the 304

South Walnut review that require substantial investigation to answer fully." (ECF

No. 44-18, PageID 2204.) He identified "three main areas that Staff [was]

---

[8] In fact, the City did go on to create a new/updated Ordinance that provided for
approving sober living group housing homes without the present necessity of
holding an open Planning Commission hearing. *See* Section I.A.21, *infra*.

propos[ing] to focus on in reviewing th[e] topic" of "group home/sober living facilities and regulations in the City":

> Where are the group home/sober living houses located within the City of Howell?
>
> Where are these types of homes located elsewhere in Livingston County and is the City of Howell taking more than our fair share of these uses Countywide?
>
> Are there gaps in our ordinances that are allowing or encouraging these uses to concentrate near downtown Howell?

(ECF No. 44-18, PageID 2204) (bullets removed). And he explained that a twelve-month moratorium would "give the Planning Commission and City Council time to review the findings at the end of the [anticipated six to nine month] study period." (ECF No. 44-18, PageID 2204.) The end of this memorandum stated that Charles had "reviewed and approved [it] for submission." (ECF No. 44-18, PageID 2204.)

The proposed Moratorium Resolution read as follows:

### RESOLUTION NO. 18-15
### MORATORIUM IN R-1 & R-2 ZONING FOR ANY SPECIAL LAND USE APPL[I]CATIONS FOR UNRELATED PERSONS TO LIVE TOGETHER

**WHEREAS**, the City of Howell allows for adult and child foster care facilities in residentially zoned properties, subject to Special Land Use approval; and,

**WHEREAS**, the City also allows Domestic Units, consisting of three or more unrelated persons, in residentially zoned properties, subject to Special Land Use approval; and,

36

**WHEREAS**, there have been increased inquiries for sober living houses and similar group living arrangements that are not specifically listed in the Zoning Ordinance located in the City of Howell; and,

**WHEREAS**, there appears to be a substantial concentration of existing group housing situations in the City that predate current standards, concentrating in downtown neighborhoods; and,

**WHEREAS**, the City desires to study this topic without an active application and there are currently no active applications in the City.

**NOW, THEREFORE, BE IT RESOLVED**, that the Howell City Council enacts a twelve-month moratorium on the acceptance, processing, review, and/or approval of any application for a Special Land Use to allow unrelated persons to live together in any property in the R-1, Single Family Residential, or R-2, Single Family Residential, zoning districts.

(ECF No. 44-18, Moratorium, PageID 2205.)

On July 23, City Council approved the Moratorium. (ECF No. 48-45, July 23, 2018 City Council Minutes, PageID 5899, 5901.) The Council's meeting minutes reflect:

> **APPROVED – RESOLUTION NO. 18-15, MORATORIUM ON GROUP HOUSING IN THE R1 & R2 ZONING DISTRICTS**
> MOTION by [Council Member] Yost, SUPPORT by [Council Member] Lobur, "To adopt Resolution No. 18-15 . . . ." Community Development Director Schmitt indicated the recent application brought out a lot of discussion on group housing and staff would like to have time to research the issue and look for potential ways to approach the use differently. The broader discussion on fair share housing will be considered to determine if the City is taking on more of these types of uses than their share. The City received correspondence from residents Jonathon Myers and Kristi DeVries expressing their support for the moratorium and encouraging Council to approve it. Council questioned the approach and suggested addressing how the management of the group homes are regulated noting they will only be successful if they

are run well. Staff will look at balancing potential policies with state law, consult with planner Carlisle Wortman and legal counsel to make sure regulations are correct. The City of Howell is not the only community looking at this issue. City Manager Charles indicated staff may engage Johnson Rosati on the initial work and if it becomes a bigger project, he will update Council; the intended budget for the project will be provided within 60 days. There are no active applications therefore staff has no concerns with applying the temporary moratorium at this time. MOTION CARRIED (6-0)[9].

(ECF No. 48-45, PageID 5901.)

At his deposition, Proctor testified that he did not know of any other zoning moratoria that the City of Howell had enacted before this one. (ECF No. 44-36, Dep. of N. Proctor, PageID 2741.) He agreed that the moratorium was "an unusual step," opining that it was "maybe unprecedented for the City but may[be] not unprecedented for other municipalities around the country that may have been presented with the same scenario." (ECF No. 44-36, PageID 2741.)

Proctor also testified that the moratorium was prompted by "the community feedback and [the City] not really knowing what the density [was]," then clarified that it was "a way to get more information on whether [the City had] a density problem," and then agreed that "that concern was . . . raised by the community in response to" the Walnut House application. (ECF No. 44-36, Dep. of N. Proctor, PageID 2734.) In contrast, Schmitt testified that "community outreach" had no effect on his recommendation that the City implement the moratorium. (ECF No. 44-15,

---

[9] Niblock was absent. (ECF No. 48-45, PageID 5899.)

Dep. of T. Schmitt, PageID 2039, 2072–73.) According to Schmitt, his recommendation "was entirely driven by the fact th[at the City] had had two applications in two years, and [it] didn't have a very . . . clear process, so [it] needed to get clarity for the applicants." (ECF No. 44-15, PageID 2039.) And yet, he also testified that the public response was likely what convinced the City Council to give the staff "a chance to pause and step back . . . as opposed to trying to rush" the Ordinance change. (ECF No. 44-15, PageID 2072–73) (adding that "if no one had really cared about this and the applicant had just withdrawn, city council would have just directed us to work on it").

When asked about the Moratorium's "substantial concentration of group housing" language, Proctor testified that he did not think that sober living homes would lead to an increased burden on police, and he did not want to "jump to th[e] conclusion" that a high density of sober living homes "could be an issue or a problem." (ECF No. 44-36, Dep. of N. Proctor, PageID 2736–38.) However, he explained, "if you have a density of a residential area that turns into a 501(c)(3), that's going to take a hit on our tax base." (ECF No. 44-36, PageID 2738.) Proctor also testified that he thought "if sober living homes . . . were exclusively in the City of Howell and none anywhere else, that would beg the question, why aren't others sharing in the effort to provide these services to those in need?" (ECF No. 44-36, PageID 2746.) And, while he said he did not personally think it would be a problem

if the City of Howell encouraged the types of uses mentioned in the Moratorium, he also did not "think [the City] should necessarily be putting out marketing literature saying, oh, yes, everyone come to Howell, because then [the City] would push a disproportionate share of sober living homes in one municipality." (ECF No. 44-36, PageID 2747.) Proctor testified that he could not "speak intelligently about how [the other city council members] feel about that issue, but knowing them all, [he thought] that most would share generally the same kind of logic." (ECF No. 44-36, Dep. of N. Proctor, PageID 2747.)

### 16. *Atsalakis Begins Renting Out The Walnut House*

Atsalakis received approval to rent the Walnut House in late August of 2018. (ECF No. 44-20, Rental Approval, PageID 2211.) Since then, she has been renting the house to a single family (now on a month-to-month basis). (ECF No. 44-2, Dep. of C. Atsalakis, PageID 1273–83.)

### 17. *The City Repeatedly Extends The Moratorium*

The original, one-year Moratorium was set expire in July of 2019. In late May 2019, Schmitt responded to Myers, who opposed the ARH and had requested an update in the previous month:

> I don't have a specific update on the property at 304 S. Walnut, other than it is rented and they've done some work on the basement. But outside of that, there has been no further discussion about a potential recovery home at this location. Staff will be asking for a three month extension of the moratorium to finalize some ordinance changes that we hope will help. We can't ban them outright, per the research into the

court cases on the matter, and our ability to regulate is limited, but we believe we have a path forward that should help.

(ECF No. 48-23, May 31, 2019 Schmitt ETO Myers, PageID 5430.)

On June 6, 2019, Schmitt submitted a memorandum to Proctor and the City

Council requesting a three-month extension to the Moratorium:

> The moratorium was put into place shortly after an application for a sober living home was withdrawn for the property at 304 South Walnut. This application had led to substantial neighborhood outcry and concern.
>
> The moratorium was put into place to allow Staff and outside consultants time to review our current ordinances and the state of regulation throughout the country, specifically as it relates to sober living homes. . . .
>
> At this time, we are asking City Council to approve a three-month extension . . . to allow Staff, the City Attorney, and our consultants to finalize work on the potential ordinance changes. In our review, we have found that the legal landscape for regulation of these uses is far from settled, but there are things that we can recommend City Council implement to address some of the concerns from the neighborhood. This will include a new licensing procedure and a new Special Land Use review process for these types of uses.

(ECF No. 48-46, June 6, 2019 Schmitt MTO Proctor, PageID 5905.)

The City Council[10] approved the extension on July 10, 2019. The Council's

meeting minutes record the approval as follows:

---

[10] At this point, the Council comprised Ellis, Lobur, Mulvahill, Manor, Proctor, Jeannette Ambrose, and Randy Greene. (ECF No. 44-35, PageID 2602.)

**APPROVED – RESOLUTION NO. 19-16, GROUP HOUSING MORATORIUM EXTENSION**

MOTION by [Council Member] Mulvahill, SUPPORT by [Council Member] Ambrose . . . . Community Development Director Schmitt indicated group housing regulations are changing and staff wants to ensure resident concerns are being addressed. City Attorney Perkins confirmed the moving targets on case law and indicated staff is reviewing local ordinances that have been upheld in Court to ensure the final regulations are enforceable. Council requested a monthly status report on the issue so they could be included in the process. Deanna Devlin, representing Amber Reineck House, indicated it had been one year since they opened their door to talk to residents in the neighborhood. She described the use as a Sober Living Home for 6 women that have been through rehabilitation and chosen to lead sober lives. They have been very patient and would like the issue to be resolved. Discussion followed. MOTION CARRIED (6-1). Mayor Proctor opposed.

(ECF No. 44-35, June 10, 2019 City Council Minutes, PageID 2604.)

At his deposition, Proctor elaborated on his opposition to the extension: he "remember[ed] saying that [he] believe[d] the Amber Reineck House people deserved a way forward, an answer, and [he] believe[d] [the City's] constituents needed to know a way forward. And [he] believe[d] 12 months was sufficient time and was disappointed that they needed more time." (ECF No. 44-36, Dep. of N. Proctor, PageID 2657.)

Subsequent Resolutions extended the Moratorium to March 23, 2020. (ECF No. 44-39, Feb. 24, 2020 City Council Minutes, PageID 3199.)

*18. Atsalakis Requests Accommodations*

On September 27, 2019, during the Moratorium, Atsalakis sent a letter to Schmitt requesting "a Special Land Use pursuant to Section 3.03 . . . on behalf of the Amber Reineck House and its expected six residents." (ECF No. 44-21, Sept. 27, 2019 Atsalakis LTO Schmitt, PageID 2213.) In this letter, she requested "two accommodations to the City of Howell's current zoning regimen and requirements":

> First, the Amber Reineck House requests an exception to the moratorium currently in effect (Resolution 19-16) and requests that the City of Howell immediately consider its Special Land Use application. This accommodation is necessary for the Amber Reineck House's application to be approved and housing for disabled women at 304 South Walnut Street can begin as soon as possible.
>
> Second, the Amber Reineck House requests an exception to the [nine] following procedural and substantive zoning requirements to operate a sober home facility for six women at 304 South Walnut Street, Howell, MI.
> - Public hearing requirements (§3.03(a) and (c); §3.13)
> - Public notice requirements, both publications and mailings (§3.03(b))
> - The issuance of any statements of findings and conclusions (§3.03(d))
> -  Compliance with the criteria of §3.03(e)
> - Any special requirements imposed under §3.03(f)
> - The one-year expiration of permission under §3.03(g)
> - Site Plan Review described in §3.04 (a)-(c)
> - Planning Commission Review as described in §3.04(e)
> - Application for Certification of Zoning Compliance under §3.07.

(ECF No. 44-21, PageID 2216.)

Atsalakis also noted that "the six women who will be residing in the Amber Reineck House at 304 South Walnut Street are disabled/handicapped within the meaning of the Fair Housing Act." (ECF No. 44-21, Sept. 27, 2019 Atsalakis LTO Schmitt, PageID 2215–16.) She explained that "[l]iving in a congregate setting with others like a family or a group of non-disabled people under the supervision of a qualified addiction counselor is necessary for the [projected ARH residents] to have an equal opportunity to use and enjoy the dwelling at 304 South Walnut Street, the housing of their choice." (ECF No. 44-21, PageID 2216.) And she asserted that:

> [A]llowing these accommodations will not impose an undue financial and administrative burden on the City of Howell. They will not fundamentally alter the City's zoning scheme. And, in light of the discriminatory opposition which has already occurred toward the Amber Reineck House, it would be manifestly futile for it to seek to comply with these requirements. We also note that the City has already held a public hearing and issued public notices with respect to this property. With respect to the other requirements, they are not required of households in single family units without occupants who are disabled, and so should not be applied here.

(ECF No. 44-21, PageID 2216.)

To the letter, Atsalakis attached a Request for Review, an updated Project Narrative, the Deed to the Walnut House, floor plans, and Google Maps and real estate agent profiles of the House. (ECF No. 44-21, PageID 2217–31.)

About a week later, on October 3, Schmitt responded to Atsalakis:

> Thank you for stopping by last Friday . . . with your request for an accommodation . . . . As you are well aware, the City has been diligently working for slightly over a year on ordinance updates to address

44

Transitional Housing Facilities and Sober Living Homes and to provide a process under our Zoning Ordinance for applicants to request a Special Accommodation Use approval. There is currently a moratorium in place on the acceptance, processing, review, and/or approval for any Special Land Use request which would allow unrelated persons to live together in a single-family residential district.

The ordinance changes have been reviewed by the Planning Commission and recommended for approval. The City Council has held the first reading of the ordinance changes and is expected to take action at their October 28th meeting to approve the regulations, which would then take effect seven days after the ordinance is published. The moratorium would then be lifted immediately after the ordinance takes effect.

At this time, I am unable to accept your Special Land Use application request under the moratorium that is currently in place. Once the ordinance has been officially adopted and is in effect, you are welcome to make formal application as either a Sober Living Home under the new ordinances or request a Special Accommodation Use. Either request will require a public hearing, as is the case with any Special Land Use under the City's Zoning Ordinance.

(ECF No. 44-22, Oct. 3, 2019 Schmitt LTO Atsalakis, PageID 2233.)

Under his signature on this letter, Schmitt included his title, "Community Development Director," and he carbon copied Interim City Manager Erv Suida, Perkins, Carol Rosati, and Carlisle. (ECF No. 44-22, PageID 2233.)

At his deposition, Proctor stated that, like Schmitt, he "believe[d]" that during the moratorium there was no "avenue available to somebody who wanted to open a sober living home," because the City was "not accepting any applications for special land use" for the purposes listed in the Moratorium. (ECF No. 44-36, Dep. of N. Proctor, PageID 2750.)

*19. Schmitt And Atsalakis Meet For Coffee*

On October 30, 2019, Schmitt and Atsalakis met for coffee. (ECF No. 44-3, Dep. of C. Atsalakis, PageID 1316.) According to Atsalakis, Schmitt "wanted to squash the lawsuit and -- or moving forward with lawyers, and he said he could get 304 open and he just wanted to make this go away." (ECF No. 44-3, PageID 1316.) Atsalakis said that she "wanted to see how he was going to do that," but "nothing ever came from it" and she "didn't hear anything following up from [the]" meeting. (ECF No. 44-3, PageID 1317.)

*20. The City Drafts The New Ordinance*

Meanwhile, the City had been working throughout the Moratorium on updating its zoning laws.

In April 2019, Carlisle Wortman completed a Report of "Preliminary Findings" on "Recovery Facilities" in the "City of Howell and Surrounding Townships." (ECF No. 58-2, Apr. 9, 2019 Carlisle Wortman Report, PageID 8030–34.) The Report noted that the "City of Howell [had] requested an evaluation be performed regarding the location, type and number of substance abuse recovery homes located within the City of Howell and the four surrounding Townships of Howell, Marion, Genoa, and Oceola. (ECF No. 58-2, PageID 8030.)

The Report examined four types of "recovery homes": "Licensed Substance Use Disorder Providers"; "Medication Assisted Treatment Programs"; "Recovery

Homes" (which included sober living homes); and "Prisoner Re-entry Housing."

(ECF No. 58-2, PageID 8033.) The Report found that the City had "both a great[er]

number and higher concentration of various types of recovery facilities than the

surrounding Townships."(ECF No. 58-2, PageID 8034.) Further, it found that, "due

to more dense development patterns, the various types of recovery facilities [were]

located in close proximity to established residential neighborhoods." (ECF No. 58-

2, PageID 8034.)

On July 10, 2019, Carlisle sent this Report to Schmitt, for Schmitt to send it to

the Planning Commission. (ECF No. 58-2, July 10, 2019 Carlisle LTO Planning

Commission, PageID 8029.) In the letter introducing the Report, Carlisle wrote:

> In response to the request of City Council, we have been asked to assist
> the City in developing effective regulations for various forms of
> transitional housing. We have been working closely with City Attorney
> Dennis Perkins and Special Counsel Carol Rosati.
>
> I initially prepared a report of preliminary findings regarding the
> concentration of recovery facilities in the City, as compared to the
> surrounding Township. The report is attached.
>
> As the team explored effective means of regulating recovery facilities,
> we were informed by Special Counsel Rosati that such facilities are
> afforded some protection under state and federal statutes, including the
> Americans With Disabilities Act, the Rehabilitation Act, and the Fair
> Housing Act. In other words, persons served by recovery facilities may
> have needs that are entitled to a reasonable accommodation which, in
> this case, is a form of transitional housing.
>
> However, there is also a need to make a distinction between special
> accommodations serving the needs of those with disabilities and other
> forms of transitional housing, such as halfway houses for individuals

47

who have been incarcerated. In the case of the latter, the same
protections for special accommodation do not apply.

Therefore, we have developed two different sets of regulations in the
Zoning Ordinance. The current Section 6.27 Transitional Housing has
been extensively revised to regulate halfway houses. A new Section
6.28 Special Accommodation Use is proposed which will regulate all
forms of housing which may be protected by state and federal law.

(ECF No. 58-2, PageID 8029.)

Schmitt sent the Report, this Carlisle letter, and a draft of the proposed new

Ordinance to the Planning Commission on August 16, 2019. (ECF No. 58-2, Aug.

16, 2019 Schmitt MTO Planning Commission, PageID 8028.) In his own cover

memorandum to these materials, which was titled "Transitional Housing and Special

Accommodation Uses," Schmitt stated:

Carlisle Wortman, along with Staff and outside legal counsel have been
working on ordinance changes to address unique group housing
situations since the application for a sober living home at 304 South
Walnut was withdrawn from consideration just over a year ago. At that
time, any housing situation that did not fall under an established
category in the Zoning Ordinance was treated a[s a] special land use,
requesting approval as a family unit under the ordinance. This was not
an ideal situation and Staff recommended City Council adopt a
moratorium on new applications for any group housing project until the
ordinance could be updated.

(ECF No. 58-2, PageID 8028.) He then asked the Planning Commission to review

"a number of changes to the Zoning Ordinance," and explained that these changes

"would create two new classes of residential uses,"

Transitional Housing and Special Accommodation Uses. Transitional
housing uses are already addressed in the ordinance, [but] these

48

> proposed changes would completely reorganize and provide additional
> guidance for the use. Special Accommodations are a concept that many
> communities have begun to incorporate into their ordinances, to address
> uses that are connected to a federal law that provides specific
> protections for the needs of the resident.

(ECF No. 58-2, PageID 8028.) Schmitt added the caveat that: "this [was] not a

panacea to address all of Howell's concerns with respect to non-single-family

residential uses in single-family homes." (ECF No. 58-2, PageID 8028.) But, he

continued:

> [T]hese changes will bring clarity and structure to the proposals in the
> future. Additionally, Mr. Carlisle's firm has provided the Planning
> Commission with good data that will allow us to review future Special
> Land Use requests with a closer eye.
>
> . . . Staff believes that this ordinance will provide good direction going
> forward to advise applicants and for the Planning Commission to make
> decisions on those applications. <u>Staff would recommend that the
> Planning Commission recommend approval to the City Council on the
> proposed ordinance.</u>

(ECF No. 58-2, PageID 8028) (emphasis original).

Soon after, the "Planning Commission held a public hearing . . . [and]

recommended approval of the proposed zoning ordinance changes to the City

Council." (ECF No. 48-48, Sept. 18, 2019 Schmitt MTO Proctor, PageID 5915.)

On September 18, 2019, Schmitt sent the new, Planning-Commission-

recommended Ordinance, labelled "Ordinance 929," to City Council. (ECF No. 48-

48, Sept. 18, 2019 Schmitt MTO Proctor, PageID 5915.) In his cover memorandum

to the Council, Schmitt relayed that the proposed changes were "a result of the City's

49

yearlong review into group housing in single-family residential districts." (ECF No.

48-48, PageID 5915.) He then explained that:

> The ordinance is intended to provide a framework for review for uses
> that are not currently mentioned in the Zoning Ordinance, including
> Sober Living Homes. It would also create standards for Special
> Accommodation Uses, which are uses for persons that are entitled to
> reasonable accommodations under the law, such as the Americans with
> Disabilities Act. The ordinance would not prohibit any use or type of
> use in any district, nor would it create any unworkable standards for a
> use that would be an undue burden on an owner, operator, or resident.
> Instead, the ordinance creates a framework for review by the City for
> uses that apply under these provisions.

(ECF No. 48-48, PageID 5915.)

Sometime after that, the City "received some pointed comments from an attorney

[with Relman Colfax PLLC]," one of the firms representing the Plaintiffs in this

case, and the "City Council directed [the Planning Commission] to take another look

at [the proposed Ordinance] to try to address the[] [attorneys'] concerns." (ECF No.

44-34, Jan. 15, 2020 Planning Commission Transcript, PageID 2572.)

A second public Planning Commission hearing was set for January 15, 2020.

(ECF No. 44-34, Jan. 15, 2020 Planning Commission Transcript, PageID 2572.) At

the request of Planning Commission Chairperson Paul Streng, Schmitt notified

everyone who had "previously been at the meetings with respect to either the

ordinance or the 304 South Walnut request" about the upcoming hearing via e-mail,

in addition to the public notice. (ECF No. 44-15, Dep. of T. Schmitt, PageID 2103–

05.)

At the meeting, the Planning Commission discussed an updated version of the Ordinance that was being "recommended by [the City's] attorneys at th[at] point." (ECF No. 44-34, Jan. 15, 2020 Planning Commission Transcript, PageID 2572); *see also* (ECF No. 44-25, Jan. 15, 2020 Planning Commission Minutes, PageID 2255–56). Schmitt characterized the Ordinance as imposing "a de minimis application requirement, an administrative review just like any other single-family home" on group housing for people with disabilities. (ECF No. 44-34, PageID 2573.) He elaborated:

> [The Ordinance is] really trying, frankly, just to get the information so that we're aware of them from just the public's perspective, because what we found is when this started, we didn't know where a lot of these types of facilities were. So if it's federally protected, it falls under [a new provision for] Special Accommodation Use. They make application just like any other use, and *it stays out of a public hearing, stays out of the Special Land Use Provision*.

(ECF No. 44-34, PageID 2573) (emphasis added).

Robin Wagner, representing the Fair Housing Center of Southeastern and Mid-Michigan ("FHCSM"), spoke "to express [FHCSM's] continued concerns in light of the[] revised ordinance," which, she said, was "still problematic and discriminatory." (ECF No. 44-34, Jan. 15, 2020 Planning Commission Transcript, PageID 2574):

> Let me go through and explain a couple of the problems with this ordinance before you consider it further. It calls out housing that would serve people with disabilities for specific, unjustified and burdensome restrictions. It develops different zoning standards for people based solely on their disabilities, and it will directly impede Amber Reineck

> Home from operating by zoning transitional houses like the Amber
> Reineck home out of single-family neighborhoods.
>
> As an initial matter, given that the proposed ordinance derives from
> disability based community opposition, it can be challenged simply on
> that basis. In other words, the City does not get to pretend that now this
> is a fine ordinance when everyone knows that the history of this
> ordinance comes out of trying to keep people with disabilities out of
> certain neighborhoods.

(ECF No. 44-34, PageID 2575.)

Streng thanked Wagner for her "very technical, but very complete report," and then asked her if she had "a copy of [her] notes" or another piece of writing that he could use to relay her concerns. (ECF No. 44-34, Jan. 15, 2020 Planning Commission Transcript, PageID 2581.) Wagner said that the FHCSM "would be happy to prepare" a written version of her comments and send it to Schmitt. (ECF No. 44-34, PageID 2581.) But the record does not show that FHCSM ever did that. *See also* (ECF No. 44, Defendants' MSJ, PageID 1151).

Next, Streng said:

> [I]t sounds to me we were asked by council to take a look at this, and
> we did. And it sounds like there's potentially some things that need to
> be looked at again, but we can't do that. We aren't attorneys, and it's
> obviously quite technical. I know this is not going to be popular . . .,
> but I think the best thing we can do is send it back to council and say
> we have now these firm comments, and see what council would like to
> do.

(ECF No. 44-34, PageID 2582.)

Then, Mayor Proctor offered:

> You know, when we were contacted by the [Plaintiffs'] Washington firm, [Relman Colfax,] we -- there's valid points, valid points brought up tonight and we bucked it back to not only our City attorney, but we bucked it back to our outside counsel as well. That took into consideration the concerns at that point, and they've addressed a lot of those concerns in this rewrite that we're tweaking.
>
> What we have here is the we've got a difference of opinions with the community. Certainly, there's legal cases that were cited here tonight, but that was not our community. I will push back on that the intent of this ordinance is to discriminate. It is not intended to discriminate.
>
> We have considerations of other constituents too that are, that are blessed not having a disability that have raised legitimate concerns, and I think this ordinance accommodates those concerns. So I truly note that the Fair Housing, Americans with Disabilities Act, other, other federally mandated and state mandated laws come in play here. But if I were to summarize counsel tonight is that cities, municipalities can't do a bloody thing. We can have ordinances for people with non-disabilities in houses, but we can't touch anybody with a disability. And I push back on that a bit, because if you have more than unrelated people in the house, I think municipalities ought to know that, whether they have a disability or not. We have ordinances for apartment buildings because it has many people in it. I think this is not intended to be discriminatory, but intended to protect those with disabilities, and those without disabilities in a larger home context.
>
> I'm personally comfortable with this. I know if we were to pass it, I don't, I don't believe this would affect the Amber Reineck Council, I don't believe it would effect negatively any other group home for disabled people, but it does give the municipality some kind of oversight on homes with multiple people in them, whether they have a disability or not. So I'm personally comfortable with this, but I'm personally adult enough to know if we pass this and the first time we have a question, a group home, we may have counsel from outside challenging us. But we listened to our constituents who had concerns, and I think this protects people in neighborhoods and also protects the rights for people with disabilities to get the care they need in a

residential setting. I think this is a good balance, and I don't believe that municipalities can just abdicate their responsibilities and just say oh, if it's a group home, we don't care. Just do whatever you want. That's not right either.

So I'm in support of passing this and letting the legal people debate it should something happen, and we'll see where it goes. But we have legal scholars on both sides of this that will argue this to death. We're not legal scholars. We have a recommendation here from our outside counsel to approve this to City Council. I would urge that perhaps we could suggest approval to the Council.

(ECF No. 44-34, PageID 2583–86.)

At his deposition, Proctor explained that the "legitimate constituent concerns" to which he was referring were "likely[] the concerns raised during our public session on, perhaps, the density, the number of homes within the area. (ECF No. 44-36, Dep. of N. Proctor, PageID 2763.) He added that he "believe[d] as an elected official that you have to listen to people and not act out of emotion and not respond emotionally to an emotional claim," and he thought "that's what the moratorium initiative did, that [the City] gained factual information to push back on emotional claims that there was perhaps a density issue within a neighborhood." (ECF No. 44-36, PageID 2766.) Finally, he testified that he thought that the Ordinance was a "good balance" because it "protect[s] those seeking to recover from drug dependency and also . . . provide[s] assurances to neighbors that group homes are maintained, they are going to be for those occupants and . . . those occupants can . . .  complain if they feel they are

unsafe[,] . . . they can go to their local municipality and say, . . . I think this is a fire hazard." (ECF No. 44-36, PageID 2769–70.)

After Proctor spoke, Streng proposed that the Planning Commission, having held a public hearing as requested, send the Ordinance back to City Council without any recommendation, because the issue was "very, very technical." (ECF No. 44-34, Jan. 15, 2020 Planning Commission Transcript, PageID 2586–87.) Proctor agreed, adding: "It would be useful to have our outside attorney here to articulate some of the safeguards to prevent discrimination. I mean I truly take that at heart. This should not be discriminatory." (ECF No. 44-34, PageID 2587.) Streng then suggested that "legal counsels talk to each other." (ECF No. 44-34, PageID 2588.)

Ultimately, Proctor moved to send the Ordinance back to the City Council without a recommendation, saying that "I think we all see the pros of this and we all see the cons of this. So we're kind of on the fence post saying that there's benefits to this and there could be some issues with it." (ECF No. 44-34, Jan. 15, 2020 Planning Commission Transcript, PageID 2589.) The Motion carried unanimously. (ECF No. 44-25, Jan. 15, 2020 Planning Commission Minutes, PageID 2256.)

The City Council[11] approved Ordinance 929 on March 9, 2020. According to the Council's meeting minutes:

---

[11] At this time, the Council still had the same members as it did when it extended the Moratorium on June 10, 2019. *Compare* (ECF No. 44-33, PageID 2558), *with* note 10, *supra*.

Ordinance 929 & 932 which are recommended for approval, are the result of a lot of work with outside consultants (Attorney Carol Rosati & Planning Consultant Dick Carlisle) and represent the lightest touch the City can take to address the main concerns raised during the group housing moratorium. . . . MOTION by Ellis, SUPPORT by Mulvahill, "To adopt Ordinance 929, an ordinance to amend the Howell Zoning Code to add regulations for Transitional Housing and Special Accommodation Use Standards." Member Ellis expressed concern with language in Section 6.27(e)(2), "The intensity of the use shall be the minimum required in order to achieve feasibility of the use" noting it unnecessarily reduces access to the use. Dick Carlisle explained that the language is meant to provide balance between allowing the operation and the potential effect on the surrounding area. The specific information supplied by the applicant during the application process will be evaluated to determine the number of residents; the minimum number is not necessarily the number that will be approved. The applicant must demonstrate the minimum number required; the maximum may not be compatible with the area. MOTION by Ellis, "To amend the motion to strike paragraph (e)(2)." Amendment died due to lack of support. A vote was taken on the motion. MOTION CARRIED (6-0).[12]

(ECF No. 44-33, Mar. 9, 2020 City Council Minutes, PageID 2561–62.)

*21. Ordinance 929 Significantly Modifies The Zoning Code's Treatment Of THFs And Housing For Those Entitled To Reasonable Accommodations Under Law*

The New Ordinance amended the definition for "Transitional Housing Facility"

("THF") to read as follows:

**Transitional Housing Facility** – For the purposes of this Ordinance, "Transitional Housing Facility" means the offering to others for purposes of occupancy through rental or lease agreements, or by other mutually acceptable agreements leading to occupancy, the occupancy of dwelling units in any form to two or more individuals who do not

---

[12] Ambrose was absent.

meet the qualifications of a "family" as defined in the City of Howell Code of Ordinances, Article Six, Chapter 1240, Zoning, Section 2.02. "Transitional housing facility" does not include: (1) a "domestic unit" under Chapter 1240, Zoning, Section 2.02 and Section 5.14 of the City Code, whether licensed by the state, county or otherwise; (2) any facility owned and operated by the Federal Bureau of Prisons; (3) an adult foster care home of six (6) persons or less licensed under the Michigan Adult Foster Care Licensing Facilities Act . . . or (4) a use granted a Special Accommodation under Section 6.29 containing six (6) persons or less.

(ECF No. 44-23, Ordinance 929, PageID 2235.) And it added the following new definition for "Special Accommodation Use" ("SAU"):

**Special Accommodation Use** – A use that provides equal housing opportunities particularly suited to the needs of persons entitled to a reasonable accommodation under state or federal law, such as but not limited to, the Federal Fair Housing Act, . . . the Americans with Disabilities Act, . . . and the Rehabilitation Act . . . . The definition of special accommodation use shall be applicable to various types of transitional and permanent homes or living arrangements which occupy dwellings or other structures and may include, but not be limited to, adult foster care large group homes and congregate facilities, and sober living homes.

(ECF No. 44-23, PageID 2235.)

The Ordinance then added "Transitional housing facility in accordance with Section 6.27" as a SLU within R-T, Two-Family Residential Districts, and kept it as a SLU within R-M Districts. (ECF No. 44-23, Ordinance 929, PageID 2236.) Additionally, it added "[s]pecial accommodation uses in accordance with Section 6.29" as a SLU within R-1, R-2, R-T, and R-M Districts. (ECF No. 44-23, PageID 2235–36.)

Next, Ordinance 9.29 amended "Section 6.27 Transitional Housing Facility . . .

to read as follows:"

(a) ***Intent.*** The purpose of this section is to allow reasonable consideration of transitional housing facilities, as defined by this Ordinance, and to ensure that such housing does not alter the fundamental character of the City. This section is further intended to advance legitimate governmental interests by regulating transitional homes in a manner that ensures that the use of land is situated in appropriate locations and with proper relationships particularly to the surrounding land uses, limits inappropriate overcrowding of land or particular uses and/or congestion of population, and ensures that public streets and facilities are not overburdened. Such transitional housing shall be planned, designed and located in a manner that protects public health, safety and welfare.

(b) ***Applicability.*** The provisions of this section shall be applicable to various types of transitional and permanent homes which occupy dwellings or other structures. The Planning Commission may approve a transitional housing facility subject to and in accordance with this section and Section 3.03.

(c) ***Conditions of Approval***. As a condition to approval of a transitional housing facility, the applicant must comply with all the terms of this section and Section 3.03, and must demonstrate all of the following:

(1) Taking into consideration the needs, facts, and circumstances which exist throughout the City and the population to be served by the use, the proposed transitional housing facility shall be necessary to afford such persons served by the home and opportunity to reside in and enjoy the City;

(2) Approval of the proposed housing shall not require or will not likely result in a fundamental alteration in the nature of the Zoning District and neighborhood in which the property is situated, or result in an excess concentration of such proposed housing in a particular area, considering the cumulative impact of one (1) or more other uses and activities in, or likely

to be in, the area, and shall not impose undue financial and administrative burden. The interests of the City shall be balanced against the need for accommodation on a case-by-case basis; and

(3) No other specific Ordinance provision exists that is available to provide the relief sought.

**(d)** ***Application Provisions***. The application for a transitional housing facility shall include the following:

(1) A concept plan drawn to scale showing the proposed use and development. At a minimum, the plan shall include the following information:

A. Evidence of ownership; location and description of site; dimensions and areas;

B. Scale, north arrow, date of plan;

C. Existing zoning of site; existing land use and zoning of adjacent parcels; location of existing buildings, drives and streets on the site and within 100 feet of the site;

D. Location, type and land area of each proposed land use; dwelling unit density (dwelling units per acre);

E. General description of proposed water, sanitary and storm drainage systems;

F. Existing natural and man-made features to be preserved or removed; location of existing structures, streets and drives; locations, width and purpose of existing easements;

G. General location, function, surface width and rights of way of proposed public and private streets;

H. General location of proposed parking and number of spaces required and provided.

    (2) A separate document that provides the number of residents served, resident services provided and the anticipated length of stay, and staffing and duties performed.

**(e)** *Standards and Regulations*. In order to be entitled to the approval of a transitional housing facility, the following must be demonstrated by the applicant:

    (1) All the requirements for entitlement to approval under subsections 6.27 (c) of this section, shall be met;

    (2) The intensity of the use (e.g., number of residents in the residential facility) shall be the minimum required in order to achieve feasibility of the use; and

    (3) The use, and all improvements on the property shall be designed and constructed to meet the following standards and conditions:

        A. Taking into consideration the size, location and character of the proposed use, the proposed use shall be established in such a manner to be compatible and harmonious, as determined by the application of generally accepted planning standards and/or principles, with:

            i. The surrounding uses; and/or

            ii. The orderly development of the surrounding neighborhood and/or vicinity.

        B. The proposed use shall be designed to ensure that vehicular and pedestrian traffic shall be no more hazardous than is normal for the district involved, taking into consideration traffic volume, proximity and relationship to intersections, adequacy of sight distances, location and access of off-street parking and pedestrian traffic safety;

C. The proposed use shall be designed and operated so as not to unreasonably impact upon surrounding property in terms of noise, dust, fumes, smoke, air, water, odor, light and/or vibration, and shall not unreasonably impact upon persons perceiving the use in terms of aesthetics;

D. The proposed use shall be such that the location and height of buildings or structures and location, nature and height of walls, fences and landscaping will not interfere with or discourage the appropriate development and use of adjacent land and buildings and will not have a detrimental effect upon their value;

E. The proposed use shall be designed, located, planned and operated in such a manner that the public health, safety and welfare will be protected; and

F. The proposed use shall be designed and operated so as not to cause substantial injury to the other property in the neighborhood in which it is to be located and will not be detrimental to existing and/or other permitted land uses in the zoning district.

**(f)** *Design Standards.* All regulations and standards for buildings, structures and site improvements within the district in which the property is situated shall apply, subject to the right of the Planning Commission to alter and supplement such standards and regulations the Planning Commission finds to be needed and reasonably proportionate to the impacts of the use given the facts and circumstances attendant to a particular case. In rendering a decision, the Planning Commission will weigh the need or extent of the accommodation which may be required, against the spirit of this Ordinance to ensure that public safety is secured, and substantial justice done, and that the essential character of the neighborhood and/or district is not altered.

**(g)** *Conditions.* In connection with the approval of a transitional housing facility, the Planning Commission may impose such conditions as are authorized by law.

**(h)** *Effect of Approval.*

    (1) The effect of an approval under this section shall be for the exclusive benefit and occupancy of such persons in need of transitional housing as represented by the applicant. If a change in such use occurs such that it is occupied by others, the regulations applicable within the district in which the property is situated shall thereupon immediately and fully apply. An approval under this section shall not be final until such time as the applicant records an affidavit at the office of the register of deeds in connection with the property, in a form approved by the City Attorney, providing notice of the terms of this provision.

    (2) An approval under this section shall be effective for a period of one (1) year and shall thereafter be void unless there is an occurrence of actual occupancy by persons for whom the transitional home has been made in granting approval.

    (3) Transitional housing facilities shall obtain a certificate of registration in accordance with Chapter 1460, Residential Rental Properties, of the Code.

(ECF No. 44-23, Ordinance 929, PageID 2236–38.)

And after that, Ordinance 929 added (the quite similar) "Section 6.29 Special Accommodation Use" as follows:

**(a)** *Intent.* This section is intended to authorize the grant of relief from the strict terms of this Ordinance for Transitional Housing Facilities in order to provide equal housing opportunities particularly suited to the needs of persons entitled to reasonable accommodation under state or federal law, such as but not limited to, the Federal Fair Housing Act, . . . the Americans with Disabilities Act, . . . and the Rehabilitation Act . . . . This Section of the Ordinance responds to the prohibition of housing discrimination based on a disability which is defined as:

62

(1) A physical or mental impairment which substantially limits one or more of such person's major life activities;

(2) A record of having such an impairment; or

(3) Being regarded as having such a physical or mental impairment that limits one or more of such person's major life activities.

This section is further intended to advance a legitimate governmental interest by regulating special accommodation uses in a manner that ensures that the use of land is situated in appropriate locations and with proper relationships particularly to the surrounding land uses, limits inappropriate overcrowding of land or particular uses and/or congestion of population, and ensures that public streets and facilities are not overburdened.

**(b)** *Applicability.* The provisions of this section shall be applicable to various types of transitional and permanent homes and structures which occupy dwellings and may include, but not be limited to, adult foster care large group homes and congregate facilities, and transitional housing facilities. The City Manager and/or his/her designee may approve a special accommodation use, subject to and in accordance with this section. It is the further the intent of this ordinance that a transitional housing facility granted a special use accommodation will be exempt from applying for or obtaining special land use approval under Section 3.03 and Section 6.27.

**(c)** *Conditions of Approval.* As a condition to approval of a special accommodation use, the applicant must comply with all the terms of this section, and must demonstrate all of the following:

(1) The ultimate residential user or users of the property shall be persons for whom state or federal law mandates the City to make reasonable accommodations in connection with proposed uses of land under the existing circumstances;

(2) Taking into consideration the needs, facts, and circumstances which exist throughout the City and the population to be

served by the use, the proposed reasonable accommodation shall be necessary to afford such person equal opportunity to the proposed use and enjoyment within the City;

(3) Approval of the proposed housing shall not require or will not likely result in a fundamental alteration in the nature of the Zoning District and neighborhood in which the property is situated, or result in an excess concentration of such proposed housing in a particular area, considering cumulative impact of one (1) or more other uses and activities in, or likely to be in, the area, and shall not impose undue financial and administrative burden. The interests of the City shall be balanced against the need for accommodation on a case-by-case basis; and

(4) No other specific Ordinance provision exists that is available to provide the relief sought.

**(d)** ***Application Provisions***. The application for a special accommodation use shall include the following:

(1) A concept plan drawn to scale showing the proposed use and development. At a minimum, the plan shall include the following information:

    A. Evidence of ownership; location and description of site; dimensions and areas;

    B. Scale, north arrow, date of plan;

    C. Existing zoning of site; existing land use and zoning of adjacent parcels; location of existing buildings, drives and streets on the site and within 100 feet of the site;

    D. Location, type and land area of each proposed land use; dwelling unit density (dwelling units per acre);

    E. General description of proposed water, sanitary and storm drainage systems;

      F. Existing natural and man-made features to be preserved or removed; location of existing structures, streets and drives; locations, width and purpose of existing easements;

      G. General location, function, surface width and rights of way of proposed public and private streets;

      H. General location of proposed parking and number of spaces required and provided.

(2) A separate document that provides the following:

      A. A summary of the basis on which the applicant asserts entitlement to approval of a special accommodation use, covering each of the requirements of subsections (c), (d), (e), and (f) of this ordinance.

      B. The number of residents served, resident services provided and the anticipated length of stay, and staffing and duties performed.

**(e)** ***Standards and Regulations***. In order to determine whether a special accommodation use should be granted, the need to provide a reasonable accommodation under State or Federal law shall be considered and weighed by the City in relationship to the following:

(1) If the proposed housing does not constitute a permitted use in the zoning district in which the property is situated, the intensity of the use (e.g., number of residents in the residential facility) shall be the minimum required in order to achieve feasibility of the use; and

(2) The use, and all improvements on the property shall be designed and constructed to meet the following standards and conditions:

      A. Taking into consideration the size, location and character of the proposed use, the proposed use shall be established in such a manner to be compatible and harmonious, as determined by the application of

generally accepted planning standards and/or principles, with:

i.     The surrounding uses; and/or

ii.    The orderly development of the surrounding neighborhood and/or vicinity.

B. The proposed use shall be designed to ensure that vehicular and pedestrian traffic shall be no more hazardous than is normal for the district involved, taking into consideration traffic volume, proximity and relationship to intersections, adequacy of sight distances, location and access of off-street parking and pedestrian traffic safety;

C. The proposed use shall be designed and operated so as not to unreasonably impact upon surrounding property in terms of noise, dust, fumes, smoke, air, water, odor, light and/or vibration, and shall not unreasonably impact upon persons perceiving the use in terms of aesthetics;

D. The proposed use shall be such that the location and height of buildings or structures and location, nature and height of walls, fences and landscaping will not interfere with or discourage the appropriate development and use of adjacent land and buildings and will not have a detrimental effect upon their value;

E. The proposed use shall be designed, located, planned and operated in such a manner that the public health, safety and welfare will be protected; and

F. The proposed use shall be designed and operated so as not to cause substantial injury to the value of other property in the neighborhood in which it is to be located and will not be detrimental to existing and/or other permitted land uses in the zoning district.

**(f)** *Design Standards.* All regulations and standards for buildings, structures and site improvements within the district in which the property is situated shall apply, subject to the right of the City Manager and/or his/her designee to alter and supplement such standards and regulations the City Manager and/or his/her designee finds to be needed and reasonably proportionate to the impacts of the use given the facts and circumstances attendant to a particular case. In rendering a decision, the City Manager and/or his/her designee will weigh the need or extent of the accommodation which may be required, against the spirit of this Ordinance to ensure that public safety is secured, and substantial justice done, and that the essential character of the neighborhood and/or district is not altered.

**(g)** *Conditions.* In connection with the approval of a special accommodation use, the City Council may impose such conditions as are authorized by law.

**(h)** *Effect of Approval.*

(1) Approval of a special accommodation use shall be solely for the benefit of the particular class of users who were the basis of requiring the City to make a reasonable accommodation under applicable state and/or federal law, and not for the benefit of any other persons. Accordingly, the effect of an approval under this section shall be for the exclusive benefit and occupancy of such class of persons. If a change in such use occurs such that it is occupied by others, the regulations applicable within the district in which the property is situated shall thereupon immediately and fully apply. An approval under this section shall not be final until such time as the applicant records an affidavit at the office of the register of deeds in connection with the property, in a form approved by the City Attorney, providing notice of the terms of this provision.

(2) An approval under this section shall be effective for a period of one (1) year and shall thereafter be void unless there is an occurrence of actual occupancy by persons for whom the special accommodation has been made in granting approval.

(3) Special accommodation uses shall obtain a certificate of registration in accordance with Chapter 1460, Residential Rental Properties, of the Code.

(ECF No. 44-23, Ordinance 929, PageID 2239–41.)

At his deposition, Schmitt testified that the Ordinance was "trying to get [sober living homes] a lane for approval." (ECF No. 44-15, Dep. of T. Schmitt, PageID 2098.) He explained that the "special accommodation use idea" was "an old concept that [had been] pioneered" by Gerald Fisher, a "[l]ongtime local land use attorney in Southeast Michigan," and something "that a lot of communities" around Howell have used "for uses that aren't explicitly listed in the code." (ECF No. 44-15, PageID 2098–100.)

Schmitt also stated that the Ordinance does not provide for a "public hearing process intentionally to try and avoid some of the negative NIMBYs that" the City heard from regarding ARH's request. (ECF No. 44-15, PageID 2105.)

Proctor testified that there were "several iterations" of this Ordinance before it was passed, and that the City "wanted to be fair, legal on anything that [it] did." (ECF No. 44-36, Dep. of N. Proctor, PageID 2748.) He added that he "did not take proactive involvement" in drafting the Ordinance, because the City "le[ft] that kind of stuff to the experts," namely Carlisle Wortman and sources of "external legal advice," who made "sure that [the City] d[id] things legally in a nondiscriminatory

68

process and that there were no unintended consequences for anything." (ECF No. 44-36, PageID 2748–49.)

> *22. The City of Howell Grants Special Accommodation Uses To Two Sober Living Homes*

Since Ordinance 929 passed, the City of Howell has granted at least two SAUs.

The first was for Atsalakis and ARH to establish a sober living home for five women in recovery, with a live-in manager, at 510 S. Michigan Avenue, which is in an R-1 District. (ECF No. 44-27, Aug. 21, 2020 DeBuff LTO Gwinn, PageID 2279–81.) Atsalakis and ARH submitted their 140-page application for this use, which they compiled with the help of attorney Daniel Gwinn, on August 7, 2020. (ECF No. 48-57, 510 Michigan SAU Application, PageID 6492–632.) The application comprised:

- A cover letter outlining the relevant portions of the zoning code, legal protections for people with disabilities seeking housing, and the proposed use (PageID 6492–95);
- Direct responses to the requirements of section 6.29 (PageID 6497–508);
- The following "Application" exhibits (PageID 6509):
  - The Warranty Deed (PageID 6511–12);
  - Closing Documents (PageID 6514–34);
  - Legal Description and Site Plan (PageID 6536);
  - Illustration of Site and Structure (PageID 6538–39);
  - Real Estate Listing (PageID 6541);
  - Street Views of Property and Adjacent Properties (PageID 6543–48);
  - Google Map Indicating Nearby Business Establishments (PageID 6550–82); and
  - Signed Purchase Agreement and Seller's Disclosure Statement (PageID 6554–63); and

- The following "Basis of Eligibility" exhibits (PageID 6564):
  - Rental Registration (PageID 6566);
  - July 10, 2019 Carlisle Wortman Report on Ordinance 929 (PageID 6568–72);
  - A "Travel Trends" report by the U.S. Department of Transportation (PageID 6575–76);
  - Insurance Liability Certification (PageID 6578);
  - Recovery Housing Expenses (PageID 6580);
  - Intake Documents (PageID 6582–614); and
  - Excerpts from literature cited in the cover letter about recovery home best practices and effects on neighborhoods (PageID 6616–32).

Two weeks later, relying on Carlisle Wortman's analysis, the City approved the application. (ECF No. 44-27 Aug. 21, 2020 P. DeBuff LTO D. Gwinn, PageID 2279–80.) Tenants moved into the 510 S. Michigan House in January of 2021. (ECF No. 44-3, Dep. of C. Atsalakis, PageID 1299.)

At her deposition on March 26, 2021, Rebecca Mayo, ARH's treasurer, and Atsalakis' mother, (ECF No. 44-3, Dep. of C. Atsalakis, PageID 1196), stated that the Michigan House had two residents, and that it had not had more than two residents at any given time since opening. (ECF No. 44-38, Dep. of R. Mayo, PageID 3107.) Mayo was not aware of any "potential residents who [had] not been able to" move into the Michigan House despite wanting to. (ECF No. 44-38, PageID 3107.)

The second SAU was for Community Catalysts Development Company ("CCDC") and Allies in Recovery ("AIR") to run a six-woman, plus one house manager, sober living home at 521 East Grand River Avenue, which is in a B1, Local Business (mixed residential and office use) District. (ECF No. 48-60, Dec. 15, 2020

DeBuff LTO Zilch, PageID 6710–11; ECF No. 48-58, 521 E. Grand River SAU Application, PageID 6635–36.) At an unspecified date, employees of CCDC and AIR submitted a 72-page application (ECF No. 48-58, PageID 6634–705) that comprised:

- A Concept Plan, pursuant to 6.29(d)(1) (PageID 6635–38);
- A Description of the proposed ownership structure (and notes that the Warranty Deed and Closing documents would be provided to the City of Howell after the final sale closing) (PageID 6639–40);
- A Legal Description and Site Plan (PageID 6641–43);
- Floor Plans and Interior Photos (PageID 6644–46);
- A basic Real Estate Description (PageID 6647);
- Exterior Photos (PageID 6648);
- A Google Map of the surrounding area (PageID 6649);
- A Purchase Agreement (PageID 6650–55);
- An Organizational History and List of Expenses for AIR (PageID 6657–59);
- A Program Description for the recovery house (PageID 6660–63); and
- Intake Documents and other forms (PageID 6664–705).

The City, again relying on Carlisle Wortman's analysis, approved this application on December 15, 2020. (ECF No. 44-28, Dec. 15, 2020 DeBuff LTO Zilch, PageID 2287–88.) The City's approval limited parking "on the site . . . to office staff and the resident manager." (ECF No. 44-28, PageID 2287.)

*23. Atsalakis Is Unsure About Whether ARH Will Open A Sober Living Home At The Walnut House*

At her deposition, Atsalakis testified that ARH "would like to" open more sober living homes. (ECF No. 44-3, Dep. of C. Atsalakis, PageID 1319.)

71

But Atsalakis and ARH have not submitted an SAU application for the Walnut House, and at the time of her deposition, Atsalakis was not sure whether they would do so in the future. (ECF No. 44-3, Dep. of C. Atsalakis, PageID 1304–06.) Atsalakis stated that this decision would "depend on if [they] think there's a need." (ECF No. 44-3, PageID 1306.)

Atsalakis conceded that nothing "about the process for [the] Michigan [House] . . . suggest[ed] to [her] that the [C]ity would discriminate" when assessing a future SAU application. (ECF No. 44-3, Dep. of C. Atsalakis, PageID 1305.) She also conceded that there was nothing about the Michigan House SAU process that she could not repeat with the Walnut House. (ECF No. 44-3, PageID 1306.)

**B. Procedural History**

On January 27, 2020, Plaintiffs Atsalakis, ARH, and FHCSM filed suit against Defendants City of Howell, Proctor, and Schmitt, the latter two in their individual and official capacities. (ECF No. 1.) On March 17, 2020, Plaintiffs amended their Complaint. (ECF No. 14.)

In their Amended Complaint, Plaintiffs asserted three causes of action against Defendants. First, Plaintiffs alleged that Defendants violated the Fair Housing Act ("FHA") by:

    a. Discriminating or otherwise making housing unavailable because of a disability, in violation of 42 U.S.C. § 3604(f)(1);

b.  Discriminating in the terms, conditions, and privileges of the sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of disability, in violation of 42 U.S.C. § 3604(f)(2);

c.  Refusing to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a person with a disability an equal opportunity to use and enjoy a dwelling, in violation of 42 U.S.C. § 3604(f)(3)(B);

d.  Making, printing, or publishing, or causing to be made, printed, or published any notice, statement, or advertisement with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based handicap, or an intention to make any such preference, limitation, or discrimination, in violation of 42 U.S.C. § 3604(c); and

e.  Coercing, intimidating, threatening, or interfering with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by the Fair Housing Act, in violation of 42 U.S.C. § 3617.

(ECF No. 14, Amended Complaint, PageID 169–71.)

Second, Plaintiffs alleged that Defendants violated Title II of the Americans with Disabilities Act ("ADA") by:

a.  Subjecting to discrimination or excluding a qualified individual with a disability, by reason of such disability, from participation in or denying that person the benefits of services, programs, or activities of a public entity in violation of 42 U.S.C. §§ 12131 and 12132; and

b.  Refusing to make reasonable accommodations or modifications in rules, policies, or practices, in violation of 42 U.S.C. §§ 12131 and 12132.

and violated Title V of the ADA by:

a. Retaliating or otherwise discriminating again an individual because such person has opposed any act or practice made unlawful by the Americans with Disabilities Act or because such individual assisted or participated in any manner in an investigation, proceeding, or hearing under the Americans with Disabilities Act, in violation of 42 U.S.C. § 12203(a); and

b. Coercing, intimidating, threatening, or interfering with an individual's exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by the ADA, in violation of 42 U.S.C. § 12203(b).

(ECF No. 14, PageID 172–73.)

And third, Plaintiffs alleged that Defendants violated the Michigan Persons with Disabilities Civil Rights Act ("MPDCRA"), Mich. Comp. Laws §§ 37.1301–03, by:

a. Denying an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a public service because of a disability that is unrelated to the individual's ability to utilize and benefit from the goods, services, facilities, privileges, advantages, or accommodations or because of the use by an individual of adaptive devices or aids; and

b. Printing, circulating, posting, mailing, or otherwise causing to be published a statement, advertisement, or sign which indicates that the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a public service will be refused, withheld from, or denied an individual because of a disability that is unrelated to the individual's ability to utilize and benefit from the goods, services, facilities, privileges, advantages or accommodations or because of the use by an individual of adaptive devices or aids, or that an individual's patronage of or presence at a place of public accommodation is objectionable, unwelcome, unacceptable, or undesirable because of a disability that is unrelated to the individual's ability to utilize and benefit from the goods,

74

services, facilities, privileges, advantages, or accommodations or because of the use by an individual of adaptive devices or aids.

and Mich. Comp. Laws, §§ 37.1501–07, by:

    a. Subjecting to discrimination or excluding a qualified individual with a disability, by reason of such disability, from participation in or denying that person the benefits of services, programs, or activities of a public entity;

    b. Making, printing, circulating, and posting, or causing to be made or published a statement, advertisement, or sign, or use a form of application for a real estate transaction, or make a record of inquiry in connection with a prospective real estate transaction, which indicates, directly or indirectly, an intent to make a limitation, specification, or discrimination with respect to a real estate transaction on the basis of disability;

    c. Refusing to make reasonable accommodations or modifications in rules, policies, or practices;

    d. Retaliating or otherwise discriminating against an individual because such person has opposed any act or practice made unlawful by the Act or because such individual assisted or participated in any manner in an investigation, proceeding, or hearing under the Act; and

    e. Coercing, intimidating, threatening, or interfering with an individual's exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by the Act.

(ECF No. 14, PageID 173–75.)

To remedy these violations, Plaintiffs asked for a declaratory judgment, preliminary and permanent injunctions, "all other affirmative relief necessary,"

compensatory and punitive damages, attorneys' fees and costs, and "such other relief as the Court deems just and equitable." (ECF No. 14, PageID 176–78.)

Defendants answered the Amended Complaint on March 31, 2020. (ECF No. 16.)

Over a year later, on June 16, 2021, after completion of discovery, Defendants moved to exclude Plaintiffs' experts Jeffrey W. Van Treese (ECF No. 42) and Brian J. Connolly (ECF No. 47). That same day, Plaintiffs moved to exclude Defendants' experts Patrick O'Keefe (ECF No. 43), Richard Carlisle (ECF No. 45), Rodney Arroyo (ECF No. 46), and Gerald Fisher (ECF No. 49). On September 29, 2021, Magistrate Judge Ivy issued a Report and Recommendation (R&R) on these motions. (ECF No. 69.) And on August 3, 2022, this Court, adopting the R&R in part, issued a final ruling on the motions. (ECF No. 83.)

On the same day that the parties moved to exclude each other's experts, Defendants moved for (partial) Summary Judgment (ECF No. 44) and Plaintiffs moved for Partial Summary Judgment (ECF No. 48). The parties responded to their counter-parties' motions on July 14 (ECF Nos. 58, 59), and replied to these responses on July 28 (ECF Nos. 63, 68). The Court held a hearing on these summary judgment motions on October 4, 2022. And this Opinion will decide the summary judgment motions.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.'" *Dekarske v. Fed. Exp. Corp.*, 294 F.R.D. 68, 77 (E.D. Mich. 2013) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). And a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

"In deciding a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party." *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Still, the non-movant must produce enough evidence to allow a reasonable jury to find in his or her favor by a preponderance of the evidence. *Anderson*, 477 U.S. at 252. And the Court may only consider evidence that could be presented in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009).

"The 'mere possibility' of a factual dispute does not suffice to create a triable case." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004) (quoting *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). Rather, "the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). "The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal quotation marks and citations omitted). In other words, "'[t]he central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)).

# III. ANALYSIS

## A. Preliminary Matters

Before addressing the main arguments of the parties' cross-Motions for partial Summary Judgment, the Court will address a few preliminary matters.

### 1. Federal anti-discrimination laws preempt conflicting state and local zoning laws.

"[A] local municipality has wide-ranging discretion in regulating land use within its borders." *Smith & Lee Assocs., Inc. v. City of Taylor, Mich.*, 13 F.3d 920, 925 (6th Cir. 1993). But it may not violate federal laws, including the FHA and the ADA. And it may not rely on conflicting state or local laws to erase liability for such violations. *See Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) ("State laws that conflict with federal law are without effect." (internal quotation marks and citation omitted)); *Larkin v. State of Mich. Dep't of Soc. Servs.*, 89 F.3d 285, 289 (6th Cir. 1996) ("[T]he [Fair Housing Amendments Act ('FHAA')][13] expressly preempts those state laws with which it conflicts."); *Oconomowoc Residential Programs, Inc. v. City of Greenfield*, 23 F. Supp. 2d 941, 952 (E.D. Wis. 1998) (". . . Congress intended that the ADA preempt state law with which it conflicts.").

---

[13] This 1988 Amendment to the FHA expanded its protection to cover "persons with physical or mental disabilities." Michael H. Schill & Samantha Friedman, *The Fair Housing Amendments Act of 1988: The First Decade*, 4 Cityscape 57, 59 (1999). For this reason, cases and articles discussing how the FHA applies to people with disabilities sometimes refer to the "FHAA" rather than just the "FHA."

*2. Proctor is **DISMISSED** in his individual capacity.*

At oral argument, Plaintiffs stated that they no longer wish to pursue any claims against Proctor in his individual capacity. Accordingly, he is **DISMISSED** in that capacity.

*3. Plaintiffs' claims under Mich. Comp. Laws §§ 37.1501–07 are* ***DISMISSED****.*

In their Amended Complaint, Plaintiffs asserts claims under two sections of the MPDCRA: Mich. Comp. Laws §§ 37.1301–03 and 37.1501–07. (ECF No. 14, Amended Complaint, PageID 173–76.)

In a footnote within their Motion for Summary Judgment, Defendants, citing *Frazier v. City of Grand Ledge, MI*, 135 F. Supp. 2d 845 (W.D. Mich. 2001), argue that the MPDCRA is "narrower" than the FHA and ADA and "is not meant to extend to government actors and policies." (ECF No. 44, Defendants' MSJ, PageID 1155.) Plaintiffs do not address this point in their Response to Defendants' Motion (nor in any of their other filings).

To the extent that the Court has jurisdiction over them,[14] the Court will **DISMISS** Plaintiffs' claims under Mich. Comp. Laws §§ 37.1501–07. According to their plain

---

[14] The Court notes that, but for a few exceptional situations, it may not "'assum[e]' jurisdiction for the purpose of deciding" an easier merits question. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). Therefore, this discussion depends on the standing analysis in Section III.B, *infra*, and does not technically dismiss any §§ 37.1501–07 claims for relief that are dismissed for lack of standing. (The Court has nonetheless placed this dismissal before its standing analysis for

text, these provisions govern only real estate transactions, other actions of real estate brokers, and the making or purchasing of loans—not municipal zoning decisions. *Frazier* supports this conclusion: in that case, the District Court for the Western District of Michigan held that §§ 37.1502(1) did not allow plaintiffs to sue a city for its allegedly discriminatory zoning decisions because the city had not "engage[d] in a real estate transaction." *Frazier*, 135 F. Supp. 2d at 850. Plaintiffs have not argued to the contrary; at oral argument, they merely stated that they were unfamiliar with these MPDCRA provisions.

On the other hand, the Court will not dismiss Plaintiffs' Mich. Comp. Laws §§ 37.1301–03 claims based on Defendants' footnote. § 37.1302 protects the rights of individuals with disabilities to the "full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a . . . public service," and § 37.1301(b) defines a "public service" as "a public facility, department, agency, board, or commission owned, operated, or managed by or on behalf of this state or a subdivision of this state." Thus, the text of these statutes refutes Defendants' claim that they do not apply to government actors. And *Frazier* does not address these provisions.

---

convenience—so that it can dispose of some minor issues together and set the scene before turning to more in-depth analyses.)

*4. This Opinion will proceed as follows.*

Defendants' Motion for Summary Judgment reveals some confusion about Plaintiffs' claims.

As the Court understands them, Plaintiffs' remaining claims to be addressed in this Opinion are as follows:

1) Defendants intentionally discriminated against people with disabilities when they enacted the Moratorium and when they enacted Ordinance 929. This discrimination violated: the FHA, 42 U.S.C. § 3604(f)(1)–(2); the ADA, 42 U.S.C. § 12132; and the MPDCRA, Mich. Comp. Laws § 37.1302(a).

2) Defendants interfered with Plaintiffs' attempt to exercise their fair housing rights when Defendants enacted the Moratorium. This interference violated: the FHA, 42 U.S.C. § 3617 and the ADA, 42 U.S.C. § 12203(b).[15]

3) Defendants refused to grant Plaintiffs reasonable accommodations. This refusal violated: the FHA, 42 U.S.C. § 3604(f)(3); the ADA, 42 U.S.C. § 12132; and the MPDCRA, Mich. Comp. Laws § 37.1302(a).

4) Defendants made discriminatory statements. These statements violated: the FHA, 42 U.S.C. § 3604(c) and the MPDCRA, Mich. Comp. Laws § 37.1302(b).[16]

---

[15] Although the Complaint also listed retaliation under § 12203*(a)* of the ADA, Plaintiffs appear to have abandoned this claim. *See* (ECF No. 48, Plaintiffs' MPSJ, PageID 4474) (citing 42 U.S.C. § 12203(b) but not (a)); (ECF No. 68, Reply to Plaintiffs' MPSJ, PageID 8513).

[16] Although Plaintiffs' Motion for Partial Summary Judgment suggests that this claim is for only an FHA violation, (ECF No. 48, Plaintiffs' MPSJ, PageID 4438), their Complaint also hinges it to the above MPDCRA provision. Because the Plaintiffs' Summary Judgment briefing does not address their discriminatory

Plaintiffs have moved for summary judgment on claims one, two, and three, and Defendants[17] have moved for summary judgment on claims one and three. This Opinion will address claim one in Section III.D, claim two in III.E, and three in III.F.

Within these claims, both parties generally follow the "common practice" of treating the applicable FHA and ADA provisions "as interchangeable." *Get Back Up, Inc. v. City of Detroit*, No. 11-13909, 2013 WL 3305672, at *4 (E.D. Mich. July 1, 2013); *see also* (ECF No. 44, Defendants' MSJ, PageID 1155) (explaining this approach).[18] Both parties generally treat these provisions as interchangeable with their MDPCRA counterparts too. (ECF No. 44, PageID 1155; ECF No. 48, Plaintiffs' MPSJ, PageID 4464.) Accordingly, this Opinion will not distinguish between the FHA, ADA, and MDPCRA provisions within each claim, except for where one of the parties does so. For the most part, the parties focus on the FHA, so this Opinion will too.

statements claim in any detail, the Court will assume that Plaintiffs have not abandoned this MPDCRA claim.

[17] Defendants' arguments about the validity of the "Pre-Ord. 929 ZO," *see* (ECF No. 44, Defendants' MSJ, PageID 1156), are inapposite and thus will not be addressed in this Opinion.

[18] Plaintiffs do not explicitly state that the FHA and ADA claims are "interchangeable," but they mostly do not distinguish between them in their arguments.

Defendants have also moved for summary judgment on the grounds that Plaintiffs' lack standing and Plaintiffs' claims are moot. This Opinion will analyze standing in Section III.B and mootness in III.C.

Finally, the Opinion will evaluate Schmitt's claims to legislative and qualified immunity in Sections III.G and III.H, respectively. And it will consider whether Proctor and Schmitt should remain in this case in their official capacities in Section III.I.

**B. Plaintiffs have established standing to bring many of their claims. But Plaintiffs have not established that their intentional discrimination, interference, and reasonable accommodation claims are fairly traceable to Schmitt, nor that they were or will be injured by Ordinance 929.**

To successfully "invoke[e] federal jurisdiction" for their case, a set of plaintiffs must establish the following three elements of constitutional[19] standing:

> First, the plaintiff[s] must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant[s], and not the result of the independent action of some third party not before the court.

---

[19] The Court need not consider the other type of standing, prudential, for two reasons. First, because "standing to sue under the" FHA, which is the main statutory focus of both parties, "is as broad as is permitted by Article III of the Constitution." *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 230 (6th Cir. 2003) (internal quotation marks and citation omitted). Second, because Defendants have not argued that the Plaintiffs lack prudential standing for any of their claims. *See June Med. Servs. L.L.C. v. Russo*, 140 S. Ct. 2103, 2117 (2020) (noting that "prudential" standing rules "can be forfeited or waived").

> Third, it must be likely, as opposed to merely speculative, that the injury
> will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S 555, 560–61 (1992).

The plaintiffs "must demonstrate standing for each claim [they] seek[] to press and for each form of relief that [they] s[eek]." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (internal quotation marks omitted). This means that "the standing inquiry must be evaluated separately as to each defendant" and as to any plaintiff's request for distinct damages (or a distinct injunction). *Disability Rts. S.C. v. McMaster*, 24 F.4th 893, 900 (4th Cir. 2022); *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1651–52 (2017). *But see Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 623 (6th Cir. 2016) ("When one party has standing to bring a claim, the *identical* claims brought by other parties to the same lawsuit are justiciable." (emphasis added)); *McLemore v. Gumucio*, No. 19-cv-00530, 2020 WL 7129023, at *6 (M.D. Tenn. Dec. 4, 2020) ("[T]he Court may proceed to the merits of a claim as long as one plaintiff has standing to bring that claim.").

The plaintiffs must establish standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Therefore, at summary judgment, the plaintiffs "can no longer rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts" that support their standing. *Id.* (internal quotation marks and citation omitted).

"An association or organization may assert standing in one of two ways: (1) on its own behalf because it has suffered a palpable injury as a result of the defendants' actions; or (2) as the representative of its members." *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 332–33 (6th Cir. 2002) (citing *Warth v. Seldin*, 422 U.S. 490, 498 (1975) and *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 341–42 (1977)).

Despite Defendants' arguments to the contrary, Plaintiffs have established standing, each on their own behalf, for many of their claims. However, Plaintiffs have not established standing to sue Schmitt for his involvement in their intentional discrimination, interference, and reasonable accommodation claims, nor have they established standing to sue for damages, injunctive relief, and declaratory relief from Ordinance 929.

> *1. Plaintiffs' intentional discrimination, interference, and reasonable accommodation claims are not fairly traceable to Schmitt in his individual capacity.*

Plaintiffs' intentional discrimination and interference claims are not fairly traceable to Schmitt because he was not a member of the City Council that enacted the Moratorium and Ordinance 929. Similarly, Plaintiffs' reasonable accommodation claims are not fairly traceable to Schmitt because when he responded to Atsalakis' accommodation request he was acting on behalf of the City; he did not personally have the authority to grant an exemption from the Moratorium.

*2. Plaintiffs have standing for their claims to damages from the City of Howell enacting the Moratorium with discriminatory intent.*

All three plaintiffs have established standing to sue on the theory that the City intentionally discriminated against them by enacting the Moratorium. First, ARH has provided evidence that the Moratorium could have caused a delay in its opportunity to provide housing for people with disabilities. ARH has alleged that this delay frustrated its mission of helping to secure sober living homes for women and inhibited its ability to secure grant funding and donations. (ECF No. 43-1, ARH and Atsalakis' Responses to Interrogatories, PageID 682–83) (elaborating on the claim that the Moratorium inhibited ARH's ability to fundraise); (ECF No. 44-38, Dep. of R. Mayo, PageID 3156–65) (same); *see also* (ECF No. 48-1, ARH Brochure, PageID 4479–81) (articulating ARH's mission). It has also provided evidence that the Moratorium diverted its attention and resources to investigating, considering, and challenging the Moratorium and away from its other work. *See* (ECF No. 43-1, PageID 688); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) ("If . . . petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact.").

Similarly, FHCSM has provided evidence that it too diverted its attention and resources to addressing the Moratorium and away from otherwise fulfilling its mission. (ECF No. 43-2, FHCSM's Responses to Interrogatories, PageID 699, 701,

703); *see also Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 725 F.3d 571, 576 (6th Cir. 2013) ("Miami Valley[] . . . alleges that it 'had to divert its resources, its staff time and energy to identify the ad and then to bring the ad to the attention of the appropriate authorities,' thereby suffering a harm of $5,292.15 in costs. . . . [A] drain on an organization's resources, as alleged by Miami Valley, constitutes a concrete and demonstrable injury for standing purposes."). Atsalakis has advanced claims that the Moratorium caused her emotional distress and cost her money, because it required her to maintain the Walnut House and prevented her from selling the House to ARH and investing the proceeds from that sale.[20] (ECF No. 43-1, ARH and Atsalakis' Responses to Interrogatories, PageID 680–81, 686–89.)

Second, Plaintiffs have offered sufficient evidence that their alleged injuries are fairly traceable to the City of Howell's actions--that the City enacted and extended the Moratorium. *See* Section III.D.2.i. Some delay may have been inevitable because the old Ordinance did not provide a clear path for ARH to open a home. However, Plaintiffs have alleged that the initial Moratorium, renewed on multiple occasions, extended any such delay longer than necessary to correct that problem.

Third, although the Moratorium has been lifted, if Plaintiffs prevail on this issue, their injuries could be redressed with damages. *See Uzuegbunam v. Preczewski*, 141

---

[20] That Atsalakis rented out the Walnut House does not automatically defeat her assertion that overall she lost money because of the Moratorium and suffered emotional distress.

S. Ct. 792, 802 (2021) ("[F]or the purpose of Article III standing, [even] nominal

damages provide the necessary redress for a completed violation of a legal right.").

> *3. None of the Plaintiffs have standing for their claims for damages, injunctive relief, and declaratory relief from the City of Howell enacting Ordinance 929 with discriminatory intent.*

Plaintiffs seek damages for complying with Ordinance 929, an injunction

prohibiting the City from enforcing it, and a declaration that it is unlawful. (ECF No.

58, Response to Defendants' MSJ, PageID 8008.[21]) As Defendants note, Plaintiffs

"'must demonstrate separate standing'" for each of these forms of relief. (ECF No.

44, Defendants' MSJ, PageID 1153) (quoting *Barber v. Miller*, 809 F.3d 840, 849

(6th Cir. 2015)). None of the Plaintiffs have established standing for any of these

forms of relief.

> i. Plaintiffs do not have standing for their claims to damages.

ARH and Atsalakis have not offered sufficient evidence that they were injured

by Ordinance 929. They argue that ARH's efforts to comply with the Ordinance, and

Atsalakis' emotional distress in reaction to the Ordinance's enactment, constitute

respective injuries in fact. *See* (ECF No. 43-1, ARH and Atsalakis' Responses to

Interrogatories, PageID 688); (ECF No. 48-57, 510 Michigan SAU Application,

---

[21] Plaintiffs' Response to Defendants' Motion for Summary Judgment does not mention their request for declaratory relief, *see* (ECF No. 58), but their Complaint asks for a declaration, (ECF No. 14, PageID 176), and at oral argument they clarified that they seek declaratory "relief for the ongoing implementation of the new ordinance."

PageID 6492–632); (ECF No. 44-38, Dep. of R. Mayo, PageID 3134) (stating that ARH paid for the lawyers who put together their SAU application for the Michigan House); (ECF No. 43-1, PageID 681) ("With *each* discriminatory *action* by Defendants, Plaintiff Atsalakis feels renewed grief for the loss of her sister . . . ." (emphasis added)). But the Court finds that the Ordinance *benefitted* ARH and Atsalakis—by providing a clear path for the approval of sober living homes and in particular the 510 S. Michigan House—and thus could not have injured them.

Similarly, FHCSM has not offered sufficient evidence that it was injured "beyond the[] costs" "of litigation" by the Ordinance. *Fair Hous. Council, Inc. v. Vill. of Olde St. Andrews, Inc.*, 210 F. App'x 469, 475 (6th Cir. 2006)

Therefore, Plaintiffs do not have standing to seek damages from Ordinance 929's enactment.

> ii. Plaintiffs do not have standing for their claim to an injunction.

"To seek injunctive relief, a plaintiff must show that he is under [an actual and imminent] threat of suffering [an] 'injury in fact' that is concrete and particularized." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Past injury is not enough. *Id.* at 495; *see also O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, . . . if unaccompanied by any continuing, present adverse effects.").

Plaintiffs have devoted little attention to their request for prospective relief. In their Response to Defendants' Motion for Summary Judgment, Plaintiffs merely state, without citation to the record, that "because the operative 2020 SAU Ordinance is itself discriminatory, the harm is ongoing," and that they "need injunctive relief to abate the ongoing burden on housing for people with disabilities, who are their clients and constituents." (ECF No. 58, Response to Defendants' MSJ, PageID 8005, 08.) And at oral argument, Plaintiffs added only—and again without citation to the record—that FHCSM "has seen its mission and purpose of promoting integrated communities undermined" and "the organizational plaintiffs [] have suffered a perceptible impairment to their programs and activities and have an ongoing frustration of mission" under *Havens*.

These arguments fail to "set forth . . . specific facts" that establish Plaintiffs' standing to sue for an injunction. *Lujan*, 504 U.S. at 561; *see also* Fed. R. Civ. Pro. 56(c)(1)(3) ("The court need consider only the cited materials . . . .").

And a broader view of Plaintiffs' briefing and the record confirms that none of the Plaintiffs have established that they are under threat of suffering a concrete future injury from Ordinance 929. First, ARH has not established that it is under such a threat. Atsalakis testified that she was not sure whether she and ARH would attempt to open the Walnut House as a sober living home, and that it would "depend on if [she and ARH] think there's a need" in the future. (ECF No. 44-3, Dep. of C.

Atsalakis, PageID 1304). She also testified that ARH "would like to" open up more sober living homes, but the record does not suggest that ARH has any concrete plan to do so—anywhere, let alone in the City of Howell. (ECF No. 44-3, PageID 1319.) This lack of plans, plus the fact that the Michigan House has not "been filled to capacity" since opening, suggest that ARH will not need to go through the Ordinance review process any time in the near future. (ECF No. 44-38, Dep. of R. Mayo, PageID 3106.) And ARH has not alleged that the Ordinance might otherwise harm it.

Similarly, FHCSM has not established that the Ordinance poses a concrete and particularized threat to it. FHCSM's Amended and Supplemental Responses to Defendants' First Interrogatories (ECF No. 43-2)[22] list a variety of harms, but none of them satisfy this requirement. To begin with, some of these harms are too vague. FHCSM notes that its "core activities include efforts to promote integration and prevent discrimination in southeast and mid-Michigan, including disability-related discrimination." (ECF No. 43-2, PageID 705.) And it then asserts that "Defendants' discriminatory conduct and ratification of discriminatory opposition from the community has substantially set back [these] goals." (ECF No. 43-2, PageID 705.) But this is not a *concrete* injury. "A mere interest in a problem is not [] sufficient to

---

[22] The Court recognizes that FHCSM produced these Responses with its Motion to Exclude Defendants' *damages* expert (ECF No. 43), but Plaintiffs have not pointed to any other record of FHCSM's past, present, or future injuries.

confer standing upon an organization." *Greater Cincinnati Coal. for the Homeless v. City of Cincinnati*, 56 F.3d 710, 716 (6th Cir. 1995) (citing *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)). Rather, an organization "must establish 'that its ability to further its goals has been perceptively impaired so as to constitute far more than simply a setback to the organization's abstract social interests.'" *Id.* (quoting *Havens Realty Corp.*, 455 U.S. at 379) (internal quotation marks and alteration omitted).

Many other harms claimed in the Responses stem from Defendants' past conduct and not from the continued existence of Ordinance 929. For example, FHCSM states that "[b]y excluding Plaintiff Amber Reineck House's sober living home at the Walnut Street house, and by inviting and endorsing community opposition to sober living homes, Defendants have directly undermined [its] WIMBY [initiative]." (ECF No. 43-2, FHCSM's Responses to Interrogatories, PageID 705.) But this statement does not encompass the future tense: it does not posit that the continued existence of Ordinance 929 undermines the WIMBY imitative any more than its past enactment already has. Similarly, FHCSM states that its "investigation into Defendants' conduct and the related litigation activities distracted from and interrupted Plaintiff's ongoing casework and activities, including Plaintiff's other investigations and outreach." (ECF No. 43-2, PageID 703.) But the harm from this litigation will conclude at the end of this case, right *before* an injunction would take effect.

And the remaining potentially relevant harms do not relate specifically to the Ordinance. FHCSM writes that "[i]n order to redress the harm to its mission caused by Defendants' conduct, [it] will need to undertake the following activities and programming: train social services organizations and municipalities in [its] . . . service area[] . . . on fair housing, zoning, and land use issues; develop educational materials and literature on zoning and land use issues; and undertake a community education campaign." (ECF No. 43-2, FHCSM's Responses to Interrogatories, PageID 705–06.) It also notes that it "stays up to date on [fair housing] issues as they arise within its service area" and that its "monitoring" of Defendants' "discriminatory treatment of sober living homes" "remains ongoing." (ECF No. 43-2, PageID 698–99.). But FHCSM does not suggest that it might change or lessen these activities, this programming, and this monitoring if Ordinance 929 is enjoined. To the contrary, their plans indicate that the City's past actions have already triggered the need for these measures. And FHCSM has not stated that any of these activities are specific to Ordinance 929: for example, while FHCSM says that it will conduct trainings on fair housing and zoning generally, it does not say that these trainings will teach housing applicants (or anyone else) about the specific requirements of Ordinance 929 or that the Ordinance somehow impairs its ability to stay up to date on housing issues. *Cf. Fair Elections Ohio v. Husted*, 770 F.3d 456, 460 (6th Cir. 2014) ("[I]f the armchair observer decides that the government is

violating the law, and decides to stop it by suing, that is not enough. This limit would be eviscerated if an advisor or organization can be deemed to have Article III standing merely by virtue of its efforts and expense to advise others how to comport with the law, or by virtue of its efforts and expense to change the law.").

ARH and FHCSM have not established standing on behalf of their members either. To "sue on behalf of its members," an organization must "show[] that: (1) its 'members would otherwise have standing to sue in their own right'; (2) the 'interests' that the suit 'seeks to protect are germane to the organization's purpose' and (3) 'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Ass'n of Am. Physicians & Surgeons v. U.S. Food & Drug Admin.*, 13 F.4th 531, 537 (6th Cir. 2021) (quoting *Hunt*, 432 U.S. at 343). The first element requires "an organization [to] do more than identify a likelihood that the defendant's conduct will harm an unknown member in light of the organization's extensive size or membership base" and "instead identify a member who . . . is about to suffer[] a concrete and particularized injury from the defendant's conduct." *Id.* at 543. Because neither ARH nor FHCSM has identified in the record any specific member whom Ordinance 929 will harm, they both fail to satisfy this element.

Finally, Atsalakis has not established that she is under threat of suffering a concrete future injury from the Ordinance. As noted above, she testified that she and

ARH have no concrete plans to open a new ARH in the City of Howell. She does not live in the City of Howell or "in the area." (ECF No. 44-3, Dep. of C. Atsalakis, PageID 1185); *see also Havens Realty Corp.*, 455 U.S. at 377 ("Our cases have upheld standing based on the effects of discrimination only within a 'relatively compact neighborhood[]' . . . ." (quoting *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 114 (1979)). And her emotional distress appears to stem from the City's *past* actions, *see, e.g.*, (ECF No. 43-1, ARH and Atsalakis' Responses to Interrogatories, PageID 679 ("As a result of Defendants' discriminatory conduct, Plaintiff Atsalakis experienced and continues to experience psychological and emotional distress . . . ."). She does not propose that enjoining the Ordinance in the *future* would alleviate this distress.

iii. Plaintiffs do not have standing for their claim to declaratory relief.

"Obtaining standing for declaratory relief has the same requirements as obtaining standing for injunctive relief." *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 406 (6th Cir. 2019). Accordingly, for the same reasons that Plaintiffs lack standing to enjoin Ordinance 929, they lack standing to seek a declaration stating that it is unlawful.

*4. Plaintiffs have standing for their claims to damages from the City of Howell interfering with their attempts to exercise their Fair Housing rights by enacting the Moratorium.*

Plaintiffs' interference claims are based on the Moratorium and its extensions. *See* Section III.E, *infra*. Therefore, Plaintiffs have standing to bring these claims for the same reasons that they have standing to bring their claims for damages from the City enacting the Moratorium with discriminatory intent.

*5. Plaintiffs have standing for their claims to damages from the City of Howell refusing to grant them a reasonable accommodation.*

Plaintiffs also have standing to bring their reasonable accommodation claims for the same reasons that they have standing to bring their Moratorium claims. By denying Atsalakis' request for reasonable accommodations, the City delayed ARH's opportunity to open a sober living house for women, led FHCSM to divert its attention from its other activities in order to investigate the potential Fair Housing violation, and added to Atsalakis' emotional distress and prevented Atsalakis from investing the money she had put into the Walnut House, less mitigation. *See* Section III.B.1, *supra*.

These injuries are fairly traceable to the City because when Schmitt denied the request he was acting on the City's behalf. (ECF No. 44-22, Oct. 3, 2019 Schmitt LTO Atsalakis, PageID 2233) (reflecting that Schmitt signed his letter denying Atsalakis' request as "Community Development Director" and that he carbon copied

other City officials); *see also Meyer v. Holley*, 537 U.S. 280, 285 (2003) ("[I]t is well established that the [FHA] provides for vicarious liability.").

And again, these injuries can be redressed with damages.

**C. Plaintiffs' claims are not moot.**

In addition to requiring that plaintiffs have standing to bring each of their claims, the Constitution also "demand[s] that an actual controversy be extant at all stages of review, not merely at the time the complaint is filed." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160 (2016) (internal quotation marks, alteration, and citation omitted). Thus, "[i]f an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point during litigation, the action can no longer proceed and must be dismissed as moot." *Id.* at 160–61 (internal quotation marks and citation omitted). But "[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Id.* at 161 (internal quotation marks and citation omitted).

Defendants argue that Plaintiffs' "claims regarding the Moratorium[] are moot because the Moratorium has expired and Ord. 929 has supplanted the regulatory scheme in place at the time of the 2018 Application." (ECF No. 44, Defendants' MSJ, PageID 1155.). But this argument fails because Plaintiffs seek damages for past injuries that the Moratorium inflicted on them, not an injunction against it. Therefore, Plaintiffs still have an interest in the outcome of these claims, and the

claims are not moot. *See Ermold v. Davis*, 855 F.3d 715, 720 (6th Cir. 2017) ("[S]o long as the plaintiff has a cause of action for damages, a defendant's change in conduct will not moot the case.").

**D. Both sides' Motions for Summary Judgment on Plaintiffs' claims that Defendants intentionally discriminated against people with disabilities by enacting the Moratorium are DENIED. Defendants' Motion for Summary Judgment on Plaintiffs' claims that Defendants intentionally discriminated against people with disabilities by enacting Ordinance 929 is GRANTED.[23]**

42 U.S.C. § 3604 of the FHA provides, in relevant part:

> As made applicable by section 3603 of this title and except as exempted by sections 3603(b) and 3607 of this title, it shall be unlawful— . . .
>
> (f)
>
>> (1) To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—. . .
>>
>>> (B) a person residing in or intending to reside in that dwelling after it is sold, rented, or made available . . .
>>
>> (2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of—. . .

---

[23] Although the Court has found that Plaintiffs do not have standing to bring their claims against Ordinance 929, *see* Section III.B.3, *supra*, the Court will nonetheless go on to address those claims here, on the merits, for additional clarification.

(B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available.[24]

Plaintiffs "may establish a violation under th[ese sections of the] FHA by showing either: (1) that the defendants were motivated by an intent to discriminate against the handicapped ('discriminatory intent' or 'disparate treatment'); or (2) that the defendant's otherwise neutral action has an unnecessarily discriminatory effect ('disparate impact')." *Larkin*, 89 F.3d at 289. The parties do not dispute that ARH's intended residents—women in recovery from substance use disorders—qualify as "handicapped" under the FHA (and the other two statutes at issue here). *Cf. Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 46 (2d Cir.

---

[24] As noted earlier, Plaintiffs tie these provisions to 42 U.S.C. § 12132 of the ADA, which states:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

and to § 37.1302 of the MPDCRA, which states:

> Except where permitted by law, a person shall not: (a) Deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation or public service because of a disability that is unrelated to the individual's ability to utilize and benefit from the goods, services, facilities, privileges, advantages, or accommodations or because of the use by an individual of adaptive devices or aids.

2002) ("Alcoholism, like drug addiction, is an 'impairment' under the definitions of a disability set forth in the FHA, the ADA, and the Rehabilitation Act."), *superseded on other grounds by Jackson v. N.Y.C. Dep't of Educ.*, 768 F. App'x 16 (2d Cir. 2019).

Plaintiffs bring disparate treatment (and not disparate impact) claims. (ECF No. 48, Plaintiffs' MPSJ, PageID 4464.) They base these claims on Defendants' enactment and extensions of the Moratorium and on Defendants' enactment of Ordinance 929. Specifically, Plaintiffs argue that these laws constituted unlawful disparate treatment for two reasons: (1) they were unjustifiably facially discriminatory; and (2) circumstantial evidence demonstrates that they were motivated by discriminatory intent. *Cf. Larkin*, 89 F.3d at 289 (noting that "facially discriminatory actions are . . . a type of . . . disparate treatment" action). Plaintiffs' first argument fails as to both laws. Their second argument presents a triable issue as to the Moratorium but fails as to Ordinance 929.

*1. Neither the Moratorium nor Ordinance 929 is facially discriminatory.*

Lawmakers may not enact policies that facially discriminate against disabled people without sufficient justification. Most obviously, a policy facially discriminates if it "single[s] out" a disabled group for adverse treatment. *Larkin*, 89 F.3d at 290; *see also Get Back Up, Inc.*, 2013 WL 3305672, at \*3 (noting that a policy discriminates against a group if it "disadvantage[es]" or "burden[s]" them).

For example, in *Larkin*, the Sixth Circuit held that a statute facially discriminated by, on its "very terms," imposing spacing and notice requirements "*only* [on adult foster care] facilities which w[ould] house the disabled." *Larkin*, 89 F.3d at 290 (emphasis added). In contrast, in *Oxford House-C*, the Eighth Circuit held that a zoning code that "allow[ed] only three unrelated, nonhandicapped people to reside together in a single family zone, but allow[ed] group homes to have up to eight handicapped residents," "favor[ed]," rather than discriminated against, disabled group home residents. *Oxford House-C v. City of St. Louis*, 77 F.3d 249, 251–52 (8th Cir. 1996).

A policy also facially discriminates against a disabled group if it treats that group *and others* worse than another group that is materially similar to the disabled group. This Court and the Sixth Circuit crystallized this principle in a case brought by "Get Back Up ('GBU'), a residential substance-abuse treatment center," against the City of Detroit. *Get Back Up, Inc.*, 2013 WL 3305672, at *1; *see also Get Back Up, Inc. v. City of Detroit*, 606 F. App'x 792 (6th Cir. 2015) (affirming the district court's opinion). In that case, the Sixth Circuit affirmed that an ordinance did not facially discriminate by requiring residential substance abuse treatment centers—along with multi-family dwellings, emergency shelters, and rooming houses (among others)— to obtain a permit to operate in a "B4-H, General Business/Residential Historic" district, because the ordinance did "not allow any materially similar use to operate

102

by right" in that district. *Get Back Up, Inc.*, 606 F. App'x at 792–97 (6th Cir. 2015).

The Court explained that "[h]ospitals and nursing homes," which the ordinance

allowed to operate by right in B4 districts, were "not materially similar to residential

substance abuse facilities in" those districts because "hospitals are not a residential

use" and "nursing homes are a uniquely sedate and unburdensome use, have

relatively little impact on traditional zoning concerns like noise and traffic, and may

warrant special treatment on the grounds that a city desperately needs nursing care."

*Id.* at 796–97. Additionally, the District Court pointed out that if "each man at GBU

had never in his life consumed drugs or alcohol" then "GBU would be an ordinary

rooming house" and "would [still] need a conditional-use permit." *Get Back Up,

Inc.*, 2013 WL 3305672, at *7.

A facially discriminatory policy will only "survive a challenge under the FHAA"

if "the defendant [] demonstrate[s] that [the policy's discrimination is] 'warranted

by the unique and specific needs and abilities of those handicapped persons' to

whom [it] appl[ies]." *Larkin*, 89 F.3d at 290 (quoting *Marbrunak, Inc. v. City of

Stow, Ohio*, 974 F.2d 43, 47 (6th Cir. 1992)). A lawmaker's "benign motive" does

not justify facial discrimination. *Id.*

103

i. The Moratorium is not facially discriminatory.

*Arguments*

Plaintiffs argue that the Moratorium facially discriminated against sober living homes because "official memoranda" about the Moratorium "and the text of the Moratorium itself all repeatedly refer to 'sober living homes.'" (ECF No. 58, Response to Defendants' MSJ, PageID 8010) (citing ECF No. 48-42, June 22, 2018 Schmitt MTO Proctor, PageID 5790 and ECF No. 48-44, July 19, 2018 Schmitt MTO Proctor, PageID 5896). They emphasize that Schmitt's June 22, 2018 memorandum to Proctor and the City Council was titled "'Group Homes and *Sober Living Houses*'" and suggested that a Moratorium was necessary because of Plaintiffs' "application for 'a group home setup for people recovering from addiction' and . . . 'a strong sense by some that the City of Howell is taking on more than [its] fair share of this housing type.'" (ECF No. 48, PageID 4466–67) (quoting Ex. 48-42, PageID 5789) (emphasis added).

Plaintiffs also assert that the Moratorium "called for differential treatment based on disability because it barred people with disabilities from moving into homes in Howell while traditional families of any size could move in freely." (ECF No. 58, Response to Defendants' MSJ, PageID 8010–11.)

Plaintiffs maintain that the fact "[t]hat the Moratorium might have reached domestic units does not change its explicit target, sober living homes." (ECF No. 58,

Response to Defendants' MSJ, PageID 8011.) "Moreover," they add, "because sober living homes are the *only* type of congregate living that have sought SLU approval in Howell in the last half decade, a moratorium on SLU applications for congregate housing is functionally exclusive to sober living houses." (ECF No. 68, Reply to Plaintiffs' MPSJ, PageID 8510) (citing ECF No. 58-5, SLU Applications, 2015–present) (emphasis Plaintiffs'); *see also* (ECF No. 58, PageID 8011) (making the same argument).

Finally, Plaintiffs argue that the Moratorium could not have justified facial discrimination against sober living homes because it "was not the result of an individualized assessment of the needs and abilities of people in recovery." (ECF No. 48, Plaintiffs' MPSJ, PageID 4468); *see also* (ECF No. 58, Response to Defendants' MSJ, PageID 8011) (making the same point).

Defendants argue that the Moratorium did not facially discriminate against people with disabilities because "a complete reading of the Moratorium Resolution reveals that both the Moratorium Resolution's title and operative language appl[ied] to *any* application for a special land use for 'unrelated persons to live together.'" (ECF No. 59, Response to Plaintiffs' MPSJ, PageID 8310) (quoting ECF No. 48-44, Moratorium, PageID 5897) (emphasis Defendants'); *see also* (ECF No. 44, Defendants' MSJ, PageID 1164) (making the same point). And they explain that the Moratorium d[id] not "mention the 'unique and specific needs' of the residents of

sober living homes" because it was not targeted toward those residents. (ECF No. 59, PageID 8311) (quoting *Marbrunak*, 974 F.2d at 48).

## *Analysis*

The Moratorium was not facially discriminatory. The Moratorium here did not "single out" housing that specifically serves people with disabilities. Rather, the Moratorium applied to "*any* application for a Special Land Use to allow unrelated persons to live together in any property in the R-1 . . . or R-2 . . . districts." (ECF No. 44-18, Moratorium, PageID 2205) (emphasis added).

Moreover, Plaintiffs have not identified any group that was both "materially similar" to those seeking to live in sober homes and treated better than them by the Moratorium. Plaintiffs' point out that the Moratorium did not restrict "traditional families of any size," (ECF No. 58, Response to Defendants' MSJ, PageID 8010–11), but such families were not "materially similar" to prospective residents of sober living homes, for two reasons. First, under Supreme Court precedent, housing for traditional families is less likely than housing for unrelated individuals to cause excess crowding, traffic, and noise. *See Vill. of Belle Terre v. Boraas*, 416 U.S. 1, 9 (1974) ("The regimes of boarding houses, fraternity houses, and the like present urban problems. More people occupy a given space; more cars rather continuously

pass by; more cars are parked; noise travels with crowds.")[25]; *see also Fair Hous. Advocs. Ass'n, Inc. v, City of Richmond Heights, Ohio*, 209 F.3d 626, 637 (6th Cir. 2000) ("'Cities have a legitimate interest in decreasing congestion, traffic, and noise in residential areas, and ordinances restricting the number of *unrelated* individuals who may occupy a single family residence are reasonably related to these legitimate goals.'" (emphasis added) (quoting *Oxford House-C*, 77 F.3d at 252)); *United States v. Vill. of Palatine, Ill.*, 37 F.3d 1230, 1232 n.1 (7th Cir. 1994) (Manion, J., concurring) ("While the Oxford House may consider a group of unrelated people living under its roof the same as blood relations, the law does not. . . . Rather, traditional and extended families receive constitutional protection that individuals and groups of friends, acquaintances or even strangers do not." (citing *Moore v. Eastland*, 431 U.S. 494, 499, 503 (1977) and *Vill. of Belle Terre*, 416 U.S. 1)).

Second, under the Zoning Code at the time the Moratorium was enacted, which Code has not been challenged by Plaintiffs, traditional families did not need to apply for a SLU to move into R-1 and R-2 neighborhoods, while sober living homes—and every other land use covered by the Moratorium—did. *See* (ECF No. 44-5. § 4.06 Purposes and Uses within Zoning Districts, PageID 1368; ECF No. 44-13, § 3.03 Special Land Uses, PageID 1591). This was a material difference because the

---

[25] *Vill. of Belle Terre* took no issue with the fact that the contested restriction treated two-person domestic units as "families," much like the City of Howell's Zoning Code does. *See id.* at 2.

Moratorium was, at least according to its own terms, enacted to allow the City "to study" the "concentration of existing group housing situations" "without an active [SLU] application." (ECF No. 44-18, Moratorium, PageID 2205). Exempting traditional families from the Moratorium did not increase the City's workload, nor force it to continue processing SLU applications for uses not contemplated by the Code, in the way that exempting sober living homes would have.

Finally, Plaintiffs' reliance on Schmitt's prefatory memorandum and the past SLU applications received by the City is misplaced. These pieces of evidence are external to the face of the Moratorium. Although the prefatory memorandum was presented to the City Council with the actual Moratorium, there is no evidence that the City Council voted on that memorandum or officially incorporated it into the law that passed. (The Court will, however, consider this external evidence in the next Section, when determining whether the entire record shows or could show that Defendants enacted the Moratorium with discriminatory intent. *See* Section III.D.2.i, *infra*.)

ii. Ordinance 929 is not facially discriminatory.

**Arguments**

Plaintiffs argue that Ordinance 929 facially discriminates against people in sober living homes because it imposes its SAU requirements "expressly—and *only*—[on] 'persons entitled to a reasonable accommodation under state or federal law,' *i.e.*,

people with disabilities." (ECF No. 48, Plaintiffs' MPSJ, PageID 4467) (emphasis Plaintiffs') (quoting ECF No. 48-54, Ordinance 929, PageID 6401). They add that "the sole application of the SAU Ordinance to housing for people with disabilities distinguishes this case from *Get Back Up*." (ECF No. 68, Reply to Plaintiffs' MPSJ, PageID 8509) (citing *Get Back Up, Inc.*, 606. F. App'x at 796).

Plaintiffs make two different arguments about what group is comparable to the people in sober living homes here. First, they argue that "the Zoning Ordinance's treatment of *traditional families*, not adult foster care facilities, is the appropriate comparator when evaluating the differential burdens placed on sober living homes." (ECF No. 48, Plaintiffs' MPSJ, PageID 4469) (emphasis added) (citing *Bank of America Corp. v. City of Miami*, 137 S. Ct. 1296, 1301 (2017)). But later, they argue that "the correct comparator is 'the general population,'" which appears to include, in Plaintiffs' view, both traditional families and "domestic units of three or more unrelated people." (ECF No. 68, Reply to Plaintiffs' MPSJ, PageID 8509) (quoting *Marbrunak, Inc.*, 974 F.2d at 47).

Plaintiffs then assert that Ordinance 929 disadvantages people with disabilities even relative to the second, more expansive comparator. This is so, according to Plaintiffs, "[b]ecause traditional families have no application process whatsoever, and because domestic units of three or more unrelated people can use the less onerous Special Land Use ('SLU') process." (ECF No. 68, Reply to Plaintiffs'

109

MPSJ, PageID 8509.) Plaintiffs insist that the SLU process is less onerous than the SAU process because "the SAU criteria are greater in both number and degree," and because their 2018 SLU Application—which "was just 14 pages, which Ms. Atsalakis compiled herself"—was much easier to put together than their 2020 SAU Application—which was 140 pages, and for which Plaintiffs "obtain[ed] legal advice [and] pa[id] for a professional site plan." (ECF No. 58, Response to Defendants' MSJ, PageID 8009–10.) Further, Plaintiffs state that "[i]n the few cases where courts have found facially discriminatory laws to be *advantageous* to people with disabilities, it [was] because they provide[d] housing options that [were] not available to nondisabled people." (ECF No. 58, PageID 8010) (citing *Oxford House-C*, 77 F.3d at 250).

At oral argument, Plaintiffs agreed that "a sober living home is a transitional housing facility," but maintained that § 6.27 of Ordinance 929 should not factor into the Court's analysis because they do not challenge it and because sober living homes are directed to the SAU process of § 6.29.

Finally, Plaintiffs contend that there is no justification for Ordinance 929's facial discrimination because "no portion of . . . the SAU Ordinance even mentions the 'unique and specific needs' of the residents of sober living homes." (ECF No. 48, Plaintiffs' MPSJ, PageID 4468–69) (quoting *Larkin*, 89 F.3d at 290); *see also* (ECF No. 58, Response to Defendants' MSJ, PageID 8009) (making the same point).

Defendants argue that people in sober living homes should not be compared to single families because, under the Zoning Code, "a single-family 'dwelling unit' is intended to provide 'permanent provisions for living, sleeping, eating, cooking and sanitation,'" but sober living homes provide only "transitional" housing. (ECF No. 59, Response to Plaintiffs' MPSJ, PageID 8310.)

Defendants then argue that Ordinance 929 "*advantages* disabled people" because under the SAU process they "need only submit an application for administrative review by the City Manager" while "THFs, adult foster care homes of more than six persons, and domestic units of three or more persons all must go through the SLU process." (ECF No. 59, Response to Plaintiffs' MPSJ, PageID 8309) (emphasis Defendants'); *see also* (ECF No. 44, Defendants' MSJ, PageID 1160) (making the same point). "Likewise," they continue, "SAUs are *advantaged* relative to adult foster care homes for six or fewer persons, which are required to show proof of satisfying the state's rigorous licensing procedures before they can locate in a residential zone by right." (ECF No. 59, PageID 8309) (emphasis Defendants').

Further, Defendants state that "the application and review criteria for an SAU application are consistent both with *Get Back Up (2015)* and those employed for any type of conditional use, as well as with the types of information necessary for the City to evaluate a reasonable accommodation request." (ECF No. 59, Response to Plaintiffs' MPSJ, PageID 8312) (internal citations omitted) (citing *Overlook Mut.*

111

*Homes, Inc. v. Spencer*, 415 F. App'x 617, 622 (6th Cir. 2011) and *Anderson v. City of Blue Ash*, 798 F.3d 338, 363 (6th Cir. 2015)); *see also* (ECF No. 44, Defendants' MSJ, PageID 1160) (making a similar point); (ECF No. 63, Reply to Defendants' MSJ, PageID 8378–79) (same).

***Analysis***

Ordinance 929 is not facially discriminatory. It cannot be disputed that, while Ordinance 929 "singles out" people with disabilities, including people in sober living homes, it singles them out for preferential, not adverse, treatment relative to materially similar groups.

After Ordinance 929's amendments to the City's Zoning Code: traditional families and adult foster care small group homes serving six people or less could operate in all Residential Districts as of right; domestic units of three or more people could operate in R-1, R-T, and R-M Districts[26] with permission granted pursuant to the SLU requirements; THFs could operate in R-T and R-M Districts with permission granted pursuant to the SLU and THF (§ 6.27) requirements; and sober living homes, along with other homes that provide equal housing opportunities for people with disabilities, could operate in all Residential Districts with permission granted pursuant to the SAU (§ 6.29) requirements. (ECF No. 44-5, § 4.06 Purposes

---

[26] It is not clear whether domestic units of three or more people are excluded from R-2 Districts or a line of the Zoning Code is cut off from the bottom of ECF No. 44-5. But either way, this does not affect the Court's analysis.

and Uses within Zoning Districts; ECF No. 44-13, § 3.03 Special Land Uses; ECF No. 44-23, Ordinance 929; ECF No. 44-29, § 6.04 Child and Adult Foster Care Facilities.)

Of these land uses, only THFs are materially similar to sober living homes. Indeed, Plaintiffs conceded that a sober living home is a type of THF at oral argument. And if the residents of a sober living home had never used drugs or alcohol, then their home would be properly characterized as a THF under Ordinance 929, because it is a house "offer[ed] to others for purposes of occupancy . . . of dwelling units in any form [by] two or more individuals who do not meet the qualifications of a 'family.'" (ECF No. 44-23, Ordinance 929, PageID 2235); *see also Get Back Up, Inc.*, 2013 WL 3305672, at *7 (determining the proper comparator for a substance abuse treatment center by considering how the center would be characterized if its patients "had never in [their] li[v]e[s] consumed drugs or alcohol"); *Bank of America Corp.*, 137 S. Ct. at 1301 (comparing "minority borrowers" to "*similarly situated* nonminority borrowers" (emphasis added)).

The other comparators suggested by Plaintiffs are not materially similar to sober living homes. As stated earlier, the Supreme Court has held that housing for traditional families is less likely than housing for unrelated individuals to cause excess crowding, traffic, and noise. *See Vill. of Belle Terre*, 416 U.S. at 9. Defendants also point out that, under their Ordinance, "a single-family 'dwelling

113

unit' is intended to provide '*permanent* provisions for living, sleeping, eating, cooking and sanitation,'" while sober living homes provide only "*transitional*" housing. (ECF No. 59, Response to Plaintiffs' MPSJ, PageID 8310) (emphasis added). Impermanent housing is likely to cause some increased traffic and noise due to more frequent moving in and out, and it may also change the character of a residential neighborhood by making it less familiar and close-knit. These are material differences that warrant zoning distinctions between sober living homes and traditional family homes. *See Get Back Up, Inc. v. City of Detroit, Mich.*, 725 F. App'x 389, 393–94 (6th Cir. 2018) (stating that concerns about property values and neighborhood character "provide legitimate, non-discriminatory bases" for zoning decisions (citing *Hamm v. City of Gahanna*, 109 F. App'x 744, 748 (6th Cir. 2004) and *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 129 (1978))).[27]

And contrary to Plaintiffs' briefing, *Marbrunak* does not provide otherwise. In that case, the Sixth Circuit faulted a city for "imposing special safety requirements" on plaintiff's "family consortium home" "for four mentally retarded adult women" because the city did not impose the requirements on "single-family dwellings" (and the requirements were not "individual[ly tailored] to the needs . . . of" the women). *Marbrunak, Inc.*, 974 F.2d at 44–47. But the reason the Sixth Circuit compared

---

[27] Plaintiffs do not argue that sober living homes are uniquely quiet, uncrowded, or permanent as compared to other THFs.

plaintiff's "family-like" home to a single-family home was that the district court had "determined [that it] qualified as [a] single-family" home under "Ohio case law," and the city had not challenged that determination on appeal. *Id.* at 45–46. *Marbrunak*'s reasoning does not apply here because Plaintiffs do not argue that sober living homes qualify as single-family homes under Michigan law.

For similar reasons, domestic units of three or more people also materially differ from sober living homes. The City's Zoning Code defines a "domestic unit" as:

> A collective number of individuals living together in one dwelling unit whose relationship is of a regular and permanent nature and having a distinct domestic character or a demonstrable and recognizable bond where each party is responsible for the basic material needs of the others and all are living and cooking as a single housekeeping unit.

(ECF No. 44-7, § 2.02 Definitions, PageID 1385.) Presumably, then, domestic units limit traffic and noise by sharing daily chores and limit crowding by sharing social circles. They also by definition maintain the "permanent nature" of single-family residential neighborhoods.

Lastly, adult foster care facilities of six persons or less materially differ from sober living homes because they are subject to state licensing requirements and, if they meet those requirements, a Michigan state law (that is not challenged by Plaintiffs) demands that they be "permitted . . . in all residential zones and . . . not subject to a special use or conditional use permit or procedure different from those required for other dwellings of similar density in the same zone." M.C.L.

§ 125.3206(1)(ii). The Court need not belabor this point because Plaintiffs have agreed with it. *See* (ECF No. 48, Plaintiffs' MPSJ, PageID 4469).

So the Court must compare Ordinance 929's treatment of sober living homes to its treatment of THFs.[28] And when the Court does that, it finds that the Ordinance favors sober living homes.

To begin with, Ordinance 929 limits THFs to R-T and R-M Districts while allowing sober living homes in all Residential Districts. (ECF No. 44-23, Ordinance 929, PageID 2235–36); *cf. Oxford House-C*, 77 F.3d at 251–52 (holding that a zoning code "favor[ed] [recovery residences] on its face" because it provided them with housing options unavailable to comparable residences whose residents did not necessarily have disabilities). Additionally, THFs must comply with the SLU process, which requires them to, among other things, attend a public hearing and procure approval from the Planning Commission. (ECF No. 44-13, Special Land Uses, PageID 1591; ECF No. 44-23, PageID 2236.) In contrast, sober living homes are exempt from the SLU process and may be approved by the City Manager. (ECF No. 44-23, PageID 2239.)

---

[28] The Court does not agree with Plaintiffs' contention that it must consider § 6.29 without reference to § 6.27. This approach would rest on an incomplete picture of the face of the Ordinance. It might also suggest that future lawmakers may not single out disabled groups for *favorable* treatment unless every requirement remaining under that treatment is warranted by those groups' unique needs and interests.

Besides these pro-sober living home differences, the processes for opening THFs and sober living homes are nearly identical. *Compare* (ECF No. 44-23, Ordinance 929, PageID 2236–38) (THF requirements), *with* (ECF No. 44-23, PageID 2239–40) (SAU requirements). In fact, there are only two requirements imposed on sober living homes that are not imposed on THFs. First, "[a]s a condition to approval of a special accommodation use, the applicant . . . must demonstrate . . . [that] [t]he ultimate residential user or users of the property shall be persons for whom state or federal law mandates the City make reasonable accommodations in connection with [the] proposed uses of land under the existing circumstances." (ECF No. 44-23, PageID 2239.) And second, "[t]he application for a special accommodation use [must] include . . . [a] summary of the basis on which the applicant asserts entitlement to approval of a special accommodation use." (ECF No. 44-23, PageID 2239–40.) These requirements hardly constitute adverse treatment. *See* (ECF No. 44-32, Dep. of B. Connolly, PageID 2495) (opining that, "subject to the city's interpretation of the [SAU ordinance] . . . it seems like transitional housing facilities are given less favorable treatment then [SAUs]"). They are simply threshold questions that ask for no more than what is necessary to verify that the *favorable* treatment of the SAU process applies. *Cf. Get Back Up, Inc.*, 2013 WL 3305672, at *4 (stating that an ordinance is not facially discriminatory "merely because [it] mentions a disabled group").

Thus, the Court concludes that the face of Ordinance 929 favors, and does not discriminate against, sober living homes.

> *2. Whether the Moratorium was enacted with discriminatory intent is a question for the jury to decide. But no reasonable jury could conclude that Ordinance 929 was enacted with discriminatory intent.*

Even if a set of plaintiffs cannot prove that a law discriminates against a disabled group on its face, they can still prevail on a disparate treatment claim by proving that the defendants enacted the law with the intent to discriminate against the disabled group. This requires the plaintiffs to "show that 'discriminatory purpose was *a* motivating factor'"[29] of the enactment. *Smith & Lee Assocs., Inc. v. City of Taylor, Mich.*, 102 F.3d 781, 790 (6th Cir. 1996) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 270 (1977)) (emphasis added). Plaintiffs can do

---

[29] This "motivating factor" test is more lenient than the common "but for" test.

Recently, in *Comcast*, the Supreme Court held that the "ancient and simple 'but for' common law causation test . . . supplies the 'default' or 'background' rule against which Congress is normally presumed to have legislated when creating its own new causes of action." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020). But that case only purported to "resolve the disagreement among the circuits over § 1981's causation requirement." *Id.* Thus, it did not displace the Sixth Circuit's rulings on the FHA and the ADA. And there is good reason to continue to apply the motivating factor test to these statutes, even in light of *Comcast*. *See* Robert G. Schwemm, *Fair Housing and the Causation Standard after Comcast*, 66 Vill. L. Rev. 63, 87–90 (2021) ("[T]he FHA has a number of features that suggest an exception from the but-for test in favor of a more lenient causation standard. These include the FHA's history, purpose, and their relationship to Title VII and, perhaps most importantly, Congress's 1988 amendments to the FHA.").

this by showing that the defendants were personally motivated by discriminatory animus or by showing that the defendants "were knowingly responsive" to others who were so motivated. *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 606 (2d Cir. 2016) (internal quotation marks and citation omitted) (evaluating an FHA claim); *see also Anderson*, 798 F.3d at 357 (quoting this standard from *Mhany* to evaluate a disparate treatment claim under the ADA); *Jetter v. City of Cincinnati*, 20-cv-581, 2021 WL 4504247, at *7 (S.D. Ohio Sept. 30, 2021) (quoting the same to evaluate a disparate treatment claim under the FHA); *United States v. City of Birmingham, Mich.*, 538 F. Supp. 819, 828 (E.D. Mich. 1982) (holding that plaintiffs can "demonstrate a city's discriminatory intent" by "show[ing] that the decision-making body acted for the sole purpose of effectuating the desires of private citizens, that [discriminatory] considerations were a motivating factor behind those desires, and that members of the decision-making body were aware of the motivations of the private citizen[s]"), *aff'd* 727 F.2d 560 (6th Cir. 1984); *Gilead Cmty. Servs., Inc. v. Town of Cromwell*, 432 F. Supp. 3d 46, 75 (D. Conn. 2019) ("if an official act is performed simply in order to appease the discriminatory viewpoints of private parties, that act itself becomes tainted with discriminatory intent even if the decisionmaker personally has no strong views on the matter"). *But see Get Back Up, Inc.*, 725 F. App'x at 393 (emphasizing that "none of the statutes at issue here make a city liable merely for being *exposed* to its citizens' allegedly discriminatory

views—the City is only liable if its decision-makers actually discriminated" (emphasis added)).

Plaintiffs need not show that discriminatory purpose was the "sole[]" motivating factor. *Smith & Lee Assocs., Inc.*, 102 F.3d at 791 (quoting *Vill. of Arlington Heights*, 429 U.S. at 265). And even "[o]therwise lawful governmental actions become unlawful when done for the purpose of disadvantaging the handicapped." *Id.* at 790.

As a practical matter, Plaintiffs can establish discriminatory purpose "through direct [or circumstantial] evidence." *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 612 (6th Cir. 2012).

"Direct evidence is evidence that proves the existence of a fact without requiring any inferences." *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004). Direct evidence that a law was enacted with discriminatory purpose would show "a specific link between . . . alleged discriminatory animus and the challenged" law. *Gallagher v. Magner*, 619 F.3d 823, 831 (8th Cir. 2010). "So if a city zoning official explicitly relies on a discriminatory policy in making [a] challenged policy decision, or if he makes discriminatory comments about the disabled while explaining his basis for the contested decision, that is direct evidence of discrimination." *Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City*, 685 F.3d 917, 920 (10th Cir. 2012).

Circumstantial evidence is indirect evidence that supports an inference. In the Sixth Circuit, courts evaluate circumstantial evidence of discriminatory purpose in fair housing cases "under the familiar burden-shifting analysis established by *McDonnell Douglas Corp v. Green*, 411 U.S. 792 [] (1973)." *Anderson*, 798 F.3d at 356, 364; *see also Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 539 (6th Cir. 2014). In this analysis, "intermediate evidentiary burdens" shift back and forth between the parties, but the "ultimate burden of persua[sion] . . . remains at all times with the plaintiff[s]." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981). The analysis is not "intended to be rigid, mechanized, or ritualistic," but rather to provide "a sensible, orderly way to evaluate the evidence . . . as it bears on the critical question of discrimination." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978).

At the start of the *McDonnell Douglas* analysis, plaintiffs bear the burden of "establish[ing] a prima facie case of intentional discrimination." *Anderson*, 798 F.3d at 357. This burden is "not onerous." *Burdine*, 450 U.S. at 253. If the plaintiffs meet it, then the burden of *production* shifts onto the defendants to "offer a legitimate, nondiscriminatory reason for [their] challenged action." *Anderson*, 798 F.3d at 357 (internal quotation marks and citation omitted). In other words, the defendants "must clearly set forth, through the introduction of admissible evidence, reasons for its action[] which, if believed by the trier of fact, would support a finding that unlawful

discrimination was not the cause of the [] action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (internal quotation marks, citation, and emphasis omitted).

If the defendants do that, then the evidentiary burden shifts back to the plaintiffs and merges with their "ultimate burden of persua[sion]." *Burdine*, 450 U.S. at 256. Plaintiffs may, at this point, present evidence that the defendants' proffered reason "is unworthy of credence" or less likely than a discriminatory reason. *Id.* But "the ultimate question is discrimination *vel non . . . not . . .* whether defendant[s'] response is credible." *St. Mary's Honor Ctr.*, 509 U.S. at 512–19 (emphasis original); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (providing another description of the *McDonnell Douglas* analysis). Indeed, as noted above, defendants may have been motivated by a discriminatory purpose *even if* they were also motivated by a legitimate one. *See Smith & Lee Assocs., Inc.*, 102 F.3d at 790–91.[30]

---

[30] For this reason, the Sixth Circuit has held that "the *McDonnell Douglas/Burdine* burden-shifting framework does *not* apply to the summary judgment analysis of Title VII mixed-motive claims." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008) (emphasis original). But the Court will proceed with the *McDonnell Douglas* framework here because this case does not involve Title VII, Plaintiffs have not explicitly set forth a "mixed-motive claim," and both sides have directed the court to this framework. *See* (ECF No. 44, Defendants' MSJ, PageID 1155; ECF No. 58, Response to Defendants' MSJ, PageID 8012); *cf. Hollis*, 760 F.3d at 539 (affirming that an FHA "disparate-treatment claim requires the plaintiff to establish discriminatory animus" and the "court therefore applies the three-step *McDonnell Douglas* test . . . in an effort to zero in on the specific intent underlying the defendant's conduct").

In *Arlington Heights*, the Supreme Court identified six non-exhaustive factors that often shed light on whether defendants enacted a law with discriminatory purpose: 1) the "impact" of the enactment; 2) the "historical background" to the enactment; 3) the "specific sequence of events leading up to the" enactment; 4) "[d]epartures from the normal procedural sequence"; 5) "[s]ubstantive departures"; and 6) the "legislative or administrative history . . ., especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Vill. of Arlington Heights*, 429 U.S. at 267–68. These factors are particularly useful for evaluating whether plaintiffs have made out prima facie and overall cases of discrimination through circumstantial evidence, but they might also point to direct evidence, legitimate explanations, or markers of pretext.[31] *Id.* at 266.

---

[31] The Sixth Circuit has repeatedly instructed courts to apply *McDonnell Douglas* when evaluating FHA disparate treatment claims based on circumstantial evidence. *HDC, LLC*, 675, F.3d at 612 ("proof of intentional discrimination . . . can be established either through direct evidence of intentional discrimination or through circumstantial evidence *using the burden-shifting framework* first articulated in *McDonnell Douglas*" (emphasis added)); *Get Back Up, Inc.*, 725 F. App'x at 392 ("Courts review intentional-discrimination claims under the burden-shifting analysis set out in *McDonnell Douglas* . . . ."). At the same time, the Sixth Circuit has also recognized the value of the *Arlington Heights* factors, including when a plaintiff's case turns on circumstantial evidence. *See Turner v. City of Englewood*, 195 F. App'x 346, 354 (6th Cir. 2006) (applying the *Arlington Heights* factors to an analysis of whether plaintiff made out a prima facie case under the *McDonnell Douglas* framework). Therefore, the Court will assess these factors within its *McDonnell Douglas* analysis rather than treat them as a separate test. *Cf. id.*; *Quad Enters. Co., LLC v. Town of Southold*, 369 F. App'x 202, 207 (2d Cir. 2010) (stating that the

Finally, if plaintiffs successfully show that defendants acted with discriminatory purpose, "the burden [of persuasion] shifts to the defendant[s] to prove that [they] would have made the same decision even if [they] had not been motivated by an unlawful purpose." *Smith & Lee Assocs., Inc.*, 102 F.3d at 791.[32] If the defendants can prove this, then the plaintiffs "no longer fairly could attribute the injury complained of to improper consideration of a discriminatory purpose" and the defendants are not liable for it. *Vill. of Arlington Heights*, 429 U.S. at 270 n.21.

> i. A reasonable jury could find that Defendants did or did not enact the Moratorium with discriminatory intent.

**Arguments**

Plaintiffs contend that circumstantial evidence proves that Defendants enacted the Moratorium with the intent to discriminate against residents of sober living homes. (ECF No. 48, Plaintiffs' MPSJ, PageID 4469–70; ECF No. 58, Response to Defendants' MSJ, PageID 8012.) They assert that the first five *Arlington Heights* factors support their prima facie case (and overall case) for this conclusion.

---

*Arlington Heights* factors "may be considered" within the *McDonnell Douglas* analysis).

[32] This final burden shift is separate from the intent-divining *McDonnell Douglas* analysis and akin to an affirmative defense. *See* Schwemm, *supra* note 29, at 75–78 (explaining this setup in the context of Title VII and Equal Protection cases); *Howard v. Senkowski*, 986 F.2d 24, 27 (2d Cir. 1993) ("Once the claimant has proven improper motivation, dual motivation analysis is available to the person accused of discrimination to avoid liability by showing that the same action would have been taken in the absence of the improper motivation that the claimant has proven.")

On the first *Arlington Heights* factor, Plaintiffs argue that the Moratorium "had [a] discriminatory impact" because it "wholly forcelos[ed] certain neighborhoods" to sober living homes. (ECF No. 58, Response to Defendants' MSJ, PageID 8013.) On the second factor, Plaintiffs argue that Defendants enacted the Moratorium "in the context of" and "*because of*" "loud and vociferous discriminatory opposition from surrounding Howell residents." (ECF No. 58, PageID 8013) (emphasis Plaintiffs') (citing ECF No. 48-42, Schmitt MTO Proctor; ECF No. 48-44, July 19, 2018 Schmitt MTO Proctor; *Gilead Cmty. Servs., Inc.*, 432 F. Supp. 3d at 73; and *MX Grp., Inc*, 293 F.3d at 341–42); *see also* (ECF No. 48, Plaintiffs' MPSJ, PageID 4471) (making the same point); (ECF No. 68, Reply to Plaintiffs' MPSJ, PageID 8511) (same).

On the third *Arlington Heights* factor, Plaintiffs argue that "the Moratorium followed close on the heels of Plaintiffs' SLU application withdrawal, was expressly meant to prevent additional applications for sober living homes, and set the stage for Ordinance 929," which they claim restricts sober living homes. (ECF No. 58, Response to Defendants' MSJ, PageID 8014.) They aver that "Defendants forced Plaintiffs along a specific path and then blocked it off entirely." (ECF No. 48, Plaintiffs' MPSJ, PageID 4470.)

Next, on the fourth and fifth factors, Plaintiffs argue that Defendants "diverged from the SLU process by requiring Ms. Atsalakis to submit additional information

and sending out atypical communications to her and the application's opponents." (ECF No. 58, Response to Defendants' MSJ, PageID 8014); *see also* (ECF No. 48, Plaintiffs' MPSJ, PageID 4470) (making the same point).

Finally, although Plaintiffs do not specifically address the sixth factor, their earlier arguments about the "official memoranda" on the Moratorium speak to it. *See* (ECF No. 58, Response to Defendants' MSJ, PageID 8010) (citing ECF No. 48-42, June 22, 2018 Schmitt MTO Proctor, PageID 5790 and ECF No. 48-44, July 19, 2018 Schmitt MTO Proctor, PageID 5896); (ECF No. 48, Plaintiffs' MPSJ, PageID 4466–67) (quoting Ex. 48-42, PageID 5789); Section III.D.1.i, *supra*.

Defendants argue that Plaintiffs fail to make a prima facie case that the Moratorium "was motivated by discriminatory animus." (ECF No. 44, Defendants' MSJ, PageID 1161, 1164). Although they do not explicitly invoke the *Arlington Heights* factors, their arguments fit fairly neatly within them.

Implicating the first *Arlington Heights* factor, Defendants maintain that because the Moratorium applied to all SLU applications "for unrelated persons to live together in *any* property within an R-1 or R-2 zoning district" it "did not target homes for persons with disabilities." (ECF No. 44, Defendants' MSJ, PageID 1164) (citing ECF No. 44-17, July 19, 2018 Schmitt MTO Proctor and Moratorium). On the second factor, they assert that Plaintiffs have "no proof that the City did anything to disturb the community" or incite the community's oppositional comments. (ECF No.

126

44, PageID 1161, 1164.) And they emphasize that the City "cannot be found to have been acting discriminatorily merely because it was exposed to citizens' viewpoints." (ECF No. 44, 1161) (citing *Get Back Up, Inc.*, 725 F. App'x at 393 and *Hamm*, 109 F. App'x 744); *see also* (ECF No. 59, Response to Plaintiffs' MPSJ, PageID 8312–13) (making the same point).

On the third and fourth factors, Defendants insist that "Schmitt's communications with residents . . . and Atsalakis were intended to address rumors circulating about the project and relay information to Atsalakis to assist her in addressing them at a public hearing regarding her 2018 application." (ECF No. 59, Response to Plaintiffs' MPSJ, PageID 8313) (citing ECF No. 44-15, Dep. of T. Schmitt, PageID 2052–53). They also claim that Plaintiffs "do not point to a single piece of evidence that [Schmitt] ever expressed any discriminatory viewpoints." (ECF No. 59, PageID 8313.) And they note that, anyways, "it was the City Council, *not* Schmitt who enacted the Moratorium." (ECF No. 63, Reply to Defendants' MSJ, PageID 8376) (emphasis Defendants') (citing *Omnipoint Holdings, Inc. v. City of Southfield*, 355 F.3d 601, 606 (6th Cir. 2004)).

On the fifth factor, Defendants state that "the consensus in the planning community appears to be that moratoria . . . are an essential tool of successful development." (ECF No. 44, Defendants' MSJ, PageID 1163) (quoting *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 337 (2002));

127

*see also* (ECF No. 59, Response to Plaintiffs' MPSJ, PageID 8310) (making the same point). And finally, on the sixth factor, they contend that "[t]o the extent that the Resolution [enacting the Moratorium] references 'sober living homes,' it is a benign reference that accurately captures the undisputed fact that there had been an increase in requests for sober homes and 'similar group living arrangements that are not specifically listed in the Zoning Ordinance.'" (ECF No. 63, Reply to Defendants' MSJ, PageID 8376) (quoting ECF No. 48-44, Moratorium, PageID 5897).

Next, Defendants argue that "[e]ven if Plaintiffs were found to make a *prima facie* case, the City had legitimate interests in enacting . . . the Moratorium." (ECF No. 59, Response to Plaintiffs' MPSJ, PageID 8314.) Specifically, they claim that "the Moratorium was adopted with the intent of reaching the point of adopting ordinance revisions like Ord. 929 that would clarify the procedures for group housing uses." (ECF No. 59, PageID 8314.) And they assert that "Plaintiffs cannot prove that th[is] interest[] [is] a pretext, given that the result of the Moratorium and Ord. 929 was to make it *easier* for homes like Plaintiffs to locate in the City, and two sober homes for women (including one for ARH) have been approved since Ord. 929's enactment." (ECF No. 59, PageID 8314) (emphasis Defendants').

Plaintiffs do not directly address this "legitimate interest" in their Reply to the Response in which Defendants introduce it. However, in their Response to Defendants' Motion for Summary Judgment, Plaintiffs do assert that "Defendants

offer no legitimate non-discriminatory interest for the Moratorium, nor could they. [The] June 2018 memo conclusively connects it to 304 S. Walnut and the regulation of recovery housing . . . ." (ECF No. 58, Response to Defendants' MSJ, PageID 8016–17.)

***Analysis***

An examination of the *Arlington Heights* factors demonstrates that Plaintiffs have established a prima facie case that the City enacted the Moratorium with discriminatory intent.[33]

Beginning with the first factor, the Moratorium had some negative "impact" on sober living homes. Although the Moratorium eventually culminated with Ordinance 929—which facially favors sober living homes as compared to similar homes, *see* Sections III.D.1.ii, *supra*, and was not (as far as the record shows) enacted with discriminatory intent, *see* Section III.D.2.ii, *infra*—the Moratorium's direct, immediate effect was to completely bar new sober homes from opening in the

---

[33] Because the Court found that Plaintiffs do not have standing to sue Schmitt in his individual capacity on this claim, *see* Section III.B.1, and will also dismiss Schmitt personally and in his official capacity on immunity grounds, *see* Sections III.G–I, it need not consider Schmitt's argument that he is not liable for the Moratorium and Ordinance 929 because he was not a member of the City Council that actually voted to enact them. *Cf. Mich. Prot. & Advoc. Servs., Inc. v. Babin*, 18 F.3d 337, 344–46 (6th Cir. 1994) ("We hold that the plaintiffs' claim against the neighbors is not cognizable under § 3604(f)(1) because the neighbors' actions did not *directly affect* the availability of housing or impede a transaction that the plaintiffs were undertaking." (emphasis added)).

City of Howell for its twenty-month term, from July 23, 2018 until March 23, 2020. *See* (ECF No. 44-18, Moratorium, PageID 2205); (ECF No. 48-45, July 23, 2018 City Council Minutes, PageID 5901) (passing the Moratorium); (ECF No. 44-39, Feb. 24, 2020, City Council Minutes PageID 3199) (extending the Moratorium for the last time). Indeed, Schmitt's response to Atsalakis' request for an exemption from the Moratorium confirmed this effect. *See* (ECF No. 44-22, Oct. 3, 2019, Schmitt LTO Atsalakis, PageID 2233) ("At this time, I am unable to accept your Special Land Use application [to open a sober living home] under the moratorium that is currently in place.").

The Moratorium applied to "*any* application for a [SLU] to allow unrelated persons to live together in any property in the R-1 . . . or R-2 . . . districts." (ECF No. 44-18, Moratorium, PageID 2205) (emphasis added). But in the three and a half years preceding it, the City received only one such application—and it was for a sober home. *See* (ECF No. 58-5, SLU Applications, 2015–present).

On the second factor, the "historical background" to the Moratorium included significant community opposition to Atsalakis and ARH's proposed sober living home. Some of this opposition referenced community concerns that are not necessarily discriminatory, such as fear of falling property values. *See Smith & Lee Assocs., Inc.*, 102 F.3d at 793 ("We also believe that a city council member's fears that a twelve-person AFC might lower surrounding property values, even if proved

to be unwarranted, do not necessarily evince discriminatory animus toward the handicapped."); *Hamm*, 109 F. App'x at 748 ("The two council members who explained their 'no' votes on the record cited the neighbors' concern about the effect of the proposed development on property values. The Hamms concede that such a concern 'would not evince discriminatory intent' if it were genuinely held . . . ."). There was community *support* for the home, too. *See* (ECF No. 44-36, Dep. of N. Proctor, PageID 2700.) Discriminatory animus appeared to be a motivating factor behind much of it. *See, e.g.*, (ECF No. 48-8, Apr. 11, 2018 Kabel ETO Charles, PageID 5388) ("[H]eroin addicts . . . do whatever is necessary to feed their habit. / If one of [the prospective ARH residents] falls off their treatment, the neighborhood will be at risk."); (ECF No. 48-17, Apr. 20, 2018, Rubin ETO Schmitt, PageID 5411–12) ("We wish to share our grave concern over the safety and well-being of the neighborhood with the proposed usage of the [ARH] . . . ."); (ECF No. 48-20, Apr. 25, 2018, LeBrecque ETO Schmitt, PageID 5243) ("[T]his use does not correspond to or enhance our family centered neighborhood."). Defendants admitted at oral argument that there were "residents out there that didn't like sober living homes[ and] that said horrible things about sober living homes and the people that live in them." Of course, this alone does not support an inference that the City adopted the views of those residents.

And Plaintiffs contend that the City Council enacted the Moratorium in knowing response to this discriminatory opposition. Schmitt's memorandum first recommending a moratorium to the City Council referenced, inter alia, this opposition. (ECF No. 48-42, June 22, 2018 Schmitt MTO Proctor, PageID 5789–90.) Schmitt testified that his recommendation was not "a reaction to [P]laintiffs' application and the public response to it." He also testified that he believed the public response was likely what convinced the City Council to give the staff "a chance to pause and step back . . . as opposed to trying to rush" the Ordinance change. (ECF No. 44-15, Dep. of T. Schmitt, PageID 2072–73.)

Schmitt's memorandum did not describe the contents of the "community response." Charles shared at least one email opposing ARH—which stated that, "[i]f one [ARH member] falls off their treatment, the neighborhood w[ould] be at risk"—with the City Council. (ECF No. 48-8, Charles ETO Kabel, PageID 5388.) Two members of the seven-member Council, Proctor and Lobur, likely received the community emails about Atsalakis' application, because those two Council members also sat on the Planning Commission. *See* (ECF No. 44-36, Dep. of N. Proctor, PageID 2670).[34]

---

[34] The City Council's minutes of the meeting at which they passed the Moratorium note that the Council received "correspondence" in support of the Moratorium from two members of the community. *See* (ECF No. 48-45, July 23, 2018 City Council Minutes, PageID 5901.)

Proctor also testified that the moratorium was "prompted" by community concerns over the "density" of housing in Howell that were raised "in response to [Atsalakis'] application." (ECF No. 44-26, Dep. of N. Proctor, PageID 2733–75.) It is not entirely clear from his deposition whether this refers to the density of sober living homes, "group housing situations," 501(c)(3)s, or some other category.

It is significant to note that the fact that City officials received community correspondence is not evidence of discrimination but rather standard operating procedure through which city agencies engage with their populations. Moreover, Mayor Proctor testified that he considered some of the community opposition to Atsalakis' application "misguided," and that he thought that if the application had come before the Planning Commission, the Commission "would have pushed back [against the opposition] . . . with facts." (ECF No. 44-36, Dep. of N. Proctor, PageID 2698.) Thus, Mayor Proctor believes that the City Council would also "push back" against discriminatory opposition rather than acquiesce to it.

On the third factor, Plaintiffs contend, from their point of view, that within the "sequence of events leading up to" the Moratorium the City responded to Atsalakis' application to open an ARH with a "bait and switch." (ECF No. 58, Response to Defendants' MSJ, PageID 7999.) This could be true, or instead the City may have drawn a reasonable and foreseeable distinction between a proposal to open a sober

living home of eight people through a SLU and a proposal to open a home of six by right. This is for a jury to decide.

On the fourth factor, Plaintiffs contend that the City departed from their typical procedural sequence for processing a SLU application by sending out atypical letters to the community discussing the status of the process. After Atsalakis submitted her SLU application, Charles sent out a letter assuring the neighbors that the ARH had not been approved. (ECF No. 44-11, Apr. 12, 2018 Charles LTO Residents, PageID 1583) ("At this time, the City has issued **no approval**" for "a recovery house" at "304 South Walnut" (emphasis original)); (ECF No. 44-36, Dep. of N. Proctor, PageID 2700) (stating that "this type of communication [was not] part of the City's general process"). Then, after Atsalakis withdrew her application, Schmitt sent a letter to the community, informing them of the withdrawal, and relaying that Atsalakis had "expressed [her] intention to continue moving forward with a recovery support services house . . . under other provisions," and emphasizing that "*no approval ha[d] been granted*." (ECF No. 48-36, June 12, 2018 Schmitt LTO Community, PageID 5754) (emphasis original).

Schmitt had also sent a letter to Atsalakis early in the process, stating: "There has been a great deal of information and misinformation in the community surrounding your application. . . . **At this time, we want to be clear that no approvals have been granted for the use of the house as anything other than a single-family**

home . . . ." (ECF No. 48-5, Apr. 11, 2018 Schmitt LTO Atsalakis, PageID 5001) (emphasis original); *see also* (ECF No. 44-15).

On the fifth factor, the Moratorium was a departure from the City's typical practice. While there may be a "consensus in the planning community . . . that moratoria . . . are an essential tool of successful development," *Tahoe-Sierra Pres. Council, Inc.*, 535 U.S. at 337, they are not a tool that the City of Howell has made use of in the recent past. In fact, Proctor described the Moratorium as "an unusual step" that was "maybe unprecedented for the City," even if not "for other municipalities around the country that may have been presented with the same scenario." (ECF No. 44-36, Dep. of N. Proctor, PageID 2741.)

As to the sixth factor, the Moratorium's legislative history also suggests that it was enacted with the ultimate goal of studying "group living situations," and in particular sober living homes. Schmitt also tied the Moratorium proposal directly to sober living homes by stating: "These facilities are beginning to create a negative perception among some populations as opioids have become more of a focus of the homes." (ECF No. 48-42, PageID 5790.)

In his memorandum introducing the text of the Moratorium proposal to the City Council, Schmitt listed the following "three main areas that Staff [was] propos[ing] to focus on [] reviewing" during its term:

> Where are the group home/sober living houses located within the City of Howell?

> Where are these types of homes located elsewhere in Livingston County and is the City of Howell taking more than our fair share of these uses Countywide?
>
> Are there gaps in our ordinances that are allowing or encouraging these uses to concentrate near downtown Howell?

(ECF No. 44-18, July 19, 2018 Schmitt MTO Proctor, PageID 2204) (bullets removed).

At the meeting at which the City Council passed the Moratorium, the Council noted that the Moratorium would allow the staff to consider "if the City is taking on more of these types of [group housing] uses than their fair share." (ECF No. 48-45, July 23, 2018 City Council Minutes, PageID 5901.) The Council also understood that during the Moratorium staff "w[ould] look at balancing potential policies with state law, [and] consult with [] Carlisle Wortman and legal counsel to make sure regulations are correct." (ECF No. 48-45, PageID 5901.) In one view, this might suggest that the Council planned to respect anti-discrimination laws; in another, it might indicate that the Council's goal was to limit group housing as much as possible while avoiding legal liability.

Finally, the Moratorium itself referenced "increased inquiries for sober living houses" and observed that "there appear[ed] to be a substantial concentration of existing group housing situations in the City that predate[d] [then-]current standards." (ECF No. 44-18, Moratorium, PageID 2205.)

All told, Plaintiffs have established a prima facie case with regard to the City's enactment of the Moratorium. Therefore, the burden of production shifts to the Defendants, who must "offer a legitimate, nondiscriminatory reason" for why they enacted the Moratorium. *Anderson*, 798 F.3d at 357.

In response to this requirement, Defendants state that the City "adopted [the Moratorium] with the intent of reaching the point of adopting ordinance revisions like Ord. 929 that would clarify the procedures for group housing uses." (ECF No. 59, Response to Plaintiffs' MPSJ, PageID 8314.) The record does provide the support necessary for Defendants to meet their burden of production at this stage. For example, the Moratorium notes that "sober living homes and similar group living arrangements [] are not specifically listed in the [pre-Ordinance 929] Zoning Ordinance." (ECF No. 44-18, Moratorium, PageID 2205.) The regulations created at the conclusion of the Moratorium by Ordinance 929 do create a clearer path to approval for sober living homes. Schmitt testified that the Moratorium was put in place so that the City could "take a step back" and "give guidelines for people so they can more easily get through this process." (ECF No. 44-15, Dep. of T. Schmitt, PageID 2070–71.) And Arroyo opined that "it is not uncommon in the planning and zoning practice that the filing of an application results in a community realizing it needs to address a situation not adequately covered in the existing ordinances." (ECF No. 46-2, Arroyo Report, PageID 4039.)

So the burden shifts back to Plaintiffs and merges with their ultimate burden of persuasion. As noted above, Plaintiffs do not directly address Defendants' explanation in their Reply. Nonetheless, this explanation does not completely outweigh the evidence that makes up Plaintiffs' prima facie case. Viewing the facts in the light most favorable to Plaintiffs, a reasonable jury could still find that the City enacted the Moratorium with the intent to discriminate against people in sober living homes. On the other hand, viewing the facts in the light most favorable to Defendants, another reasonable jury could find that the City enacted the Moratorium for the lawful reasons they have put forth. Therefore, both sides' Motions for Summary Judgment on this claim are **DENIED**.[35] It will be up to a jury. *Cf. Pullman-Standard v. Swint*, 456 U.S. 273, 288 (1982) ("Treating issues of intent as factual matters for the trier of fact is commonplace.").

> ii. No reasonable jury could find that the Defendants enacted Ordinance 929 with discriminatory intent.

***Arguments***

Plaintiffs also contend that circumstantial evidence proves that Defendants enacted Ordinance 929 with the intent to discriminate against residents of sober living homes. (ECF No. 48, Plaintiffs' MPSJ, PageID 4469–70; ECF No. 58,

---

[35] Defendants have not argued that, even if a trier of fact found that they enacted the Moratorium with discriminatory motivation, they could still convince that trier of fact that they would have enacted the Moratorium absent that motivation. Therefore, this Opinion need not address that possibility further.

Response to Defendants' MSJ, PageID 8012.) According to Plaintiffs, the Moratorium and Ordinance 929 were "culmination[s] of the same discriminatory arc." (ECF No. 48, PageID 4471.) For that reason, their arguments in this section often mirror or overlap with their arguments in the previous section.

On the first *Arlington Heights* factor, Plaintiffs argue that Ordinance 929 has a "discriminatory impact[]" because it "impose[s] excessive burdens" on sober living homes. (ECF No. 58, Response to Defendants' MSJ, PageID 8013); *see also* Section III.D.1.ii, *supra*. On the second, Plaintiffs argue that Ordinance 929 was "enacted in the context of" and "*because of*" the same "discriminatory opposition" that Plaintiffs say motivated the Moratorium and its extensions. (ECF No. 58, PageID 8013) (emphasis Plaintiffs') (citing ECF No. 48-3, Dep. of T. Schmitt, PageID 4861); *see also* (ECF No. 48, Plaintiffs' MPSJ, PageID 4471) (making the same point and citing *Gilead Cmty Servs., Inc.*, 432 F. Supp. 3d at 73); (ECF No. 68, Reply to Plaintiffs' MPSJ, PageID 8511) (same); Section III.D.2.i, *supra* (citing to pre-Moratorium opposition and relevant case law).

On the third and fourth factors, Plaintiffs argue that the events and procedural anomalies preceding the Moratorium "set the stage for" Ordinance 929. (ECF No. 58, Response to Defendants' MSJ, PageID 8014.) They also argue that Defendants' enactment and "repeated[] exten[sions] of the Moratorium" deviated "from the City's usual zoning practices." (ECF No. 48, Plaintiffs' MPSJ, PageID 4471.)

On the fifth factor, they argue that Connolly "confirms" that Ordinance 929 "departs from sound principles of planning and zoning." (ECF No. 58, Response to Defendants' MSJ, PageID 8014) (citing ECF No. 48-56, Connolly Report, PageID 6437–41). And lastly, relating to the sixth (as well as second) factors, they argue that "Proctor's comments at the January 2020 Planning Commission meeting further confirmed that [Ordinance 929] was meant to 'accommodate' the opponents of Plaintiffs' sober living homes." (ECF No. 58, PageID 8013) (citing ECF No. 58-6, Jan. 15, 2020 Planning Commission Transcript).

Defendants disagree. They argue that Plaintiffs "cannot make a *prima facie* case that Ord. 929 was motivated by discriminatory animus." (ECF No. 44, Defendants' MSJ, PageID 1161.)

Relevant to the first *Arlington Heights* factor, Defendants argue that Ordinance 929 "*advantages* uses that qualify for a SAU," including sober living homes. (ECF No. 44, Defendants' MSJ, PageID 1160) (emphasis Defendants'); *see also* Section III.D.1.ii, *supra*. On the second factor, they again emphasize that "the City cannot be found to have been acting discriminatorily merely because it was exposed to citizens' viewpoints." (ECF No. 44, PageID 1161) (citing *Get Back Up, Inc.*, 725 F. App'x at 393 and *Hamm*, 109 F. App'x 744). Further, they take issue with Plaintiffs "try[ing] to conflate negative community comments made during the time that the 2018 Application was pending with the adoption of Ord. 929 a year and a half later."

140

(ECF No. 59, Response to Plaintiffs' MPSJ, PageID 8312.) To this point, they note that "Atsalakis admitted that what she described as community 'bullying' related to [her] 2018 Application 'died down' at the same time consideration of the house did (i.e. mid-late summer 2018)." (ECF No. 44, PageID 1161) (citing ECF No. 44-2, Dep. of C. Atsalakis, PageID 1311–12); *see also* (ECF No. 59, PageID 8312) (making the same point).

Defendants do not touch on the third or fourth factors besides asserting, as noted above, that "Schmitt's communications with residents . . . were intended to" help Atsalakis and ARH. (ECF No. 59, Response to Plaintiffs' MPSJ, PageID 8313); *see also* Section III.D.2.i, *supra*. On the fifth factor, Defendants argue that "[e]ven Plaintiffs' proposed planning expert acknowledged that ['generally speaking,' at least 'many' of] the 'standards and regulations' for an SAU in Ord. 929 . . . are consistent with those that would be employed for any special use approval" or rezoning approval. (ECF No. 44, Defendants' MSJ, PageID 1160, 1163) (quoting ECF No. 44-31, Dep. of B. Connolly, PageID 2492–93); *see also* (ECF No. 63, Reply to Defendants' MSJ, PageID 8378–79) ("Ord. 929 does not establish special development standards, but sets forth review standards for a SAU application that are akin to the process validated in *Get Back Up, Inc.* [in 2015].").

On the sixth and final factor, Defendants assert that "the minutes of the [Planning Commission] and City Council meetings at which the final version of Ord. 929 was

considered reveal that *no members of the public except Plaintiffs' counsel* spoke regarding the ordinance." (ECF No. 44, Defendants' MSJ, PageID 1161) (emphasis Defendants') (citing ECF No. 44-25, Jan. 15, 2020 Planning Commission Minutes and ECF No. 44-33, Mar. 9, 2020 City Council Minutes); *see also* (ECF No. 59, Response to Plaintiffs' MPSJ, PageID 8313) (making the same point). They also argue that Plaintiffs' "take [Proctor's comments at the January 15, 2020 Planning Commission meeting] out of context," and that Proctor actually "favorably acknowledged that the FH[A] and ADA were in play on this issue" and "explained [that] Ord. 929 was not intended to discriminate." (ECF No. 44, PageID 1161–62) (citing ECF No. 44-34, Jan. 15, 2020 Planning Commission Transcript, PageID 2582–85). They add that "[t]he idea that Mayor Proctor somehow injected discriminatory bias into the consideration of Ord. 929 is also belied by the fact that he was the sole vote dissenting from extending the moratorium based on his view that Plaintiffs and the residents should have had answers within a year." (ECF No. 44, PageID 1162) (citing ECF No. 44-35, June 10, 2019 City Council Minutes and ECF No. 44-36, Dep. of N. Proctor, PageID 2657). And they further contend that "Plaintiffs cannot establish a causal connection between these isolated comments and any official action of the City, as the [Planning Commission] forwarded Ord. 929 to the City Council without a recommendation, and there is no allegation (nor evidence) that [] Proctor's comments played a role in the City Council's ultimate

142

adoption of Ord. 929." (ECF No. 44, PageID 1162); *see also* (ECF No. 59, PageID 8313) (citing *Smith & Lee*, 102 F.3d at 793 as holding, "where one Council member expressed fears about adult foster care facilities, [that because] the comments were 'the position of only one member' th[ey] did not necessarily support animus").

Then, Defendants argue that "[e]ven if Plaintiffs were found to make a *prima facie* case, the City had legitimate interests in enacting Ord. 929." (ECF No. 59, Response to Plaintiffs' MPSJ, PageID 8314); *see also* (ECF No. 44, Defendants' MSJ, PageID 1162) (making the same point). They state that "[t]he [Zoning Code]'s lack of specific provisions for sober homes (or similar facilities) was a recognized concern long before Plaintiffs came on the scene." (ECF No. 44, PageID 1162.) And they explain that Ordinance 929 "resolved this concern and was enacted to provide equal housing to persons entitled to a reasonable accommodation, and to advance the legitimate interests of ensuring that SAUs are properly located, that overcrowding is avoided, and that streets and facilities are not overburdened." (ECF No. 44, PageID 1162–63) (citing ECF No. 44-23, Ordinance 929, PageID 2239); *see also* (ECF No. 59, PageID 8314) (making the same point). They contend that:

> The advantageous treatment of SAUs in Ord. 929 ties in with the express intent of Ord. 929, specifically Section 6.29, which states that it is "intended to authorize the grant of relief from the strict terms of this Ordinance for Transitional housing facilities . . . particularly suited to the needs of persons entitled to reasonable accommodation under state or federal law."

(ECF No. 59, PageID 8314) (quoting ECF No. 44-23, PageID 2239).

143

In turn, Plaintiffs argue that these "legitimate interests" are mere pretext. They assert that "[n]one of the interests listed in Defendants' brief were even mentioned in Mr. Carlisle's August 2019 study of housing in Howell, which preceded the SAU Ordinance" and "Defendants also confirmed that they did not evaluate the effects of sober living homes on public services." (ECF No. 58, Response to Defendants' MSJ, PageID 8015) (citing ECF No. 58-2, July 10, 2019 Carlisle MTO Planning Commission, for the first quoted statement and ECF No. 48-7, Dep. of N. Proctor, PageID 5313, for the second.) And they note that "Schmitt disagreed that there exist any such effects." (ECF No. 58, PageID 8015) (citing ECF No. 48-3, Dep. of T. Schmitt, PageID 4856).

Further, they claim that the record does not "indicate the SAU Ordinance actually serves [Defendants'] stated interests" and suggest, as a supporting example, that "overcrowding of houses is governed by the Occupancy Code, not the 2020 SAU Ordinance." (ECF No. 58, Response to Defendants' MSJ, PageID 8015) (citing ECF No. 48-39, Carlisle Report, PageID 5764–65). And they state that Defendants "do not offer any record support to show that these interests motivated them *when they enacted* the SAU Ordinance." (ECF No. 58, PageID 8015) (emphasis Plaintiffs') (citing *Philhall Corp. v. United States*, 546 F.2d 210, 215 (6th Cir. 1976)).

Additionally, Plaintiffs argue that Defendants cannot "salvage the SAU Ordinance as a process to provide reasonable accommodations" because the

Ordinance "makes it *more difficult* for people with disabilities to obtain housing than it is for nondisabled people." (ECF No. 58, Response to Defendants' MSJ, PageID 8015–16) (emphasis Plaintiffs') (citing *Oxford House, Inc. v. Twp. of Cherry Hill*, 799 F. Supp. 450, 462 (D.N.J. 1992)). Lastly, they aver that "Defendants' assertion that they enacted the 2020 SAU Ordinance to address a regulatory gap does not cancel out their discriminatory intent." (ECF No. 58, PageID 8016); *see also* (ECF No. 68, Reply to Plaintiffs' MPSJ, PageID 8511) (alluding to these arguments).

### *Analysis*

An examination of the *Arlington Heights* factors demonstrates that Plaintiffs have not established a prima facie case that the City enacted Ordinance 929 with discriminatory intent.

First, the Ordinance's impact does not strengthen Plaintiffs' case. This is because, while the Ordinance requires those attempting to open a sober living home to follow new application requirements and abide by new conditions of approval, (ECF No. 44-23, Ordinance 929, PageID 2236–38), the Ordinance treats sober living homes better than it does comparable group housing for people who do not (necessarily) have disabilities. *See* Section III.D.1.ii, *supra*. Two sober living homes have been approved under the Ordinance. *See* (ECF No. 44-27, Aug. 21, 2020, DeBuff LTO Gwinn, PageID 2279–80; ECF No. 44-28, Dec. 15, 2020, DeBuff LTO Zilch, PageID 2287–88). And Plaintiffs have not offered any evidence that any sober living

home has been denied, unable to apply for, or discouraged from applying for zoning approval under it.

Plaintiffs suggest that the size of their SAU application—140 pages and prepared by their multiple lawyers (ECF No. 48-57, 510 Michigan SAU Application, PageID 6492–632)—shows that the Ordinance burdens sober living homes. But the successful Grand River application was half the length of Plaintiffs'. (ECF No. 48-58, 521 E. Grand River SAU Application, PageID 66734–705.)

Second, the historical background to the Ordinance adds some minor support to Plaintiffs' prima facie case--the Moratorium and its multiple extensions. As discussed in the previous section, while the City may have enacted the Moratorium in acquiescence to some in the community's discriminatory opposition to sober living homes and to delay the opening of new sober living homes, this does not support a conclusion that the 929 Ordinance is discriminatory.

The "discriminatory opposition" that preceded the Moratorium is less relevant here because of the substance of the 929 Ordinance. Before it was enacted, the Ordinance had gone through multiple drafts and Schmitt, the City Attorney, Carlisle Wortman, the City's outside council, the Planning Commission, Relman Colfax, and FHCSM had all weighed in on it. (44-34, Jan. 15, 2020 Planning Commission Transcript, PageID 2572–81; ECF No. 58-2, July 10, 2019 Carlisle LTO Planning Commission, PageID 8029.) Thus, the record does not indicate that Schmitt

exclusively or even primarily controlled the Ordinance's contents or the City Council members' decisions to enact it. *Cf. Smith & Lee*, 102 F.3d at 793 ("We continue to believe that the views expressed by the City Council Chairman regarding the safety of AFC residents during a fire were 'the position of only one member of the Council.'" (quoting *Smith & Lee Assocs.*, Inc., 13 F.3d at 928)).

The Moratorium's last extension, and thus at least some of the cause of its length, stemmed from the City's attempt to address comments on the proposed Ordinance submitted by Plaintiffs' counsel Relman Colfax around the end of 2019. (ECF No. 44-34, Jan. 15, 2020 Planning Commission Transcript, PageID 2581.)

Before the Planning Commission's January 15, 2020 meeting to discuss the new Ordinance, Schmitt departed from procedural norms by, at Streng's request, notifying everyone who had "previously been at the meetings with respect to either the ordinance or the 304 South Walnut request." (ECF No. 44-15, Dep. of T. Schmitt, PageID 2103–05.) But this fact is neutral, because the group notified appears to have included people who supported the Walnut House, in addition to people who opposed it. *See* (ECF No. 44-36, Dep. of N. Proctor, PageID 2700) (noting that some people who reached out to the City supported ARH).

Plaintiffs' expert Connolly conceded that "generally speaking" "many of" the "standards and regulations" set out in 6.29(e) are "consistent with planning and zoning principles" that one "would see [for] special use approval." (ECF No. 44-32,

Dep. of B. Connolly, PageID 2493.) Further, Arroyo appears to believe that all of Ordinance 929's requirements are consistent with such principles. (ECF No. 46-2, Arroyo Report, PageID 4023–27.) More importantly, the Ordinance does not on its face treat sober living homes worse than any other comparable type of housing. *See* III.D.1.ii, *supra*. And there is no evidence that the City has used any of the Ordinance's subjective criteria to prohibit or delay the opening of new sober living homes. To the contrary, the City promptly granted the two sober living home applications submitted through the Ordinance, *see* Section I.A.22, *supra*, and Atsalakis testified that she did not think that the subjective criteria were applied unfairly when the City reviewed her application to open the Michigan House, (ECF No. 44-3, Dep. of C. Atsalakis, PageID 1305–06).

The legislative history could suggest at times that the Ordinance might have been adopted with knowledge of the community opposition to Atsalakis' application. That does not taint Ordinance 929.

Parts of the legislative history demonstrate that the City took care to enact the Moratorium without incorporating any animus, indicating that it did not consider expressions of animus "legitimate." As noted previously, in late 2019, the City Council sent the draft ordinance back to the Planning Commission "to try to address" "some pointed comments" from Plaintiffs' attorney Relman Colfax. (ECF No. 44-34, Jan. 15, 2020 Panning Commission Transcript, PageID 2572.) Then, when

148

Wagner raised further concerns at the January 15 Planning Commission meeting, a commissioner asked her for a written version of her comments—so that the City could review and address them. (ECF No. 44-34, PageID 2574–81.) (As far as the record shows, she never provided a written version.)

At that same meeting, Schmitt characterized the new ordinance as applying a "de minimis application requirement" for SAUs. (ECF No. 44-34, Jan. 15, 2020 Planning Commission Transcript, PageID 2573.) And Proctor, a member of the City Council, also emphasized that the Ordinance was "not intended to discriminate." (ECF No. 44-34, PageID 2583–86.)

Further, the Ordinance explicitly states that the SAU section "is intended to authorize the grant of relief from the strict terms of this Ordinance for Transitional Housing Facilities in order to provide equal housing opportunities particularly suited to the needs of persons entitled to reasonable accommodation under state or federal law." (ECF No. 44-23, Ordinance 929, PageID 2239.)

Further, and tellingly, the Ordinance exempts SAUs from the public hearing and notice requirements imposed on other THFs. (ECF No. 44-23, Ordinance 929, PageID 2239). According to Schmitt, this exemption was meant "to try and *avoid* some of the negative NIMBYs that" had opposed Atsalakis' original request. (ECF No. 44-15, Dep. of T. Schmitt, PageID 2105) (emphasis added).

All in all, this does not amount to a prima facie case by Plaintiffs that Defendants enacted Ordinance 929 with discriminatory intent. Further, Plaintiffs' case would also fail at the third step of the *McDonnell Douglas* analysis, for the reasons that follow.

In response to Plaintiffs alleged prima facie case, Defendants assert that they enacted Ordinance 929 to "resolve[] th[e] concern" over the Zoning Code's "lack of specific provisions for sober homes (or similar facilities)," "to provide equal housing to persons entitled to a reasonable accommodation," and "to advance the legitimate interests of ensuring that SAUs are properly located, that overcrowding is avoided, and that streets and facilities are not overburdened." (ECF No. 44, Defendants' MSJ, PageID 1162–63.) To support these explanations, they cite the Ordinance itself. Given the Ordinance's "intent" section described above (and reproduced in full further above), this would satisfy Defendants' burden of production.

Plaintiffs do not offer a strong counter to these explanations. Plaintiffs do not specifically argue against Defendants' assertion that they enacted the Ordinance to fill gaps in the zoning code. *See* (ECF No. 58, Response to Defendants' MSJ, PageID 8016) (simply stating that this reason "does not cancel out [Defendants'] discriminatory intent"). And Plaintiffs' argument that the Ordinance cannot be explained as an attempt to accommodate those in sober living homes because it disadvantages them as compared to "nondisabled people," (ECF No. 58, PageID

8015–16), is unpersuasive, because it rests on Plaintiffs' unsupported assumption that sober living homes are comparable to housing for single families rather than to other group housing, like THFs.

In light of these unrefuted explanations, and the weakness of Plaintiffs' alleged prima facie case, no reasonable jury would conclude that Defendants enacted the Ordinance with discriminatory intent, even when viewing the case in the light most favorable to the Plaintiffs. Indeed, the Ordinance creates a clear and accessible path to zoning approval for SAUs, just as Defendants state that they intended it to. The Ordinance is not facially discriminatory. There is no evidence that the City has applied it in a discriminatory manner. And there is scant evidence on the intents of many of the Ordinance's drafters and on the intents of most of the City Council members who voted to enact it.

For these reasons, Defendants' Motion for Summary Judgment on this claim is **GRANTED**.

### E. Plaintiffs' Motion for Summary Judgment on their claim of unlawful interference is DENIED.

42 U.S.C. § 3617 of the FHA provides:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.[36]

---

[36] Plaintiffs also tie this claim to 42 U.S.C. § 12203(b) of the ADA, which provides:

To prevail on a claim under this provision, plaintiffs must establish three elements. *Hood v. Midwest Sav. Bank*, 95 F. App'x 768, 779 (6th Cir. 2004). First, plaintiffs must establish that they "exercise[d] or enjoy[ed]," or "aided or encouraged any other person in the exercise or enjoyment of," "any right granted or protected by" §§ 3603–06. 42 U.S.C. § 3617; *Hood*, 95 F. App'x at 779; *see also Linkletter v. W. & S. Fin. Grp., Inc.*, 851 F.3d 632, 639–40 (6th Cir. 2017) (emphasizing that "Section 3617 requires a nexus with the rights protected by §§ 3603–06").

Second, plaintiffs must establish that the defendants subjected them to "intentional conduct [that] constituted coercion, intimidation, threat, or interference." *Hood*, 95 F. App'x at 779. The term "interference" "should be broadly interpreted" so that it "reach[es] all practices which have the effect of interfering with housing rights." *Linkletter*, 851 F.3d at 638. Therefore, "interference" "is not limited to [actions] of potent force or duress, . . . [but rather] encompasses less obvious, but equally illegal practices such as exclusionary zoning, deflating appraisals . . . and insurance redlining." *Babin*, 18 F.3d at 347.

---

It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

And third, plaintiffs must establish a "causal connection" between the first two elements. *Hood*, 95 F. App'x at 779. That is, they must establish that the defendants acted "in retaliation" for their exercising or enjoying, or encouraging another to exercise or enjoy, a right under §§ 3603–06. *Linkletter*, 851 F.3d at 639.

In addition to establishing these three elements, plaintiffs must show that the defendants acted with "discriminatory animus." *HDC, LLC*, 675 F.3d at 613.

The Sixth Circuit has offered the following example of a § 3617 violation:

> Suppose Alice says to Bob, a prospective home buyer, "If a seller ever discriminates against you because of your race, sue him!" Eve, a racist eavesdropper, becomes enraged upon hearing this conversation and threatens to assault Alice. At this point, Eve has violated § 3617, regardless of whether she discriminated against Bob or otherwise violated the fair housing rights secured by §§ 3603–3606. Eve has "threaten[ed] ... [a] person," namely Alice. And this threat was "on account of [Alice's] having aided or encouraged any other person in the exercise or enjoyment of [a fair housing right]." Eve threatened Alice because Alice had encouraged Bob to protect himself against discrimination relating to housing. The statute requires no more.

*Hidden Vill., LLC v. City of Lakewood, Ohio*, 734 F.3d 519, 528 (6th Cir. 2013).[37]

### *Arguments*

In their Motion for Partial Summary Judgment, on the first *Hood* element, Plaintiffs argue that they exercised their "rights protected by § 3604" "by attempting

---

[37] Although this example does not explicitly mention discriminatory animus, such animus is implied by the characterization of Eve's motivation.

to open a sober living home at 304 S. Walnut." (ECF No. 48, Plaintiffs' MPSJ, PageID 4474.)

On the second *Hood* element, they contend that Defendants interfered with them by "enact[ing] the Moratorium and thereby block[ing] sober living homes in residential neighborhoods for nearly twenty months." (ECF No. 48, Plaintiffs' MPSJ, PageID 4474–75.) "It is axiomatic," they assert, "that foreclosing housing entirely rises to the level of interference." (ECF No. 48, PageID 4475) (citing *Linkletter*, 851 F.3d at 638).

And on the third element, they claim that "[i]t is undisputed that Defendants enacted the Moratorium in direct response to Plaintiffs' application for 'a group home setup for people recovering from addiction.'" (ECF No. 48, Plaintiffs' MPSJ, PageID 4475) (quoting ECF No. 48-42, Schmitt MTO City Council). They also claim that the Moratorium was "designed to prevent sober living homes during its pendency," and that it "targets sober living homes" "[b]y its terms." (ECF No. 48, PageID 4475.)

Finally, Plaintiffs state that, "[a]lthough the record evidence establishes Defendants' discriminatory intent, the effect is also undeniable: one need only look at Plaintiffs' own experience . . . to confirm that the Moratorium foreclosed recovery housing in Howell." (ECF No. 48, Plaintiffs' MPSJ, PageID 4475.)

In response, Defendants argue that Plaintiffs cannot establish the third *Hood* element—a causal connection between the Plaintiffs exercising their rights and the Defendants enacting the Moratorium. (ECF No. 59, Response to Plaintiffs' MPSJ, PageID 8319.) They state that "a full reading of the [Schmitt] memo [cited by Plaintiffs] shows that the City had received *multiple* applications and inquiries regarding group housing facilities during that time, and there were questions about where they were located and concentrated." (ECF No. 59, PageID 8319) (emphasis added). They also claim that "Plaintiffs [] ignore deposition testimony indicating that the Moratorium and ordinance revision effort was precipitated by a need to address ambiguity in the ZO about how to treat uses that were not expressly provided for in the ZO." (ECF No. 59, PageID 8319) (citing ECF No. 44-18, July 19, 2018 Schmitt MTO City Council, PageID 2204). And they point out that "[t]he Moratorium Resolution notes that the City desired to study the topic 'without an active application'" and the Plaintiffs had "voluntarily withdrawn their application" for a sober living home "over a month before the Moratorium was adopted." (ECF No. 59, PageID 8319) (citing ECF No. 44-18, Moratorium, PageID 2205).

Defendants also argue that "Plaintiffs cannot establish a discriminatory effect to prove discriminatory animus" because "the Moratorium had an effect on *all* group housing facilities, regardless of one's disability status." (ECF No. 59, Response to Plaintiffs' MPSJ, PageID 8318–19) (emphasis Defendants'). And they add that

155

"Plaintiffs do not identify any applicants for other types of group housing that were approved during the Moratorium period." (ECF No. 59, PageID 8319.)[38, 39]

Plaintiffs reply that Defendants' Response "explicitly states that sober living home applications, including Plaintiffs', prompted the Moratorium," and thus "confirm[s] that they enacted the Moratorium because of disability." (ECF No. 68, Reply to Plaintiffs' MPSJ, PageID 8513.) They also assert that Defendants' argument that they "have not demonstrated animus" "ignore[es] that the 'existence of [benign] motivations does not protect the defendants . . . when their actions had a clear discriminatory effect.'" (ECF No. 68, Reply to Plaintiffs' MPSJ, PageID 8513) (quoting *Linkletter*, 851 F.3d at 640).

---

[38] Defendants further contend that Plaintiffs were mistaken when they stated that their FHA and ADA interference claims are evaluated under the same standard and proceeded accordingly. (ECF No. 59, PageID 8317) (citing *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014) and *Mich. Flyer, LLC v. Wayne Cnty. Airport Auth.*, 138 F. Supp. 3d 899, 902 (E.D. Mich. 2015)). But, as Plaintiffs explain in their Reply, Defendants' argument here "mistakenly analyze[s] Plaintiffs' ADA interference claim [under § 12203(b)] as a retaliation claim [under § 12203(a)], but the two are distinct." (ECF No. 68, PageID 8513.) At this point, Plaintiffs assert only ADA *interference* claims. *See* Section III.A.4, *supra*. Therefore, this argument is inapposite.

[39] Defendants ask the Court to not only deny summary judgment to Plaintiffs on this claim, but also to award summary judgment to them on it, even though they did not include it in their initial Motion for Summary Judgment, because Plaintiffs' Complaint did not give them a "clear delineation" of this claim. (ECF No. 59, PageID 8320) (citing *EEOC v. J.H. Routh Packing Co.*, 246 F.3d 850, 854 (6th Cir. 2001) and Fed. R. Civ. P. 9). Plaintiffs reply that it is too late for Defendants to submit that request. (ECF No. 68, Reply to Plaintiffs' MPSJ, PageID 8507) (citing *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008)).

*Analysis*

The Court **DENIES** Plaintiffs' motion for summary judgment on this claim because a reasonable jury could find that the City of Howell enacted the Moratorium without discriminatory animus, i.e. the Moratorium was enacted to deal with an entire zoning plan, not just their specific claim.

The Court disagrees with Plaintiffs' contention that they must prevail on this claim under *Linkletter* because the Moratorium had the *effect* of temporarily depriving women in recovery of new sober living homes. *Linkletter* held only that "[d]iscriminatory animus requires plaintiffs to put forth some evidence of discriminatory effect or intent on the defendant's part to *survive*," not to prevail on, "summary judgment." *Linkletter*, 851 F.3d at 639 (emphasis added) (internal quotation marks omitted). And *Campbell*, the case *Linkletter* cited for that holding, clarifies that "discriminatory effect" is relevant to the extent that it may reveal animus, but is not an automatic substitute for animus. *See Campbell v. Robb*, 162 F. App'x 460, 473–74 (6th Cir. 2006) (emphasizing that the Sixth Circuit "require[s] a § 3617 plaintiff to demonstrate that the defendant exercise[d] their powers with a discriminatory animus," and referring to such animus as a "discriminatory motivation"). "Discriminatory animus" involves an intent element that "discriminatory effect" does not, but discriminatory effects may evince

discriminatory intent. *See* ANIMUS, Black's Law Dictionary (11th ed. 2019) ("Ill

will; animosity"; "Intention").

Plaintiffs also quote *Linkletter*'s statement that "[t]he existence of [benign]

motivations does not protect the defendants from housing discrimination claims

when their actions had a clear discriminatory effect." *Linkletter*, 851 F.3d at 640.

But this statement comes from *Linkletter*'s discussion of whether the § 3617 claim

at issue had a sufficient nexus to the rights protected by §§ 3603–06: it is merely

acknowledging that courts may hold actors liable under *§ 3604* via a disparate impact

theory. The statement has no bearing on § 3617's animus requirement.

Further, even if *Linkletter*'s treatment of the animus requirement is unclear, the

Sixth Circuit's other interference cases have repeatedly upheld the requirement

without suggesting that discriminatory effect automatically satisfies it. *See HDC,

LLC*, 675 F.3d at 613 ("In this Circuit, a plaintiff is required to demonstrate

'discriminatory animus' to prevail on an interference claim under the Act.");

*Campbell*, 162 F. App'x at 473 ("Campbell's position"—"that the district court erred

. . . by requiring her to present proof of discriminatory animus as part of her *prima

facie* case" on her § 3617 claim—"is contrary to the law of our circuit."); *Babin*, 18

F.3d at 347 ("Section 3617 . . . extends to [] actors who are in a position directly to

disrupt the exercise or enjoyment of a protected right and exercise their powers with

a discriminatory animus."); *Kooman v. Boulder Bluff Condos.*, 833 F. App'x 623,

630–31 (6th Cir. 2020) ("[I]n this Circuit, a plaintiff is required to demonstrate 'discriminatory animus' to prevail on an interference claim under the Fair Housing Act." (internal alteration marks omitted)); *see also Leonard v. Nokel LLC*, No. 21-cv-10146, 2021 WL 3032523, at *8 (E.D. Mich. July 19, 2021) ("In the Sixth Circuit, a plaintiff is required to demonstrate 'discriminatory animus' to prevail on an interference claim under the Act." (internal quotation marks omitted)); *Price v. Oxley*, No. 21-cv-158, 2021 WL 5937748, at *3 (S.D. Ohio Dec. 16, 2021) ("To state a claim for relief under § 3617 . . . plaintiffs must allege facts showing defendants acted with a 'discriminatory animus.'"), *report and recommendation adopted by* 2022 WL 60531 (Jan. 6, 2022).

Accordingly, because the Moratorium's arguably discriminatory effects do not conclusively establish that it was enacted with discriminatory animus, *see* Section III.D.2.i, *supra*, Plaintiffs are not entitled to summary judgment here.[40]

---

[40] The Court declines to consider granting Defendants summary judgment on this claim because they did not request such judgment in their own Motion.

**F. Both sides' Motions for Summary Judgment on Plaintiffs' claim that Defendants unlawfully denied their first request for a reasonable accommodation are DENIED. Defendants' Motion for Summary Judgment on Plaintiffs' claim that Defendants unlawfully denied their second request for a reasonable accommodation is GRANTED.**

42 U.S.C. § 3604(f) of the FHA provides, in relevant part:

> (3) For purposes of this subsection, discrimination includes . . .
>
> > (B) a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling . . . .[41]

This subsection "imposes an affirmative duty upon [defendants] reasonably to accommodate the needs of handicapped persons." *Groner v. Golden Gate Gardens*

---

[41] Plaintiffs also tie this claim to 42 U.S.C. § 12132, which provides:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

and Mich. Comp. Laws § 37.1302(a) of the MPDCRA, which provides:

> Except where permitted by law, a person shall not:
>
> (a) Deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation or public service because of a disability that is unrelated to the individual's ability to utilize and benefit from the goods, services, facilities, privileges, advantages, or accommodations or because of the use by an individual of adaptive devices or aids.

*Apartments*, 250 F.3d 1039, 1044 (6th Cir. 2001) (internal quotation marks and citation omitted). And "[a] violation [of this subsection] occurs when" the disabled plaintiffs, or the plaintiffs making a request on behalf of those with disabilities, are "first denied a reasonable accommodation." *Bryant Woods Inn, Inc. v. Howard Cnty., Md.*, 124 F.3d 597, 602 (4th Cir. 1997).

To prevail on a reasonable accommodation claim, plaintiffs must prove that, at the time that defendants refused their accommodation request: (1) plaintiffs (or their residents or associates for whom they made the request) had a disability; (2) the defendants "knew or should reasonably [have] be[en] expected to know of" that disability; (3) the requested "accommodation . . . [was] necessary to afford the" disabled parties "an equal opportunity to use and enjoy [a] dwelling"; and (4) the requested "accommodation [was] reasonable." *Dubois v. Ass'n of Apartment Owners of 2987 Kalakaua*, 453 F.3d 1175, 1179 (9th Cir. 2006); *see also Overlook Mut. Homes, Inc.*, 415 F. App'x at 621 (adopting this test from *Dubois*); *Hollis*, 760 F.3d at 541 (adopting the test from *Overlook*). Plaintiffs must also prove that (5) the defendants did in fact refuse the request. *Hollis*, 760 F.3d at 541. This is a "highly fact-specific" inquiry that "require[es] case-by-case determination." *Groner*, 250 F.3d at 1044.

Here, Atsalakis demanded the following accommodations (within the same letter): first, "an exception to the moratorium . . . [such that] the City . . . [would]

immediately consider [her] Special Land Use application"; and second, "an exception to the following procedural and substantive zoning requirements":

- Public hearing requirements (§3.03(a) and (c); §3.13)
- Public notice requirements, both publications and mailings (§3.03(b))
- The issuance of any statements of findings and conclusions (§3.03(d))
-  Compliance with the criteria of §3.03(e)
- Any special requirements imposed under §3.03(f)
- The one-year expiration of permission under §3.03(g)
- Site Plan Review described in §3.04 (a)-(c)
- Planning Commission Review as described in §3.04(e)
- Application for Certification of Zoning Compliance under §3.07.

(ECF No. 44-21, Sept. 27, 2019 Atsalakis LTO Schmitt, PageID 2216.) These significant demands by Plaintiffs would eliminate almost every appropriate zoning requirement.

The Court will treat these as two separate accommodation requests, because that is how Atsalakis framed them in her letter (and how Plaintiffs framed them in their briefing). *See* (ECF No. 44-21, PageID 2216; ECF No. 48, Plaintiffs' MPSJ, PageID 4472). Moreover, Defendants were not bound to decide the requests in the same way: they could have granted Atsalakis' first request and denied her second.[42]

---

[42] Defendants' briefing combines these requests into one, *see, e.g.*, (ECF No. 59, Response to Plaintiffs' MPSJ, PageID 8315), but it does not explain why the Court should do the same.

Plaintiffs can easily establish the first two elements for both accommodation requests. They can establish the third element for the first request but not for the second. They can show that the fourth element presents a jury question for the remaining first request. And they can establish the fifth element for the first request.

### 1–2. Defendants knew or should have known that Atsalakis' associates had disabilities.

Atsalakis informed Defendants that she intended to open an ARH for women in recovery from substance abuse at least twice: first, when she submitted her original SLU application for the Walnut House, (ECF No. 44-4, Request for Review, PageID 1357); and second, when she submitted her request for reasonable accommodations, (ECF No. 44-21, Sept. 27, 2019 Atsalakis LTO Schmitt, PageID 2213–16) (emphasizing that "the six women who will be residing in the [ARH] . . . are disabled/handicapped within the meaning of the [FHA]"). And Defendants do not dispute that they knew that Atsalakis was associated with women with disabilities. Thus, Plaintiffs have established these first two elements as to both requests.

### 3. The first accommodation was necessary but the second was not.

Next, Plaintiffs must prove that Defendants refused Atsalakis' reasonable accommodation requests "when such accommodations may [have] be[en] *necessary to afford*" the relevant persons with disabilities[43] "*equal opportunity* to use and enjoy

---

[43] The original phrase is "such person," but the previous provision, § 3604(f)(3)(A), defines that term as "the handicapped person." In turn, § 3604(f)(1) and (2) make

a dwelling." 42 U.S.C. § 3604(f)(3)(B) (emphasis added). Analysis of this element revolves around the terms "necessary" and "equal opportunity."

"Necessary" sets a "high standard." *Vorchheimer v. Phila. Owners Ass'n*, 903 F.3d 100, 105 (3d Cir. 2018). It means "'indispensable,' 'essential,' 'something that cannot be done without.'" *Davis v. Echo Valley Condo. Ass'n*, 945 F.3d 483, 490 (6th Cir. 2019) (quoting *Cinnamon Hills Youth Crisis Center, Inc.*, 685 F.3d at 923 (quoting Oxford English Dictionary, vol. X at 276 (2d ed. 1989))). And, as courts have interpreted the provision, the word "'may' signals not a low probability of necessity, but rather the conditional mood." *Vorchheimer*, 903 F.3d at 107. In other words, "'when such accommodations may be necessary' . . . is another way of saying 'whenever they are necessary' or 'as far as they are necessary.'" *Id.* (internal alteration omitted); *see also Smith & Lee Assocs., Inc.*, 102 F.3d at 795 ("[I]n the first appeal, we remanded for the District Court to consider whether an accommodation *was necessary* to enable investors to develop AFC homes." (emphasis added)); *Davis*, 945 F.3d at 490 ("Davis' total smoking ban *likely was not necessary* . . . to give her the same opportunity to use and enjoy her condo as compared to a non-disabled person who dislikes the smell of smoke." (emphasis added)).

---

clear that this "handicapped person" may be the person requesting the accommodation, a person "residing in or intending to reside in" the requesting person's "dwelling," or "any person associated with" the requesting person.

In context here, "necessary" "'mandates a causation inquiry that examines whether the requested accommodation . . . would redress injuries that otherwise would prevent a disabled [person] from receiving the same [opportunity] as a non-disabled person would receive.'" *Madej v. Maiden*, 951 F.3d 364, 371 (6th Cir. 2020) (quoting *Hollis*, 760 F.3d at 541). That is, it "'functions as a but-for causation requirement, tying the needed accommodations to equal housing opportunity.'" *Id.* at 371 (quoting *Vorchheimer*, 903 F.3d at 110).

"Equal opportunity" is defined broadly. The FHAA's House Report explains that the Act "is a clear pronouncement of a national commitment to end the unnecessary exclusion of persons with handicaps from the American mainstream." *Smith & Lee Assocs., Inc.*, 102 F.3d at 795 (quoting H.R. Rep. No. 100-711, at 18 (1988)) (emphasis omitted). For that reason, "equal opportunity" protects not only the right "to use and enjoy a [particular] dwelling," 42 U.S.C. § 3604(f)(3)(B), but also the broader right "to choose to live in single-family neighborhoods." *Smith & Lee Assocs., Inc.*, 102 F.3d at 795. Put differently, "'[e]qual opportunity' means that disabled individuals are entitled to live in the same residences *and communities* as non-disabled individuals, insofar as that can be accomplished through a reasonable accommodation or modification." *Hollis*, 760 F.3d at 541 (emphasis added).

Moreover, "'equal opportunity[]' . . . is concerned with achieving equal results, not just formal equality." *Smith & Lee Assocs., Inc.*, 102 F.3d at 795. So an

165

accommodation is not automatically unnecessary just because it is not available to people without disabilities. For example, in *Smith & Lee*, the Sixth Circuit held that a city should have permitted an adult foster care facility to serve nine elderly disabled residents even though it was located in a single-family zone and the city would not have allowed nine unrelated people without disabilities to live there. *Id.* at 794–96. The Court explained that the care facility was entitled to an accommodation because the elderly disabled needed such a facility to live in a single-family neighborhood (they could not live independently), the city had an "insufficient supply" of such facilities, and the facility needed at least nine residents to be "economically viable." *Id.* at 789, 794–96.

All told, then, Plaintiffs may establish this element by proving that their requested accommodation would have "redress[ed] injuries that otherwise would" have deprived the relevant disabled group from an equal opportunity to enjoy a particular home or live in the neighborhood of their choice due to their disabilities. *Anderson*, 798 F.3d at 361; *see also Dayton Veterans Residences Ltd. P'ship v. Dayton Metro. Hous. Auth.*, No. 21-3090, 2021 WL 5411220, at *7 (6th Cir. Nov. 19, 2021) ("[W]e must ask whether GDPM's successful procurement of VASH vouchers—which would allow Freedom's Path to create housing for disabled veterans—would

accommodate disabled veterans by providing them access to housing more readily

available to nondisabled persons.").[44]

---

[44] One final question that has not been definitively answered by a published Sixth Circuit decision is whether a set of plaintiffs must prove that the defendants *knew* that the accommodation was necessary (and reasonable) when they refused it or instead need only prove that the accommodation was *in fact* necessary (and reasonable) at the time of refusal. Case law is inconsistent on the question. *Compare Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Twp. of Scotch Plains*, 284 F.3d 442, 451 (3d Cir. 2002) ("[C]ourts hearing reasonable accommodations challenges should ordinarily limit their review to the administrative record. This rule permits local land use boards to have the initial opportunity to provide reasonable accommodations . . .; it also comports with the tradition in American law that land use decisions are quintessentially local in nature."), *Bryant Woods Inn, Inc.*, 124 F.3d at 603–05 (stating that, "in enacting the FHA, Congress clearly did not contemplate abandoning the deference that courts have traditionally shown to such local zoning codes," and deciding whether an accommodation request was necessary and reasonable by examining "the record before the board"), *Kooman*, 833 F. App'x at 628 ("The Board likewise could not have known, from the information it had on July 1, that the railing was 'necessary' for Bob's 'full enjoyment of the premises.' . . . [A] housing provider must know that an accommodation is necessary in order to become liable for refusing it."), *Keys Youth Servs., Inc. v. City of Olathe, KS*, 248 F.3d 1267, 1275 (10th Cir. 2001) ("The court based its decision on the principle that Olathe cannot be liable for refusing to grant a reasonable and necessary accommodation if the City never knew the accommodation was in fact necessary. We agree."), *and Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1219 (11th Cir. 2008) ("[T]he City cannot be liable for refusing to grant a reasonable and necessary accommodation if the City never knew the accommodation was in fact necessary." (internal citation omitted)), *with Hollis*, 760 F.3d at 541 (requiring only that "FHA reasonable-modification plaintiffs . . . prove [] the reasonableness and necessity of the requested modification," while also requiring, for comparison, that such plaintiffs prove "that *the defendant knew or should have known* of the disability at the time of the refusal" (emphasis added)), *Jankowski Lee & Assocs. v. Cisneros*, 91 F.3d 891, 894–95 (7th Cir. 1996) ("Petitioner's [argue] that Rusinov bore the burden of producing documentation establishing . . . his need for the requested accommodation. Petitioner's denial of Rusinov's request based on their lack of knowledge of the extent of his injury is simply a ruse to avoid the penalty for violating the FHA. . . . Petitioner's position is untenable."), *and Howard v. HMK*

*Arguments*

Plaintiffs assert that their requested "accommodations were necessary for [] ARH and Atsalakis to provide women in recovery an equal opportunity to enjoy congregate housing in a residential neighborhood in Howell." (ECF No. 48, Plaintiffs' MPSJ, PageID 4472.) They argue that "absent exception from the Moratorium, [Atsalakis and ARH] had no way to follow Mr. Schmitt's instructions" to submit an adult foster care facility license or apply for a SLU "and pursue a sober living home in a residential neighborhood in Howell." (ECF No. 48, PageID 4472– 73); *see also* (ECF No. 58, Response to Defendants' MSJ, PageID 8018) (making the same point). They add that "Defendants [] have not presented any evidence that Plaintiffs had another way to open a sober living home at 304 S. Walnut." (ECF No. 68, Reply to Plaintiffs' MPSJ, PageID 8512.)

"Similarly," they argue that "waiver from the public hearing and notice provisions of the SLU process would have both expedited review and protected

---

*Holdings, LLC*, 988 F.3d 1185, 1191 (9th Cir. 2021) (holding that a requested accommodation was not necessary because *it*—the court, not the defendant—could not "find a connection between [the plaintiff]'s disability and his request[ed] accommodation," but adding that "a landlord fail[s] to engage with a tenant requesting an accommodation . . . at its own risk").

But because Atsalakis' letter explained why she believed her requested accommodations were necessary and reasonable, the City already had all the information from Atsalakis' prior SLU application, and the parties' arguments do not hinge on this question, the Court need not answer the question now.

Plaintiffs from further discriminatory opposition and harassment from other Howell residents" and "was therefore necessary to 'affirmatively enhance a disabled person's quality of life by ameliorating the effects of the disability.'" (ECF No. 48, Plaintiffs' MPSJ, PageID 4473) (citing ECF No. 48-52, Dep. of G. Fisher, PageID 6048–49 and quoting *Smith & Lee Assocs., Inc.* 102 F.3d at 795 (internal alteration omitted)); *see also* (ECF No. 58, Response to Defendants' MSJ, PageID 8018) (making the same point).

Further, Plaintiffs note that Atsalakis "explained the necessity of these accommodations" in her letter requesting them. (ECF No. 69, Reply to Plaintiffs' MPSJ PageID 8512) (citing ECF No. 48-50, Sept. 27, 2019 Atsalakis LTO Schmitt); *see also* (ECF No. 58, Response to Defendants' MSJ, PageID 8018) (making the same point).

Treating Plaintiffs' letter as requesting a single, combined accommodation, Defendants argue that, because "the Moratorium applied to *all group housing, regardless of disability status*," "non-disabled people were on the same terms as disabled people relative to seeking group housing," and thus "the need for a reasonable accommodation to put disabled people at the same opportunity level was not implicated." (ECF No. 63, Reply to Defendants' MSJ, PageID 8379) (emphasis Defendants') They add that "[t]he necessity of the accommodation is also negated by the fact that the City had at least nine recovery homes . . . at the time of Plaintiff's

2019 letter, including at least two sober living facilities." (ECF No. 59, Response to Plaintiffs' MPSJ, PageID 8316) (citing ECF No. 44-15, Dep. of T. Schmitt, PageID 2092 and ECF No. 44-41, Apr. 9, 2019 Carlisle Wortman Report, PageID 3207).

Defendants then assert that exemption from the Moratorium "would have had no practical effect since [Atsalakis] would have [still] resisted using the non-discriminatory application process for establishing a group home," as shown by the other part of her request. (ECF No. 59, Response to Plaintiffs' MPSJ, PageID 8316.) They contend that "there is nothing inherent about the City's SLU procedure that made an accommodation necessary, *per se*." (ECF No. 59, PageID 8316.) And on that point, they note that the Sixth Circuit "has observed that the Supreme Court 'declined to rule' that a conditional use procedure . . . could 'never be imposed'" and also observed that "review by a ZBA via a zoning variance process is among acceptable procedures for a city to require for seeking a reasonable accommodation." (ECF No. 59, PageID 8315–16) (quoting *Get Back Up, Inc.*, 606. F. App'x at 797 (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 447 (1985)) and citing *Vill. of Palatine, Ill.*, 37 F.3d at 1234 and *Get Back Up, Inc.*, 2013 WL 3305672, at *8).

Lastly, Defendants claim that Atsalakis' letter "did not explain why an accommodation from *every* provision cited was reasonable or necessary, nor do Plaintiffs offer any [such] explanation in their motion." (ECF No. 59, Response to

Plaintiffs' MPSJ, PageID 8315) (emphasis Defendants'); *see also* (ECF No. 44, Defendants' MSJ, PageID 1165) (making the same point).[45]

*Analysis*

The first accommodation that Atsalakis requested was necessary. Some people in recovery from substance addiction[46] need to live in sober living homes. *See* (ECF No. 44-21, Sept. 27, 2019 Atsalakis LTO Schmitt, PageID 2213) ("the Amber Reineck House provides necessary housing to people with disabilities"); (ECF No. 48-1, ARH Brochure, PageID 4479) ("Persons struggling with substance use disorder live right here in our community. If they choose to seek treatment at a detox facility, and want to live a life in recovery, often they do not have access to a safe, sober place to live after discharge."). Yet, at the time Schmitt refused Atsalakis'

---

[45] Defendants also make inapposite arguments about whether a reasonable accommodation was available under the Zoning Code *before* and *after* the Moratorium. (ECF No. 44, Defendants' MSJ, PageID 1165–66); *see also* (ECF No. 58, Response to Defendants' MSJ, PageID 8017) (explaining why these arguments are "inapplicable to this claim").

[46] The Court can assume based on common sense that some women in Howell fit this description at the time that Schmitt refused Atsalakis' request for accommodations. Plus, there is evidence to support this assumption. At her deposition, Atsalakis testified that she was "get[ting] messages all the time from people looking for" sober housing, and also that, when she first purchased the Walnut House, she had already "seen" that HNV was "serving" "clients" "from Livingston County" in Washtenaw County, because "there was no home for women in Livingston." (ECF No. 44-3, Dep. of C. Atsalakis, PageID 1221.) Also, there were already residents in the Michigan ARH within five months of it receiving zoning approval. (ECF No. 44-3, PageID 1299; ECF No. 44-27, Aug. 21, 2020 DeBuff LTO Gwinn, PageID 2279–80.)

requests for accommodations, there were no such homes that accepted women within the City of Howell. *See* (ECF No. 44-21, PageID 2220) ("Livingston County at present offers only residential sober living services for men, but none for women."); (ECF No. 48-1, PageID 4479) ("There are no sober living homes located in Howell for women in recovery from substance use disorder." (capitalization removed)). And at that time, Atsalakis could not receive zoning approval to open an ARH without an exemption from the Moratorium. *See* Sections III.D.1.i and III.D.2.i, *supra*.[47]

Therefore, as Atsalakis' letter explained, an exemption from the Moratorium was necessary to ensure that women in recovery had an equal opportunity to live in a single family neighborhood—or, as it happens, any other neighborhood—within the City of Howell.

Defendants' arguments do not change this conclusion. It does not matter that the Moratorium applied to all group housing, not just sober living homes, because the right to a reasonable accommodation "is concerned with achieving equal results, not just formal equality." *Smith & Lee Assocs., Inc.*, 102 F.3d at 795. And Defendants offer no evidence that granting an exemption from the Moratorium "would have had no practical effect" because Atsalakis also asked for waiver of some SLU

---

[47] None of these facts are in dispute. Defendants note that there were "nine recovery homes" and "at least two sober living facilities" in the City, (ECF No. 59, Response to Plaintiffs' MPSJ, PageID 8316), but they do not suggest that the other recovery homes would have been adequate substitutes for a sober living home nor deny that the two sober living facilities were open exclusively to men.

requirements. (ECF No. 59, Response to Plaintiffs' MPSJ, PageID 8316.) Neither Atsalakis' letter requesting accommodations, nor any other part of the record, proves that Atslakis would not have complied with these requirements if the City had granted her an exemption from the Moratorium without waiving them. *Cf.* (ECF No. 44-21, Sept. 27, 2019 Atsalakis LTO Schmitt, PageID 2213–16) (opining that it "would be manifestly futile" for Atsalakis to "seek to comply with the[] [SLU] requirements," but not suggesting that she would not do so if necessary).

In contrast, the second accommodation that Atsalakis requested was not necessary. Waiver of the public hearing and notice requirements *may* have been necessary to afford ARH's eventual residents an equal opportunity to enjoy their home free from discriminatory pushback from neighbors. But even so, Plaintiffs have offered no evidence that some other parts of this accommodation were necessary.

For example, waiver of "[t]he one-year expiration of permission under §3.03(g)" was not necessary. (ECF No. 44-21, Sept. 27, 2019 Atsalakis LTO Schmitt, PageID 2216); *see also* (ECF No. 44-13, § 3.03 Special Land Uses). Plaintiffs' state that Atsalakis' letter "explained the necessity of" exemption from this and the other requirements that did not involve public notice and hearings. (ECF No. 69, Reply to Plaintiffs' MPSJ, PageID 8512.) But all the letter offers on that point is that these requirements "are not required of households in single family units without

occupants who are disabled, and so should not be applied" to the proposed ARH. (ECF No. 44-21, PageID 2216.); *see also* (ECF No. 43-1, ARH and Atsalakis' Responses to Interrogatories, PageID 665–66) (echoing the letter when describing why waiver of the SLU requirements was necessary). This statement fails to account for the fact that these requirements applied to all similar group housing—whether meant specifically for residents with disabilities or not—and did not apply to single families that included one or more people with disabilities. More importantly, given that "equal opportunity" encompasses more than just formal equality, the statement does not indicate that these requirements would hinder the opening and operation of sober living homes or harm their residents in any significant way. It does not suggest that Atsalakis was unable to comply with these requirements, nor that the requirements prevented Atsalakis from opening a sober living home in the City for some other reason, nor even that the requirements would detract from ARH residents' enjoyment of their home and neighborhood.

Thus, no reasonable jury could find that this second accommodation, taken as a whole, was "essential" or "indispensable" to afford people with disabilities an equal opportunity to housing. Accordingly, Plaintiffs' wholesale request for its laundry list of multiple exemptions does not reach the endzone. Defendants' Motion for Summary Judgment is **GRANTED** as to this second accommodation.

The remainder of this Section will consider only the first accommodation.

*4. Whether the first accommodation was reasonable is a question for the jury.*

Next, Plaintiffs must prove that the first accommodation was "reasonable." To

do so, they first must prove that their request was for an "accommodation" at all. An

accommodation is an "adjustment," rather than a "fundamental change[]" that "turns

the challenged policy into something else entirely":

> Consider two examples: One would naturally say that a blind tenant
> requests an accommodation from an apartment's "no pets" policy if the
> tenant seeks an exemption for a seeing eye dog. But one would not
> naturally say that a tenant with allergies requests an accommodation
> from an apartment's "pet friendly" policy if the tenant seeks a total pet
> ban. The former tenant seeks a *one-off adjustment*; the latter seeks a
> *complete change*. The word "accommodation" includes the first, but not
> the second, request.

*Davis*, 945 F.3d at 490–91 (emphasis original) (internal citation and quotation marks

omitted); *see also Smith & Lee Assocs., Inc.*, 13 F.3d at 930 (citing *United States v.

Vill. of Marshall, Wis.*, 787 F. Supp. 872, 878 (W.D. Wis. 1991) for the proposition

that a reasonable accommodation must "not undermine the basic purpose that the

requirement seeks to achieve" (internal quotation and alteration marks omitted)).

Notably, the Sixth Circuit has "long . . . rejected the notion that making an exception

to a zoning scheme to permit something that would normally be forbidden

automatically amounts to a fundamental alteration," because "[r]equiring public

entities to make exceptions to their rules and zoning policies is exactly what the

FHAA does." *Anderson*, 798 F.3d at 363.

If they prove that their request was in fact for an accommodation, Plaintiffs must then prove that the accommodation was reasonable. An accommodation is reasonable if "the costs of implementing it [do not] exceed any expected benefits it will provide" to the disabled recipients. *Davis*, 945 F.3d at 491.

When weighing the costs of implementing an accommodation, courts consider both the "financial and administrative burdens" that it "would impose on the defendant (and perhaps on persons or interests whom the defendant represents)." *Hollis*, 760 F.3d at 542. In doing so, courts may take into account the effect that granting an accommodation request may have on "other potential applications." *Smith & Lee Assocs., Inc.*, 13 F.3d at 932. Courts may also consider whether the requested accommodation would "interfere with the rights of third parties." *Davis*, 945 F.3d at 492 ("[A] third party's rights do not have to be sacrificed on the altar of reasonable accommodation." (internal quotation and alteration marks and citation omitted)).

### *Arguments*

Plaintiffs argue that both of their "requested accommodations were [] reasonable." (ECF No. 48, Plaintiffs' MPSJ, PageID 4473.) They insist that "Plaintiffs merely sought to use a single, preexisting house as a six-person sober living home. They wanted to move in just as a traditional family would." (ECF No. 59, Response to Defendants' MSJ, PageID 8019.)

176

Plaintiffs assert that "the accommodations that [Atsalakis] sought [would not] have fundamentally altered the neighborhood," given that it "already permitted six-person adult foster care facilities and traditional families of all sizes." (ECF No. 58, Response to Defendants' MSJ, PageID 8019) (citing *Smith & Lee Assocs., Inc.*, 102 F.3d at 769); *see also* (ECF No. 48, Plaintiffs' MPSJ, PageID 4473–74) (making the same points). And they claim that "Defendants have confirmed that this request would not have imposed any additional costs, whether financial or administrative." (ECF No. 58, PageID 8019) (citing ECF No. 48-3, Dep. of T. Schmitt, PageID 4917–20).[48]

Defendants barely discuss this element. But they do assert, as noted previously, that Atsalakis' request letter "did not explain why an accommodation from *every* provision cited was reasonable or necessary," and that "Plaintiffs [do not] offer any [such] explanation in their motion" for partial summary judgment. (ECF No. 59, Response to Plaintiffs' MPSJ, PageID 8315) (emphasis Defendants'); *see also* (ECF No. 44, Defendants' MSJ, PageID 1165) (making the same point).

*Analysis*

The remaining request was for an accommodation from, and not a "fundamental change" to, the Moratorium. As the Sixth Circuit explained in *Anderson*, "[r]equiring

---

[48] Plaintiffs also make an argument here that is specific to the second accommodation and thus now immaterial.

public entities to make *exceptions* to their rules and zoning policies is exactly what the FHAA does." *Anderson*, 798 F.3d at 363 (emphasis added). And Defendants have not argued that the Moratorium was uniquely incompatible with exceptions.

However, the question of whether the accommodation was reasonable is a more difficult one. On one hand, women recovering from addiction in the City of Howell would likely have benefited from the accommodation, because Atsalakis would have been able to apply for permission to open an ARH sooner—she requested the accommodation about six months before the Moratorium ended—and thus likely able to open one sooner.

On the other hand, the extent of this benefit is not entirely clear. Plaintiffs have not quantified (in their briefing or in Atsalakis' letter) how many women would have taken the earlier opportunity to live in an ARH—though the Michigan House's occupancy might provide some context from which to estimate. Nor have they outlined what happens in what frequency to women seeking sober living in the City of Howell who cannot find it there.

Moreover, granting the accommodation would have imposed at least some burden on the City. The need to process Atsalakis' SLU application would have added "administrative work" and diminished the Moratorium's efficacy. (ECF No. 48-3, Dep. of T. Schmitt, PageID 4920). Granting Atsalakis an exemption from the Moratorium may have also encouraged others to apply for similar exemptions, which

the City would have needed to evaluate, adding more work. And the processing of these applications might have delayed the City's creation of Ordinance 929, and thereby harmed constituents who were waiting for the new ordinance to pass before applying for a group housing authorization, such as, perhaps, the directors of the East Grand River House.

That said, the extent of these burdens is not entirely clear either. And Defendants' production of all SLU applications since 2015, (ECF No. 58-5), suggests that group housing applications in the City were rare.

On balance, it is not clear that every reasonable jury viewing the facts in the light most favorable to Defendants would find that the accommodation was reasonable. But it is also not clear that every reasonable jury viewing the facts in the light most favorable to Plaintiffs would find that the accommodation was *un*reasonable. This is a genuinely disputed issue for the jury. *Cf. Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 419 (6th Cir. 2020) ("The reasonableness of a proposed accommodation" that forms the basis of a claim under the ADA "is a question of fact.").

### *5. Schmitt refused Atsalakis' request for the first accommodation.*

Finally, Plaintiffs must prove that Defendants actually refused[49] Atsalakis' request for the first accommodation. When evaluating this element, "reality matters more than labels." *Kooman*, 833 F. App'x at 626.

---

[49] There is an exception for futility that is not relevant here.

One way for defendants to refuse an accommodation request is via a final decision. A decision may be final notwithstanding the possibility (or result) of a direct appeal. *See Bryant Woods Inn, Inc.*, 124 F.3d at 602 ("[A] violation occurs when the disabled resident is first denied a reasonable accommodation, irrespective of the remedies granted in subsequent proceedings."). But a decision is not final if it is meant as a precursor to further discussions, or a cue for the requestors to produce more information, or an instruction for the requestors to follow reasonable procedures for submitting their request. *See Kooman*, 833 F. App'x at 627 (holding that a condominium's letter purporting to deny the plaintiff's modification request was not actually a denial because it invited the plaintiff to reach out with questions and a representative later told the plaintiff to submit a "doctor's note," which showed "that the matter was not over"); *Overlook Mut. Homes, Inc.*, 415 F. App'x at 621 (holding that defendants are "entitled to seek information from an allegedly disabled person in order to establish the existence of the disability and the necessity of the accommodation"); *Oxford House-C*, 77 F.3d at 253 ("The City has consistently said it cannot make an exception to the zoning code unless the Oxford Houses apply to the City's Board of Adjustments for a variance, and the Oxford Houses refuse to apply. Their refusal is fatal to their reasonable accommodation claim." (internal citation omitted)); *State and Local Land Use Laws and Practices and the Application of the Fair Housing Act*, Joint Statement of the Dep't of HUD & DOJ 16 (Nov. 10,

2016), https://www.justice.gov/opa/file/912366/download [https://perma.cc/2GCU-Z8S7] ("Where a local land use or zoning code contains specific procedures for seeking a departure from the general rule, courts have decided that these procedures should ordinarily be followed" as long as they are not "unreasonably burdensome or intrusive or . . . delay[ing].").

Another way for defendants to refuse an accommodation request is via "an undue delay in responding to" or a "failure to reach an agreement on an accommodation request." *Overlook Mut. Homes, Inc.*, 415 F. App'x at 621 (internal quotation marks and citation omitted). For example, "a housing provider that refuses to make a decision unless a requestor provides *unreasonably excessive* information could be found to have constructively denied the request by 'stonewalling' and short-circuiting the process." *Id.* at 622 (emphasis added). In cases of delay, courts may consider whether the requestors had the benefit of the accommodation while their request for it was pending. *See id.* at 623 (deeming it "important" that the plaintiffs were allowed to keep their service dog at home while they sought an exemption from their apartment's no-pets policy).

Finally, while the Sixth Circuit has stated that, "[a]s a general rule, housing providers should cooperate with residents to resolve disputes over reasonable accommodations rather than turning to the courts," *id*, it has also held that the FHA does not "impose[] an obligation . . . to engage in an interactive process" on either

party, *Groner*, 250 F.3d at 1047. *But see* Joint Statement of the Dep't of HUD & DOJ, *supra*, at 16 ("When a local government refuses an accommodation request because it would pose an undue financial and administrative burden, the local government *should* discuss with the requester whether there is an alternative accommodation that would effectively address [their] needs." (emphasis added)). Thus, in this circuit, defendants need not engage with those requesting accommodations that are not required by law.

### *Arguments*

Plaintiffs argue that Schmitt refused Atsalakis' request for accommodations when he responded that he was "'unable to accept' the 'request' and instead directed [Atsalakis] to 'make a formal application' once 'the ordinance ha[d] been officially adopted.'" (ECF No. 58, Response to Defendants' MSJ, PageID 8020) (quoting ECF No. 48-51, Oct. 3, 2019 Schmitt LTO Atsalakis, PageID 5952). They also assert that Atsalakis and Schmitt's subsequent coffee meeting, which "resulted in no resolution or relief," "did not retroactively change or amend this denial." (ECF No. 58, PageID 8020); *see also* (ECF No. 68, Reply to Plaintiffs' MPSJ, PageID 8512) (making the same point).

Plaintiffs state that it "is an open question" "whether the [interactive process] is required by the FHA in the zoning context." (ECF No. 68, Reply to Plaintiffs' MPSJ, PageID 8512) (comparing *Groner*, 250 F.3d at 1047 with Joint Statement of the

182

Dep't of HUD & DOJ, *supra*, at 16). But if an interactive process is required, they maintain, the "post-denial" coffee meeting would not have satisfied that requirement, "especially because Defendants have presented no evidence that [the meeting] included discussion of 'an alternative accommodation that would effectively address the disability-related needs of the group home's residents.'" (ECF No. 58, Response to Defendants' MSJ, PageID 8020) (quoting Joint Statement of the Dep't of HUD & DOJ, *supra*, at 16).

Finally, Plaintiffs emphasize that the Moratorium "did not somehow put a moratorium on enforcement of federal anti-discrimination law or pause [Defendants'] affirmative duty to accommodate people with disabilities." (ECF No. 58, Response to Defendants' MSJ, PageID 8019–20.)

Defendants claim that "[e]valuating an accommodation request is an interactive process that requires the applicant to provide information at the outset to justify the request, and to be responsive to inquiries that [the] City makes in an effort to tailor the appropriate accommodation." (ECF No. 44, Defendants' MSJ, PageID 8315) (citing *Newell v. Central Mich. Univ. Bd. of Trustees*, No. 19-11988, 2020 WL 4584050 (E.D. Mich. Aug. 10, 2020)); *see also* (ECF No. 59, Response to Plaintiffs' MPSJ, PageID 8315) (using the exact same language). They then state that:

> [D]espite the fact that the Moratorium prevented the City from immediately processing [Atsalakis'] request, the City still engaged Atsalakis in an effort to find a path for approving the Walnut house as a sober home, including by having Schmitt meet with Atsalakis – a

183

meeting that Atsalakis described "went well," but after which she withdrew from the interactive process of seeking a reasonable accommodation by declining to further reengage the City prior to filing this lawsuit.

(ECF No. 59, PageID 8316–17) (citing ECF No. 44-3, Dep. of C. Atsalakis, PageID 1316–18); *see also* (ECF No. 44, PageID 1166) (making the same point).

Defendants contend that "even if Plaintiffs had been authorized to *apply*, Plaintiffs' September 2019 letter did not expressly seek an exemption from the reasonable accommodation process of ZO § 5.14," and thus Defendants were not required to consider the letter, because it requested an accommodation without following that proper process. (ECF No. 63, Reply to Defendants' MSJ, PageID 8379) (emphasis original).

And finally, at oral argument, Defendants averred that Schmitt's response to Atsalakis' letter was not a final decision because he was a lower-level administrator without the power to pause the Moratorium and because Atsalakis could have appealed his decision.

*Analysis*

Schmitt, acting on behalf of the City, refused Atsalakis' request for reasonable accommodations. By telling Atsalakis that he was "unable to accept [her] [SLU] application request under the moratorium" and that she could "make formal application" "[o]nce the [new] ordinance ha[d] been officially adopted," (ECF No. 44-23, Oct. 3, 2019 Schmitt LTO Atsalakis, PageID 2233), Schmitt unequivocally

184

represented that the City would not allow Atsalakis an exemption from the Moratorium and that the matter was closed. At that point, Schmitt had issued a refusal, regardless of whether Atsalakis could have appealed his decision. *See Bryant Woods Inn, Inc.*, 124 F.3d at 602 ("Under the Fair Housing Act, however, a violation occurs when the disabled resident is *first denied* a reasonable accommodation, irrespective of the remedies granted in subsequent proceedings." (emphasis added)).

Defendants' arguments do not change this reality. Schmitt did not tell Atsalakis that he alone did not have the power to grant her request or that she should send it to someone higher up; instead, he sent Atsalakis a refusal letter in his capacity as a representative of the City, signing his name with his "Community Development Director" title and carbon copying other City officials and consultants. (ECF No. 44-23, Oct. 3, 2019 Schmitt LTO Atsalakis, PageID 2233.) Neither did Schmitt tell Atsalakis that he or the City would reconsider her request if she followed the procedures of § 5.14, nor could he since the City had enacted a Moratorium.[50]

And even if Schmitt could reverse his refusal—which he cannot, *Bryant Woods Inn, Inc.*, 124 F.3d at 602—the record does not reflect that Schmitt attempted to do so at his coffee meeting with Atsalakis. At that meeting, Schmitt told Atsalakis that

---

[50] Further, Defendants did not clearly raise these arguments—about Schmitt's lack of power and Atsalakis' failure to comply with ZO § 5.14 when requesting accommodation from the Moratorium—until oral argument and their Reply brief, respectively. Thus, in addition to failing for the reasons discussed above, these arguments fail for being late. *See Scottsdale Ins. Co.*, 513 F.3d at 553.

he wanted to resolve the issue, but not that he would grant her an exemption from the Moratorium. And he never followed up. (ECF No. 44-3, Dep. of C. Atsalakis, PageID 1316–17.) Thus, Defendants' argument that Schmitt did not refuse Atsalakis' request, but rather "engaged in the interactive process," is unpersuasive.[51]

In sum, Plaintiffs have established the first, second, third, and fifth elements for their first reasonable accommodation claim. But the fourth element for that claim presents a jury question. Therefore, both sides' Motions for Summary Judgment on Plaintiffs' first reasonable accommodation claim are **DENIED**.

### G. If Plaintiffs had standing to assert discriminatory treatment and interference claims against Schmitt, then Schmitt would be entitled to legislative immunity from such claims.

The Supreme Court has held that, "[r]egardless of the level of government, the exercise of legislative discretion should not be inhibited by judicial interference or distorted by the fear of personal liability." *Bogan v. Scott-Harris*, 523 U.S. 44, 52

---

[51] Defendants' citation to *Newell* is also misplaced. At the very beginning of their arguments, Defendants state that they are analyzing this reasonable accommodation claim "[u]nder the FHAA." (ECF No. 44, Defendants' MSJ, PageID 1164; ECF No. 59, Response to Plaintiffs' MPSJ, PageID 8314). But *Newell* evaluates its reasonable accommodation claim under the ADA and the Rehabilitation Act, and not the FHA. *See Newell*, 2020 WL 4584050, at *1, 8. Thus, *Newell* cannot establish that the "interactive process" is required by the FHA.

To the extent that Defendants were attempting to offer a separate defense to Plaintiffs' ADA reasonable accommodation claim by citing *Newell*, that attempt fails because it has not been adequately explained or developed. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997).

(1998); *see also Saboury v. City of Lansing*, 366 F. Supp. 3d 928, 930 (W.D. Mich. 2017) ("Council members are politically accountable to their constituents for the votes they cast. They are not accountable to the Court through the threat of personal liability for money damages."). Accordingly, "[i]t is well established that federal, state, and regional legislators are entitled to absolute immunity from civil liability for their legislative activities." *Bogan*, 523 U.S. at 46. And even "officials outside the legislative branch are entitled to legislative immunity when they perform legislative functions." *Id.* at 55.

"Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Id.* at 54. The Sixth Circuit "has adopted a two-part test for this determination":

> First, a court must consider the acts' form to determine whether "they were integral steps in the legislative process." Second, a court should analyze the substance of the defendant's acts to determine whether they bear "all the hallmarks of traditional legislation," including "a discretionary, policymaking decision implicating the budgetary priorities of the city and the services the city provides to its constituents."

*Saboury*, 366 F. Supp. 3d at 933–34 (internal citations omitted) (quoting *Guindon v. Twp. of Dundee, Mich.*, 488 F. App'x 27, 33 (6th Cir. 2012)).

Both the Supreme Court and the Sixth Circuit have held that "voting for an ordinance" is "quintessentially legislative." *Bogan*, 523 U.S. at 55; *Shoultes v. Laidlaw*, 886 F.2d 114, 117–18 (6th Cir. 1989) ("The Mayor and Council clearly

were acting in their legislative capacities in passing the 1978 zoning ordinance.").

But the Sixth Circuit has also held that if a "zoning action involves applying existing

zoning rules to a specific property, the question of legislative immunity becomes

more difficult because applying known rules and legislation to make a zoning

decision in this way is more likely to be administrative rather than legislative."

*Jaggers v. City of Alexandria*, No. 08-5213, 2009 WL 233244, at *5 (6th Cir. 2009)

(citing 8A Eugene McQuillian, The Law of Municipal corporations § 25.217 (3d ed.

2008) ("[A] zoning ordinance vesting in the municipal council the power to

determine whether a building permit should be granted . . . ordinarily is regarded as

administrative, rather than legislative in character.")); *see also Acevedo-Garcia v.*

*Vera-Monroig*, 204 F.3d 1, 9 (1st Cir. 2000) ("If the action involves establishment

of a general policy, it is legislative; if it singles out specifiable individuals and affects

them differently from others, it is administrative." (internal quotation and alteration

marks omitted)).

"It is the defendants' burden to establish the existence of absolute legislative

immunity." *Canary v. Osborn*, 211 F.3d 324, 328 (6th Cir. 2000).

### Arguments

Defendants argue that "[i]nsofar as the Complaint attempts to hold Mayor Proctor

liable only for his legislative acts of reviewing, discussing, and voting upon Ord.

929 as a member of the PC and City Council, Mayor Proctor is entitled to absolute

immunity." (ECF No. 44, Defendants' MSJ, PageID 1167.) They do not explicitly argue that Schmitt is entitled to legislative immunity. At oral argument, Defendants noted that they do not argue that Schmitt is so entitled on the basis of *enacting* the Moratorium and Ordinance for the simple reason that he did not actually enact them.

As noted above, Plaintiffs have agreed to dismiss Proctor from this case in his individual capacity. However, even though Defendants do not specifically broach the subject, Plaintiffs also make a point of asserting that Schmitt is not entitled to legislative immunity. They argue that Schmitt "rendered decisions specific to Plaintiffs that were administrative, not legislative in nature," including "at minimum, his denial of Plaintiffs' request for reasonable accommodations." (ECF No. 58, Response to Defendants' MSJ, PageID 8022) (citing *Jaggers*, 2009 WL 233244, at *4). And at oral argument, they argued that "no legislative immunity applies [] to Mr. Schmitt" because "he was not an elected official" and he was "saying [of his] own volition" as the Community Development Director that the City "should have a Moratorium," study the issue of sober living homes, and implement Ordinance 929, and those are administrative functions.

## *Analysis*

Even if Plaintiffs had standing to bring its intentional discrimination and interference claims against Schmitt, the Court would have **GRANTED** Schmitt legislative immunity under Federal Rule of Civil Procedure 56(f)(2). Schmitt's

proposal of and contributions to the enactment of the Moratorium were "integral steps in the legislative process" and "discretionary, policymaking decision[s]" rather than routine administrative functions. *Saboury*, 366 F. Supp. 3d at 933–34; *cf. HIRA Educ. Servs. N. Am. v. Augustine*, 991 F.3d 180, 189–90 (3d Cir. 2021) ("Vogel's introduction of Senate Resolution 154 and Sainato and Bernstine's presentation of it to the House were quintessentially legislative activities."); *Aitchison v. Raffiani*, 708 F.2d 96, 99–100 (3d Cir. 1983) ("[B]ecause the borough attorney was acting in direct assistance of legislative activity he was entitled to absolute immunity."); *N. Grove St. Props., LLC v. City of Elgin*, No. 15-cv-10925, 2016 WL 5477540, at *6 (N.D. Ill. Sept. 29, 2016) ("As Cogley's role was as an advisor and aide to the City Council, his communications to the City Council about what laws to pass and why to pass them—which would be protected if made by a legislator—are entitled to absolute legislative immunity."). Thus, Schmitt qualifies for legislative immunity with respect to these actions, regardless of his position when he took them and his intent behind them.

Defendants' assertion of legislative immunity for Proctor, along with their recognition that such immunity attaches to "legislative acts," (ECF No. 44, Defendants' MSJ, PageID 1167), are enough to raise the issue of whether legislative immunity should shield Schmitt too. Indeed, Plaintiffs felt compelled to address the issue. And it would be inequitable to deny immunity to Schmitt for his administrative

involvement in the Moratorium while immunizing Proctor for his role in actually voting to pass it. *Cf. NRP Holdings LLC v. City of Buffalo*, No. 11-cv-472S, 2017 WL 745860, at *11 (W.D.N.Y. Feb. 27, 2017) ("Deputy Mayor Casey has not moved to dismiss the RICO claim against him. However, having found that legislative immunity precludes the RICO claims against Mayor Brown and Council Member Smith, and that Deputy Mayor Casey is alleged only to have participated in the same conduct attributed to the other defendants, this Court finds *sua sponte* that Deputy Mayor Casey is also immune."), *aff'd,* 916 F.3d 177 (2d Cir. 2019); *Rini v. Zwirn*, 886 F. Supp. 270, 284 (E.D.N.Y. 1995) ("Although the Municipal defendants . . . do not explicitly assert the legislative privilege with respect to Middlemark, Biamonte, and Nedelka, it nevertheless follows from the assertion of the argument in favor of the individual Board members . . . that for the reasons stated, the aides are entitled to legislative immunity in that the complaint questions their conduct in the course of their duties in assisting to develop this legislation.").

The Court would also find it appropriate to grant Schmitt this immunity under Rule 56(f)(2), because Schmitt moved for summary judgment based on immunity generally, Plaintiffs moved for summary judgment against Schmitt for his involvement in enacting the Moratorium, and Plaintiffs presented argument on the specific issue of whether Schmitt is entitled to legislative immunity. *See Smith v. Perkins Bd. of Educ.*, 708 F.3d 821, 829 (6th Cir. 2013) (explaining that "whether

the prevailing party moved for summary judgment" and "what issues the parties

focused on in their briefs" are both relevant to whether a "losing party had sufficient

notice of the possibility that summary judgment could be granted against it" under

Rule 56(f)(2)).

### H. Schmitt is entitled to qualified immunity from the remaining claims against him.

Qualified immunity is an affirmative defense that shields "government officials

performing discretionary functions . . . from liability for civil damages." *Harlow v.

Fitzgerald*, 457 U.S. 800, 815–18 (1982). After an official raises the defense of

qualified immunity, the plaintiff bears the burden of showing that it does not apply.

*Blake v. Wright*, 179 F.3d 1003, 1007 (6th Cir. 1999).

The purpose of this defense is to balance "the need to hold public officials

accountable when they exercise power irresponsibly" with "the need to shield

officials from harassment, distraction, and liability when they perform their duties

reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Because qualified

immunity is "an *immunity from suit* rather than a mere defense to liability[,] . . . it is

effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*,

472 U.S. 511, 526 (1985) (emphasis original).

"Under the familiar test for qualified immunity, a public official is immune from

suit unless the plaintiff establishes: (1) a [statutory or] constitutional violation; and

(2) that the right at issue was 'clearly established' when the [violation] occurred."

*Gordon v. Bierenga*, 20 F.4th 1077, 1082 (6th Cir. 2021); *see also Hidden Vill., LLC*, 734 F.3d at 528–29 (granting qualified immunity to individual defendants on an FHA claim). Judges may address these steps in either order. *Pearson*, 555 U.S. at 236.

On the second step, "clearly established" is a "demanding standard" that "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The question governing this step is: did "the state of the law g[i]ve [the official] fair warning that [his] alleged treatment of [the plaintiffs] was un[lawful]"? *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

The answer to this question is yes only if, "at the time of the official's conduct, . . . 'every "reasonable official would understand that what he is doing"' is unlawful." *Wesby*, 138 S. Ct. at 589 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987))). This means that the law must have "clearly prohibit[ed] the offic[ial]'s conduct in the particular circumstances before him." *Id.*

### Arguments

Defendants argue that "Schmitt is [] shielded by qualified immunity." (ECF No. 44, Defendants' MSJ, PageID 1168.) They assert that "Plaintiffs do not have a clearly established right to be protected from hearing criticisms, for the City to

exercise a heckler's veto over citizen speech, to force City employees to make specific statements to citizens, or to be automatically granted a reasonable accommodation," and thus "[s]ummary judgment must be entered in Schmitt's favor." (ECF Nos. 44, PageID 1168.)

Plaintiffs respond that Schmitt "is [not] entitled to qualified immunity" because he "violated [their] longstanding and clearly established statutory rights by subjecting them to disparate treatment, denying them a reasonable accommodation, and interfering with their housing rights." (ECF No. 58, Response to Defendants' MSJ, PageID 8021) (citing the arguments made previously in the Response, ECF No. 48, Plaintiffs MPSJ, and *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019)).

Defendants reply that Plaintiffs "do little to challenge [Schmitt's] immunity other than restate their bare allegations against him. This is consistent with Plaintiffs' cross-motion for summary judgment, where they failed to make any arguments specific to Schmitt to establish his liability as a matter of law." (ECF No. 63, Reply to Defendants' MSJ, PageID 8380.) And they conclude that "[a]bsent any individualized argument, the Complaint against Schmitt must be dismissed on the basis of immunity or as a matter of law for failing to establish any claim against him." (ECF No. 63, PageID 8380.)

At oral argument, Plaintiffs reiterated their position that Ataslakis' accommodation requests were reasonable and necessary. They also noted that, when Schmitt denied these requests, the "contours" of the reasonable and necessary requirements and the fact "that [FHA] and ADA reasonable accommodation provisions take precedence over local law" were clearly established. Therefore, they maintained, Schmitt violated clearly established law when he issued his denial.

Plaintiffs also asserted at oral argument that Schmitt was not entitled to qualified immunity from their discriminatory statements claim, because he violated the clearly established prohibition on making statements that indicate discrimination when he, for example, emailed Myers: "We can't ban them outright, per the research into the court cases on the matter, and our ability to regulate is limited, but we believe we have a path forward that should help." (ECF No. 48-23, May 31, 2019 Schmitt ETO Myers, PageID 5430.) And the path forward culminated in Ordinance 929.

*Analysis*

Schmitt is entitled to qualified immunity from the claims remaining against him because Plaintiffs have not met their burden of showing that such immunity does not apply. *See Blake*, 179 F.3d at 1007.

First, if Plaintiffs had standing to bring their reasonable accommodation claim against Schmitt, Schmitt would be entitled to qualified immunity from the claim. Plaintiffs have not demonstrated that "any reasonable official" would have known

that denying Atsalakis' request for reasonable accommodations was unlawful. Plaintiffs are correct that at the time of denial it was clearly established that a city official cannot deny a request for an accommodation that is necessary to provide equal opportunity to housing to women recovering from substance abuse and reasonable given the circumstances, even if the accommodation requires an exemption from state or local laws. *See* Section III.F, *supra*. But it was not the case that "every reasonable official would [have] underst[ood] that" Atsalakis' request was both necessary and reasonable here. It would not have been unreasonable for an official to interpret Atsalakis' letter as requesting one extensive accommodation and then to conclude that that accommodation was not strictly necessary because it included a laundry list of demands such as the exemption from the one-year expiration of permission. *See* Section III.F, *supra*. And even if an official did separate out the two requests, as the Court has done, it would not necessarily have been unreasonable for the official to conclude that an exemption from the Moratorium was unreasonable, because (at least on this record) it is not entirely clear that the benefits of the exemption categorically outweighed its burdens. *See* Section III.F, *supra*.[52]

---

[52] Further, the amount of time (or lack thereof) that Schmitt spent on considering Atsalakis' request is inapposite. The reasonable accommodation provision of the FHA does not impose liability on a city official who fails to sufficiently consider an unnecessary or unreasonable request; it imposes liability on an official who denies a necessary and reasonable one. *See* Section III.F.5, *supra*. And Plaintiffs have not

Second and finally, Plaintiffs have not established that "any reasonable official" would have known that statements made by Schmitt violated the law. In fact, although Schmitt clearly moved for summary judgment on the basis that he has qualified immunity from all of Plaintiffs' claims against him, (ECF No. 44, Defendants' MSJ, PageID 1168), Plaintiffs' briefing does not address their "discriminatory statements" claim at all. *Cf. Mt. Pleasant Blacktopping Co., Inc. v. Greene Cnty., Ohio*, No. 21-3684, 2022 WL 1308513, at *2 (6th Cir. May 2, 2022) ("[Plaintiff] made no argument at all as to qualified immunity, clearly failing to carry its burden." (internal quotation marks and citation omitted)).

And Plaintiffs' opposition at oral argument to Schmitt's assertion of qualified immunity as to this claim came too late. At that point, Plaintiffs had already waived their response to Schmitt's assertion. *Cf. U.S. ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 450 n.6 (6th Cir. 2008) ("Defendant for the first time asserted at oral argument that Ms. Marlar's retaliation claim should fail . . . . Failure to allege this in its brief, however, waives the issue."); *Lane v. City of LaFollette, Tenn.*, 490 F.3d 410, 420 (6th Cir. 2007) ("As an initial matter, we note that Defendants Fannon and Hatmaker have waived this argument by not including it in their brief."); *Hertz Schram PC v. F.B.I.*, No. 12-cv-14234, 2014 WL 764682, at *10 n.4 (E.D. Mich.

---

brought an intentional discrimination claim against Schmitt for his denial of Ataslakis' accommodation requests. *See* (ECF No. 58, Response to Defendants' MSJ, PageID 8008–17); Section III.D, *supra*.

Feb. 25, 2014) ("Arguments raised for the first time at a hearing or oral argument are not properly before the Court."); *Sharp v. Ally Fin., Inc.*, 328 F. Supp. 3d 81, 105 (W.D.N.Y. 2018) ("[i]t is well-established in th[e] [Second] Circuit that new arguments raised in successive briefing papers will not be considered where those arguments could have been raised in a previous submission"). Indeed, Plaintiffs' surprise presentation of this argument did not afford Schmitt adequate time to prepare a rebuttal. *Cf. Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 309 (1st Cir. 2002) ("Defendants cannot utilize oral argument as a forum for unveiling new arguments of which plaintiffs did not have proper notice or opportunity to challenge."); *First Tenn. Bank Nat. Ass'n v. Glob. Title, LLC*, No. 09-cv-550, 2010 WL 5187834, at *1 (E.D. Va. Nov. 16, 2010) ("Raising such new arguments for the first time at oral argument undermines the purpose of orderly briefing and risks subjecting an opponent to an unfair disadvantage."), *report and recommendation adopted*, 2010 WL 5186745 (Dec. 15, 2010). And when Schmitt raised a new argument about individual immunity to ADA claims at the Hearing, Plaintiffs correctly pointed out that that argument should not "be heard at th[at] late date."

Accordingly, if Plaintiffs had standing to bring their claims against Schmitt, he would be **DISMISSED** from this case in his individual capacity on the basis of legislative and qualified immunity.

## I. Proctor and Schmitt are DISMISSED from the case in their official capacities.

Plaintiffs argue that Proctor—and, the Court assumes for consistency, Schmitt—should remain in this case "in [their] official capacity[ies]." (ECF No. 58, Response to Defendants' MSJ, PageID 8022) (citing *Blue Water Fin. Co. v. City of Lansing*, No. 97-cv-200, 1998 WL 278187, at *3 (W.D. Mich. 1998)). Defendants respond that "for both Proctor and Schmitt, the 'official capacity' claims must be dismissed because they are redundant of the action against the city." (ECF No. 63, Reply to Defendants' MSJ, PageID 8379–80) (citing *Jackson v. Shelby Cnty. Gov't*, No. 07-6356, 2008 WL 4915434, at *2 (6th Cir. Nov. 10, 2008)).

The Court agrees with Defendants. Plaintiffs' claims against Proctor and Schmitt in their official capacities are redundant to their claims against the City of Howell. *See Preston v. Cnty. of Macomb*, No. 18-12158, 2018 WL 11176494, at *1 (E.D. Mich. Dec. 14, 2018) ("A lawsuit against an officer in his official capacity is 'in all respects other than the name, to be treated as a suit against the entity.' Therefore, official-capacity claims are redundant when the entity itself is named, and it is appropriate for courts to dismiss such claims." (quoting *Foster v. Michigan*, 573 F. App'x 377, 390 (6th Cir. 2014)) (internal citations omitted)); *Jackson*, 2008 WL 4915434, at *2 ("[T]he district court properly granted summary judgment to the defendants on the claims against the sheriff in his official capacity because those

claims mirror the claims against the County, and are therefore redundant."). For that reason, Proctor and Schmitt are **DISMISSED** in their official capacities.

## CONCLUSION

Proctor and Schmitt are **DISMISSED** in their individual and official capacities.

Plaintiffs' claims under Mich. Comp. Laws §§ 37.1501–07 are **DISMISSED**.

Plaintiffs' disparate treatment claims as to Ordinance 929 are **DISMISSED.** And

Plaintiffs' denial of reasonable accommodation claims as to the second

accommodation requested by Atsalakis are **DISMISSED**.

Plaintiffs' remaining claims may proceed to trial. Specifically, these claims are

that:

1) The City of Howell enacted the Moratorium with discriminatory intent, in violation of the FHA (42 U.S.C. § 3604(f)(1)–(2)), the ADA (42 U.S.C. §12132), and the MPDCRA (Mich. Comp. Laws § 37.1302(a));

2) The City of Howell interfered with Plaintiffs' attempts to exercise their fair housing rights by enacting the Moratorium, in violation of the FHA (42 U.S.C. § 3617) and the ADA (42 U.S.C. § 12203(b));

3) The City of Howell refused to grant Plaintiffs the reasonable accommodation of their requested exemption from the Moratorium, in violation of the FHA (42 U.S.C. § 3604(f)(3)), the ADA (42 U.S.C. § 12132), and the MPDCRA (Mich. Comp. Laws § 37.1302(a)); and

4) The City of Howell could be liable for discriminatory statements made in violation of the FHA (42 U.S.C. § 3604(c)) and the MPDCRA (Mich. Comp. Laws § 37.1302(b)).

**IT IS SO ORDERED.**

Dated: December 13, 2022                    s/Paul D. Borman
                                            Paul D. Borman
                                            United States District Judge